AARON J. GREENSPAN
legal@thinkcomputer.org
THINK COMPUTER FOUNDATION
1132 Boranda Avenue
Mountain View, CA  94040-3145
Telephone: (415) 670-9350
Fax: (415) 373-3959

*PRO SE*

E-filing

**F I L E D**

MAY 2 3 2014

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

ADR

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| THINK COMPUTER FOUNDATION, an Ohio 501(c)3 non-profit corporation; THINK COMPUTER CORPORATION, a Delaware corporation, | Case No. **CV 14. 02396 BLF** |
| Plaintiffs, | **COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF** |
| v. | JURY TRIAL DEMANDED |
| ADMINISTRATIVE OFFICE OF THE UNITED STATES COURTS; UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA; and AMERICAN BAR ASSOCIATION, | **PSG** |
| Defendants. | |

COMPLAINT

Plaintiffs Think Computer Foundation (the "Foundation") and Think Computer Corporation, collectively, "Plaintiffs," hereby allege and state as their claims against the Defendants as follows:

## INTRODUCTION AND SUMMARY OF THE CASE

1.  As the direct embodiment of Article III of the United States Constitution, the United States Courts (the "Courts") are a vital public resource and asset. According to publicly available statistics, from the period starting June 30, 2012 and ending June 30, 2013, the Courts handled 283,087 civil case filings and 69,642 criminal case filings nationwide at the district level. At the appellate level, the Courts saw 56,360 filings. These statistics represent typical caseload levels in recent years.

2.  Individual federal court cases at the district and appellate levels are tracked and published on-line through an electronic filing system known somewhat interchangeably as CM/ECF and PACER, which are respectively acronyms for Case Management/Electronic Case Files (the system's "write" component) and Public Access to Court Electronic Records (the system's "read" component, used in this document to refer to the entire system for the sake of simplicity). PACER is managed, developed and maintained by Defendant Administrative Office of the United States Courts (the "AO"). The central PACER web site, http://www.pacer.gov, is one of many individual PACER web sites that the various district, bankruptcy and appellate courts each maintain with some degree of autonomy.

3.  Throughout the nation, no matter the type or level of court, Defendant AO mandates and collects public access fees for electronic access to PACER web pages and court documents. Such fees are authorized by Congress, but only to the "extent necessary." For years, the AO has completely ignored this deliberate Congressional limitation and has exploited its limited authorization, transforming PACER into a highly profitable crutch to

1    prop up the Courts' budget.  The AO's willful disregard of Congressional intent violates at

2    least the E-Commerce Act of 2002 and promotes societal inequality.

3         4.  The AO has imposed policies granting extremely limited free access to PACER to

4    its least demanding users and certain select academics, in an attempt to gloss over, quell

5    discussion around and otherwise excuse its unlawful activity.

6         5.  The imposition of un-"necessary" fees on litigants and the public inherently

7    biases the Courts in favor those parties with larger budgets, especially because PACER is

8    designed in such a way that it functions in an unreliable and erratic manner, often billing

9    users for the AO's programming mistakes.  *Pro se* and *in forma pauperis* litigants are among

10   the least able to afford such unlawful, unnecessary and erroneous fees, yet in a precedent-

11   based system, access to court documents is necessary for the successful prosecution of a case.

12        6.  Plaintiffs are active users of PACER and have paid roughly one thousand dollars

13   in unlawful, unnecessary and erroneous fees to Defendant AO simply to access public

14   information that Defendant AO incurs zero marginal cost to provide.

15        7.  The Courts are further biased in favor of parties with large budgets, and against

16   small businesses, through the imposition of specific local rules in each district and appellate

17   court that serve to collectively prohibit corporate self-representation in the United States of

18   America.  Such local rules ("the Restrictive Local Rules"), including Civil Local Rules 3-

19   9(b) and 5-1(b) in the Northern District of California, are unconstitutional, in violation of at

20   least the Equal Protection Clause and Due Process Clause of the Fourteenth Amendment to

21   the United States Constitution.

22        8.  The Restrictive Local Rules exist not to further the interests of justice, but as

23   protectionist measures designed to solidify the economic monopoly of Defendant American

24   Bar Association (the "ABA").

25

COMPLAINT

9.  To remedy these present, on-going and continuous facial and applied constitutional violations, and to put an end to the ongoing harm caused by Defendants, Plaintiffs seek declaratory and injunctive relief invalidating Civil Local Rules 3-9(b), 5-1(b) and the Restrictive Local Rules, and striking down the AO's fee structure for PACER to the extent that it fails to comport with the E-Government Act of 2002 and/or other laws.

## JURISDICTION

10. This action arises under 42 U.S.C. § 1983 and the First and Fourteenth Amendments to the Constitution of the United States.

11. This Court has original jurisdiction over these federal claims pursuant to 28 U.S.C. §§ 1331, 1337 and 1343.

12. This Court has authority to award the requested declaratory relief under 28 U.S.C. § 2201; the requested injunctive relief under 28 U.S.C. § 1343(3); and any attorney's fees under 42 U.S.C. § 1988.

## VENUE

13. Venue is proper under 28 U.S.C. § 1391 in the Northern District of California because a substantial part of the actions or omissions giving rise to this case occurred within this District, and at least one Defendant resides or operates within this District.

## THE PARTIES

### Plaintiffs

14. Plaintiff Think Computer Foundation is an Ohio non-profit corporation recognized by the Internal Revenue Service as a tax-exempt organization under § 501(c)(3) of the Internal Revenue Code. The Foundation operates PlainSite (http://www.plainsite.org), a popular web site that compiles government information, including information from the Courts via PACER, in order to make such information more accessible to the general public

1    (or put another way, in "plain sight.") PlainSite is housed on servers physically located in

2    Santa Clara County, in this District.

3        15. Plaintiff Think Computer Corporation is a Delaware corporation located at 1132

4    Boranda Avenue, Mountain View, CA 94040-3145 in Santa Clara County, in this District.

5    Think Computer Corporation develops the PlainSite software and plays an active role in its

6    management. Think Computer Corporation is also a litigant in this District and as such, is a

7    frequent user of PACER.

8                                **Defendants**

9        16. Defendant Administrative Office of the United States Courts ("AO") "serves the

10   federal Judiciary in carrying out its constitutional mission to provide equal justice under

11   law," according to its web site. The AO is a federal governmental entity headquartered in

12   Washington, D.C. with offices in Richardson, Texas, and oversees PACER in all respects.

13       17. Defendant United States District Court for the Northern District of California (the

14   "District Court") is a federal district court in the Ninth Circuit with control over its own

15   Local Rules. According to is web site, "the boundaries of the Northern District of California

16   encompass fifteen counties: Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin,

17   Mendocino, Monterey, Napa, San Benito, San Francisco, San Mateo, Santa Clara, Santa

18   Cruz, and Sonoma. The court has four courthouses (in San Francisco, Oakland, San Jose and

19   Eureka), fourteen district judgeships (also known as Article III judgeships) and eleven

20   magistrate judgeships."

21       18. Defendant American Bar Association is an Illinois corporation whose

22   headquarters and principal place of business are located in Chicago, Illinois. The ABA is

23   responsible for the accreditation of law schools within the United States, whose degrees are

24   required to sit for state bar exams. According to the ABA web site, "Since 1952, the Council

25

COMPLAINT

4

1  of the Section of Legal Education and Admissions to the Bar of the American Bar

2  Association has been recognized by the United States Department of Education as the

3  national agency for the accreditation of programs leading to the J.D. degree in the United

4  States." The ABA also writes various model rules and works in tandem with state bar

5  associations to regulate the legal profession. The ABA conducts business in this District; the

6  2013 ABA Annual Meeting took place in San Francisco, California.

## FACTUAL BACKGROUND

A.  *The AO Defies Congress by Relying on PACER Fees for Revenue*

19. Defendant AO's fee schedule for PACER (the "Fee Schedule"), supposedly "Issued in accordance with 28 U.S.C. § 1913, 1914, 1926, 1930, 1932," and attached to this Complaint as Exhibit A, generally specifies that users must pay $0.10 per "page" for PACER data and $2.40 per audio file.

20. Many PACER documents are stored as Adobe Acrobat Portable Document Format (PDF) files, which are paginated. However, numerous non-PDF pages on PACER are not explicitly paginated, forcing the AO's PACER software developers to guess how many pages *might* be needed to print such pages, and to charge accordingly. The fee for many PACER documents, and especially reports, is therefore arbitrarily determined.

21. PACER frequently charges a fee even for web pages that indicate that PACER encountered an error and failed to return the user's requested information.

22. The Fee Schedule states, "No fee is charged for access to judicial opinions." This is false; PACER often charges $0.10 per page for access to judicial opinions.

23. Wendell Skidgel, Senior Attorney for Defendant AO, stated in a March 24, 2014 e-mail to Plaintiffs, "the Judicial Conference of the United States' policy regarding written opinions clearly states that the authoring judge determines which a *[sic]* document meets the

1    definition of a written opinion." This "policy," which in fact does not appear in the Fee

2    Schedule, results in the arbitrary and unlawful levying of fees on users who have no

3    obligation to pay them. Furthermore, the word "judge" does not appear anywhere in the Fee

4    Schedule at all, suggesting a uniform, court-wide policy.

5        24. The distinction between opinions, orders, and other materials on PACER is

6    entirely arbitrary. All non-sealed data on PACER is public, non-copyrightable information

7    already in the public domain. Recent attempts by attorneys to enforce copyright law to cover

8    their legal briefs have been struck down. *See White et al v. West Publishing Corporation et*

9    *al*, Case No. 1:12-cv-01340 (S.D.N.Y. 2013).

10       25. The E-Government Act of 2002 (Public Law 107-347) was enacted on December

11   17, 2002, with an effective date for most provisions of April 17, 2003. § 205(e) of the E-

12   Government Act of 2002 read:

13           "(e) COST OF PROVIDING ELECTRONIC DOCKETING
             INFORMATION.—Section 303(a) of the Judiciary Appropriations Act, 1992
14           (28 U.S.C. 1913 note) is amended in the first sentence by striking 'shall
             hereafter' and inserting 'may, only to the extent necessary,'."
15
     The relevant note attached to 28 U.S.C. § 1913 was therefore modified to read as follows:
16
17           "(a) The Judicial Conference may, only to the extent necessary, prescribe
             reasonable fees, pursuant to sections 1913, 1914, 1926, 1930, and 1932 of title
             28, United States Code, for collection by the courts under those sections for
18           access to information available through automatic data processing equipment.
             These fees may distinguish between classes of persons, and shall provide for
19           exempting persons or classes of persons from the fees, in order to avoid
             unreasonable burdens and to promote public access to such information."
20
     The inclusion of the phrase "to promote public access to such information" is material to the
21
     limitation of "to the extent necessary," representing Congress's clear goal of making court
22
     information easily accessible to the general public, with as few obstacles as possible.
23
         26. Researchers at the Princeton University Center for Information Technology
24
     Policy ("CITP") examined PACER's financial records for 2010. According to their findings,
25

COMPLAINT

6

1   "We examined the Courts' budget documents from the past few years, and we discovered

2   that the Courts claim PACER expenses of roughly $25 million per year.  But in 2010,

3   PACER users paid about $90 million in fees to access the system."

4       27. Defendant AO's profit of $65 million from PACER fees in 2010 alone represents

5   a gross abuse of Defendant AO's statutory authorization to collect fees "to the extent

6   necessary."  Yet even the quoted figure of $25 million per year grossly inflates the true

7   market cost of operating an information system comparable in scope to PACER.  Upon

8   information and belief, such a system could be effectively run for under $1 million per year.

9       28. Plaintiffs' PlainSite web site, which surpasses PACER's functionality in a number

10  of respects[1] while still mirroring its core purpose and much of its contents, cost less than

11  $5,000 to develop using commodity hardware and open-source software, and costs less than

12  $2,500 to run on an annual basis.  PlainSite houses approximately 7 million dockets.  Even if

13  PlainSite were 100 times as large, with 700 million dockets, and were correspondingly 100

14  times as expensive, it would still only cost $250,000 at most to run on an annual basis—or

15  ten times less than PACER in 2010.

16      29. Upon information and belief, PACER only stores data corresponding to

17  approximately 50 million dockets.

18      30. On March 25, 2010, United States Senator Joseph I. Lieberman wrote to the

19  United States Senate Committee on Appropriations, stating in part:

20      "Since the passage of the E-Government Act, the vision of having information
    'freely available to the greatest extent possible' is far from being met, despite
21  the technological innovations that should have led to reduced costs in the past
    eight years.  In fact, cost for these documents has gone up, from $.07 to $.08-
22  per-page.  The Judiciary has attempted to mitigate the shortcomings of the

23  _____

[1] Unlike PACER, PlainSite is a universal docketing system that can track a case across courts and/or agencies,
24  improving navigation.  PlainSite also indexes parties, law firms, judges, assets, and attorneys, taking into
    account clerical errors, typographical errors, and ever-changing law firm names.  According to server logs,
25  Defendants use PlainSite on a daily basis, preferring its convenience and functionality to PACER.

COMPLAINT                7

current fee approach in a variety of ways, including limiting charges to $2.40-per-document and the recent announcement that any charges less than $10-per-quarter will be waived. While these efforts should be commended, I continue to have concerns that these steps will not dramatically increase public access as long as the pay-per-access model continues."

31. Defendant AO reacted to Senator Lieberman by doubling down on its unlawful and discriminatory behavior. It notified PACER users of *another* price increase effective April 1, 2012, causing the cost per PACER "page" to increase from $0.08 to $0.10, the current price.

32. Due to Defendant AO's continuous, multi-year, willful abuse of its statutory authorization, users of PACER who have paid fees, including but not limited to Plaintiffs, are collectively owed refunds totaling several hundred million dollars.

33. Defendant AO's unlawful activities have directly contributed to the loss of at least one life, namely, open information activist Aaron Swartz.

34. Defendant AO launched a pilot program at certain law libraries nationwide in September, 2008 involving free access to PACER. Swartz was one member of a team of researchers affiliated with CITP, and personally assisted in the acquisition of PACER data (approximately 710,000 dockets plus associated documents) from the pilot program. Defendant AO reacted by suspending the pilot program on October 1, 2008 and referring the matter to the Federal Bureau of Investigation. *See* Exhibit B. Though criminal charges were never filed against Swartz directly regarding the PACER pilot program, Swartz was charged in a similar incident on July 14, 2011 involving academic (as opposed to legal) texts, despite the plain requests of the involved parties (namely, JSTOR) not to proceed with any charges. Under intense pressure due to the trumped-up criminal prosecution, and with dwindling financial resources due to typically outrageous attorney fees, Swartz committed suicide on January 11, 2013.

35. Upon information and belief, the criminal charges ultimately filed against Aaron Swartz were largely informed by and/or retribution for the 2008 PACER pilot program episode.

36. Upon information and belief, Defendant AO encouraged the United States Department of Justice to file criminal charges against Aaron Swartz.

37. Aaron Swartz's premature death was entirely avoidable.

B.    **_Plaintiffs' Attempts to Clarify Their Own PACER Fees_**

38. Plaintiffs have attempted on a number of occasions to clarify the reason why they must pay $0.10 per page to receive PACER error messages, documents that are clearly court opinions, or any court documents at all, including but not limited to judicial financial disclosure forms.

39. On February 9, 2012, the Foundation wrote an open letter to Defendant AO and Plaintiffs' representative in Congress, Anna Eshoo, highlighting the many problems with PACER's billing structure, including but not limited to its discriminatory nature.

40. Congresswoman Eshoo's March 21, 2012 response erroneously stated, "Currently, any individual may search PACER for free and can obtain copies of all final opinions (including convictions) without charge."

41. Defendant AO did not respond to the Foundation at all until Congresswoman Eshoo directed them to do so. The AO's eventual June 11, 2012 response from Michel Ishakian, Chief, Public Access and Records Management Division, contained the outright falsehood, later contradicted by Senior Attorney Skidgel, that "free access to judicial opinions is provided." *See* Exhibit C.

42. In her response, Ms. Ishakian also attempted to portray satisfaction with PACER as being at a "high level." This was typical of Ms. Ishakian, whose efforts on behalf of

Defendant AO have consisted primarily of whitewashing a broken system. A May 1, 2014 letter to the editor of the *ABA Journal* highlighted a different take:

> "PACER is evocative of our broken criminal justice system: willfully deficient, where justice is only available to those who can afford it. The real obstacle to change is the fear of government officials, who have become accustomed to the lack of transparency that has become the platform for their corrupt practices. Because fixing PACER is only the first step.
>
> What crimes does the government often charge, only to later drop? How many people like Aaron Swartz are there, bullied and threatened with inflated accusations? How often is a particular person a witness in a case, e.g., a known corrupt cop or expert witness? Those are questions only machine-readable bulk data, accessible to everyone for free, can answer.
>
> It is high time the chief justice of the United States—as the presiding officer of the Judicial Conference of the United States, the supervisory body with authority over both the Administrative Office of the United States Courts and PACER—takes action. And if he won't do his job, then Congress should.
>
> Eric Branson
> Denver"

43. Defendant AO has repeatedly refused to refund Plaintiffs' PACER fees for any reason, even when such fees were generated for error messages or court opinions, let alone any other kind of public domain information.

C.  **The United States Courts Routinely Deny Small Businesses and Non-Profit Organizations "Access to Justice"**

44. "Access to Justice" is a buzzword frequently used in legal academic circles and the Courts that has largely become devoid of meaning as the price of legal services has skyrocketed beyond the affordability of much of the American middle class. Typical hourly rates for associates range from $300 to $400 per hour, while partners often charge in excess of $500 per hour. In 2012, median household income in the United States was $51,017, which, if entirely devoted to attorney fees (a ridiculous but common expectation), would pay for only 170 hours of an "inexpensive" associate's time, or only 102 hours of a partner's time—about enough time to research, draft, review and file one or two complex motions.

45. Self-representation is a right, grounded in 28 U.S.C. § 1654 since 1948, and 28 U.S.C. § 394 before that, long afforded to individuals in the United States. The statute itself uses the term "parties," but delegates authority to "the rules of such [United States] courts."

46. The landmark case of *Gideon v. Wainwright*, 372 U.S. 335 (1963), linked the separate concepts of effective legal representation and affordability by ruling that state courts were required to provide counsel in criminal cases where defendants could not afford a lawyer. Of course, individuals are not required to hire lawyers. Yet corporations are.

47. Paradoxically, there is no inverse principle to *Gideon* for corporations involved in civil cases. If counsel is too expensive, a case cannot proceed.[2] This notable gap in the legal system, caused by a combination of the protectionist rules described herein and general market failure, eviscerates the legal rights of an enormous class of corporate persons and the underlying individual entrepreneurs, who tend to be those very persons most in need of the Courts' services.

48. The District Court's Civil Local Rule 3-9(b), under the heading "Parties," states:

"(b)  Corporation or Other Entity.  A corporation, unincorporated association, partnership or other such entity may appear only through a member of the bar of this Court."

49. Small businesses, which are typically incorporated as corporations, are generally thought to be responsible more than 50% of the United States Gross Domestic Product (GDP), and "represent 99.7 percent of all employer firms" according to the United States Small Business Administration. *See* Exhibit D.

---

[2] Frequently, civil litigation is a "life-or-death" proposition for a small business; an unfavorable outcome, or the inability of the corporation to access the justice system at all, can mean the end of the business. "'Obviously Fourteenth Amendment cases dealing with state action have no application here, but if they did, we believe that to deprive civilian dependents of the safeguards of a jury trial here...would be as invalid under those cases as it would be in cases of a capital nature.' 361 U.S., at 246-247." *Gideon, supra,* at 348-349.

COMPLAINT

11

50. Plaintiff Think Computer Corporation is one such small business. In mid-2011 its main product, FaceCash®, became inoperable after financial industry lobbyists convinced the California legislature to begin regulating domestic money transmission for the first time in an unconstitutional manner. In order to continue as a business, Think Computer Corporation's only option was to sue over the constitutionality of the relevant state statute in this Court, and eventually, to attempt to protect itself from the resulting unfair competition that the new statute encouraged, as well. *See Think Computer Corp v. Venchiarutti et al*, Case No. 5:11-cv-05496-HRL (N.D. California 2011); *see also Think Computer Corp. v. Dwolla, Inc. et al*, Case No. 5:13-cv-02054-EJD (N.D. California 2013). Doing so required Think to spend large sums on attorney fees due to Civil Local Rule 3-9(b).

51. In 2012, Plaintiff Think Computer Corporation would have turned a small profit were it not for the attorney fees necessitated by Civil Local Rule 3-9(b). The corporation posted a 2012 net loss of $41,226.95, having spent $52,552.95 on attorney fees throughout the fiscal year. In 2013, attorney fees of $36,778.75 constituted the vast majority (82.73%) of the corporation's $44,451.96 net loss.

52. Think Computer Foundation is primarily funded by Think Computer Corporation. For every dollar spent on avoidable and unnecessary attorney fees and not donated, the Foundation cannot use those same funds to further the goals of its charter.

53. Due to attorney fees necessitated by Civil Local Rule 3-9(b), the undersigned has not paid himself a salary as President & CEO of Plaintiff Think Computer Corporation since 2011.

54. Civil Local Rule 3-9(b) is frequently cited in rulings denying access to justice to small businesses and non-profit organizations that cannot afford or for any reason do not want counsel, as is the case with similar Restrictive Local Rules in other districts. *See Dr.*

1   *JKL Ltd. v. HPC IT Education Center*, 749 F. Supp. 2d 1038 (N.D. California 2010). *See*

2   *also Walnut Creek Manor, LLC v. Mayhew Center, LLC*, Case No. 4:07-cv-05664-CW (N.D.

3   California 2013).

4       55. The legal rationale for Restrictive Local Rules is inconsistent. The issue of

5   corporate self-representation has hardly been given any serious consideration since the

6   Supreme Court's cursory and tangential mention of the topic in *Rowland v. California Men's*

7   *Colony, Unit II Men's Advisory Council*, 506 U.S. 194 (1993), two years prior to the advent

8   of the commercial internet—a technological transformation that has changed how citizens

9   and corporations alike interact with Government. Nonetheless, even in *Rowland*, the

10   Supreme Court explained that while 28 U.S.C. § 1915 once made reference to "citizens"—a

11   term that courts in the 1930s considered to be exclusive of corporations—it had been

12   changed to "persons" in 1959. In the ruling, Footnote 2 surrounding this discussion points

13   out that the change emanated from the Judicial Conference's concern that singling out aliens

14   from citizens "may be unconstitutional." *Id.* Either way, Congress has never made any

15   statutory determination that corporations should be exempt from the ability to represent

16   themselves or appear *in forma pauperis*.

17       56. In *Palazzo v. Gulf Oil Corporation*, 764 F.2d 1381 (11th Cir. 1985), the Court

18   ruled that a business owner, Frank Palazzo, could not represent the interests of his

19   corporation despite his repeated attempts to do so. In its ruling, the Court cited a long string

20   of precedential cases dating back to 1824, all consistently interpreting 28 U.S.C. § 1654 in

21   the same limited fashion, excluding corporations from representing themselves "personally"

22   due to the lack of a physical person that might appear.

23       57. One of the only federal court decisions to ever properly analyze the matter of

24   corporate self-representation dates back to 1976, in which a District Judge of the Eastern

25

District of New York allowed a bankruptcy case to proceed with a corporation representing itself. *In the Matter of Holliday's Tax Services, Inc.*, 417 F.Supp. 182 (E.D.N.Y. 1976). In this ruling, Judge Weinstein pointed out:

> "Were counsel freely available to lower and middle income persons in civil cases, the traditional rule requiring corporations, whether large or small, to appear by a lawyer would work no hardship. But the lack of a guarantee of counsel to persons of modest means like Mr. Holliday remains one of the scandals of our judicial system."

*Id.* at 183. Judge Weinstein continued:

> "The traditional rule is unnecessarily harsh and unrealistic when applied in bankruptcy to small, closely-held corporations. They are set up by the thousands. Many, such as the one before us, are in the name of the person doing business. In these instances, incorporation is merely a technicality, facilitating competitive economic activity by individuals. Failure of the 'corporation' is, for all practical purposes, the failure of the individual entrepreneur."

58. In 1958, Congress passed the Technical Amendments Act of 1958 (72 Stat. 1650), which amended the Internal Revenue Code of 1954 by creating a new sub-chapter S at the end of chapter 1. Since then, millions of "S corporations" have come into being. Instead of being taxed at the corporate level, as corporations typically are, businesses that have availed themselves of a sub-chapter S election pass all of their earnings (or losses) through to their shareholders for tax purposes, of whom there may be no more than 75 (though the initial limit was 10).

59. For subchapter-S corporation owners, the District Court's Civil Local Rule 3-9(b) and other Restrictive Local Rules lead to a situation involving taxation without representation, in which shareholders in—and frequently 100% owners of—sub-chapter S corporations are responsible for paying taxes not as corporations, but *as individuals, on their personal Internal Revenue Service Form 1040 tax return*, on both their income *and their business earnings*, yet are legally prohibited from representing their own individual business

1    interests.  Put another way, an election to convert a sole proprietorship or partnership—each

2    of which could appear *pro se* in a federal court without issue—to an S corporation solely for

3    tax reasons has the undesired, unintended, and wholly arbitrary side-effect of waiving a

4    business owner's First Amendment right to free speech in a court of law, solely because of

5    Restrictive Local Rules such as Civil Local Rule 3-9(b).

6         60. Small businesses sometimes pay more taxes than the largest companies in the

7    United States of America, whose lawyers exploit tax loopholes to move income overseas.

8    For example, General Electric filed a 57,000 page tax return on $14 billion in profits in 2010,

9    but paid no taxes.  Restrictive Local Rules therefore prohibit those same small businesses

10   who fund the Courts from making use of them, while large corporations who can afford

11   counsel (perhaps thanks to their tax evasion schemes) get a free ride.

12        61. In *Citizens United v. Federal Election Com'n*, 130 S. Ct. 876 (2010), the Supreme

13   Court ruled that "political speech does not lose First Amendment protection because its

14   source is a corporation." *State v. Tennant*, West Virginia Supreme Court of Appeals (2012).

15   Or, put another way, "the government may not suppress political speech on the basis of the

16   speaker's corporate identity." *Morgan v. Swanson*, 659 F. 3d 359 (5th Cir. 2011).  Yet this

17   happens daily in federal courtrooms as corporations—but only the smallest ones—are kicked

18   out simply by virtue of the fact that they are corporations who generally cannot afford

19   counsel.

20        62. Corporations are no more themselves able to "decide" to "donate" to political

21   candidates that they are able to "represent themselves."  In each case, the corporation,

22   comprised of individuals, acts through the actions of its officers and/or its board of directors.

23   In this regard, the issues of political speech and courtroom speech are one in the same,

24

25

COMPLAINT                                                    15

1    especially considering that many court cases involving businesses affected by Restrictive

2    Local Rules also involve decidedly political issues.

3        63. Historical rationales for prohibiting corporate self-representation border on the

4    absurd. "The reasons for requiring that a party, unless exercising his constitutional right to

5    represent himself, be represented by an attorney are principally that the conduct of litigation

6    by a non-attorney creates unusual burdens for his adversaries and the court, as well as for the

7    party he would represent. 'The lay litigant frequently brings pleadings that are awkwardly

8    drafted, motions that are inarticulately presented, [and] proceedings that are needlessly

9    multiplicative.'[3] *Jones v. Niagara Frontier Transportation Authority*, 722 F.2d 20, 22 (2d

10   Cir.1983); see also id. (the lay litigant also lacks many of the attorney's ethical

11   responsibilities, such as to avoid litigating unfounded or vexatious claims)." *Berrios v. New*

12   *York City Housing Authority*, 564 F. 3d 130 (2nd Cir. 2009). In no other context is any court

13   permitted to deny justice to a party simply because that party's potential future activity *might*

14   prove to be a nuisance. Such reasoning is *prima facie* evidence of discrimination against

15   small businesses and those generally unable to afford what is typically overpriced legal

16   counsel.

17       64. The notion that attorneys are more ethically bound and/or superior to laymen, and

18   therefore uniquely able to represent corporations, is similarly without merit. Plaintiffs have

19   encountered, and via PlainSite, documented, catalogued, and indexed, a wide variety of

20   unscrupulous behavior on the part of lawyers, ranging from chronic over-billing, to forgery,

21   to fraud, to outright malpractice, far too extensive to document here.

22

23

24   [3] Even if this were true, the Courts' various caseload issues could be resolved through better use of web-based
     error-checking technology, commonly found on commercial web sites that process much higher volumes of
25   customer requests.

65. Attorneys practicing before every federal court routinely face sanctions from both judges and bar associations for unethical conduct, and more alarmingly, frequently escape the consequences of such conduct until it is so egregious that it is completely undeniable. For example, "Steele, Hansmeier, and Duffy ('Principals') are attorneys with shattered law practices. Seeking easy money, they conspired to operate this enterprise and formed the AF Holdings and Ingenuity 13 entities (among other fungible entities) for the sole purpose of litigating copyright-infringement lawsuits." *Ingenuity 13 LLC v. Doe*, Case No. 2:12-cv-8333-ODW(JCx) (C.D. California 2013). In other words, the present system favored by the Courts is one in which attorneys "Steele, Hansmeier, and Duffy" are presumed ethically sound enough to represent a corporation, but the average small business owner is not.

66. The effects of Restrictive Local Rules are disproportionately felt by small businesses. Due to the shareholder limitation, S corporations tend to be small, with less than $1 million per year in revenue, while larger companies opt for C corporation status. Large corporations that can afford to hire lawyers regardless of the situation, and will, are by definition not affected by the Restrictive Local Rules, further focusing their impact on the small business sector.

67. Restrictive Local Rules set the Courts apart from the rest of the legal world. Corporations are permitted to represent their own interests via officers or directors before the executive branch, such as in the context of the United States Patent and Trademark Office Trademark Trial and Appeal Board. Corporations are also permitted to represent themselves in small claims courts nationwide. In those venues, the supposedly unusual challenges of "needlessly multiplicative" and/or inarticulate pleadings are somehow managed.

68. In the aforementioned non-Court venues, *pro se* filers are permitted to file electronically as would anyone else. Yet Civil Local Rule 5-1(b) in this District mandates

that *pro se* filers must use paper until such time as a motion for electronic filing is approved by a judge. Attorneys can file electronically without any needed approval. In this way, the Courts actually *mandate* that *pro se* filers *must* file "needlessly multiplicative" motions.

69. Many legitimate cases involving corporate plaintiffs either cannot be prosecuted due to the prohibitive expense of counsel or due to the fact that many lawyers simply refuse to take the time to understand a plaintiff's needs without the promise of a large monetary incentive at some point during the proceedings. Therefore, the Restrictive Local Rules frequently quash meritorious civil claims before they ever see the inside of a courtroom.

70. Upon information and belief, the true purpose of the Restrictive Local Rules is to attempt to increase demand for attorneys, whose private interests are collectively represented by Defendant American Bar Association.

71. Upon information and belief, Defendant American Bar Association has conspired with the various Courts, including Defendant United States District Court for the Northern District of California, to impose Restrictive Local Rules. Many officials of the Courts are, by virtue of their position, also ABA members or officials.

72. *Pro se* and *in forma pauperis* litigants do not have lobbying or other special interest groups they can rely upon to represent their interests before Congress—for they are not a special interest; they are simply the American people. Minority rights and civil liberties special interest groups and organizations whose interests might overlap tend to focus on more acute and cohesive issues, leaving ordinary citizens without advocates.

73. Few lawyers, if any, are willing to sign their name to a complaint that could weaken the legal profession's monopoly, let alone a complaint that might be perceived as antagonistic toward the Courts. Even academic lawyers who might be interested in the

COMPLAINT

18

1    underlying legal principles generally plan to file other cases in the long term, and are loathe

2    to take any action that might jeopardize a career as a successful legal academic.

3    ## CLAIMS FOR RELIEF

4    ### FIRST CLAIM

5    *Against Defendant United States District Court for the Northern District of California*
     *For Violation of the Equal Protection Clause of the Fourteenth Amendment*

6    *(42 U.S.C. § 1983)*

7    74. Plaintiffs re-allege and incorporate by this reference each and every allegation set

8    forth in this Complaint as if the same were fully set forth herein.

9    75. Civil Local Rules 3-9(b), 5-1(b) and similar Restrictive Local Rules in district

10   and/or appellate courts nationwide are facially unconstitutional, as they violate the Equal

11   Protection Clause of the Fourteenth Amendment to the United States Constitution.

12   76. Civil Local Rules 3-9(b), 5-1(b) and similar Restrictive Local Rules in district

13   and/or appellate courts nationwide, including but not limited to Defendant United States

14   District Court for the Northern District of California, have the effect of granting equal

15   protection under the law to only those corporations, limited liability companies, limited

16   partnerships, and other such entities that can afford or otherwise desire counsel, amounting to

17   only the largest corporations in the United States. In this manner, Civil Local Rules 3-9(b),

18   5-1(b) and similar Restrictive Local Rules discriminate against small businesses in an

19   unconstitutional manner.

20   77. In 1976, District Judge Weinstein of the Eastern District of New York recognized

21   the constitutional flaw in disallowing corporate representation:

22   > "'Equal' application of the law to all corporations, large and small, is,
     > likewise, a specious rationale for the grossly inequitable treatment of small
     > businesses. Equal-rights-to-sleep-under-bridges jurisprudence is no longer

23   > viewed with favor."

24   *In the Matter of Holliday's Tax Services, Inc., supra* at 184.

25

COMPLAINT                                              19

78. Defendants, acting under color of law for the purported goal of protecting the Courts, have enforced Civil Local Rules 3-9(b), 5-1(b) and similar Restrictive Local Rules on the supposed grounds that to do otherwise would mire the Courts in meritless and vexatious litigation, despite simultaneously allowing notorious copyright and patent trolls—all represented by counsel—to instigate a plethora of meritless and vexatious litigation.

79. Defendants have enforced Civil Local Rule 3-9(b) and similar Restrictive Local Rules merely for the convenience of the Courts and the economic benefit of the lawyers associated therewith. In the words of Judge Weinstein, "[A] person's day in court is more important than the convenience of the court." *Id.*

80. Defendants have enforced Civil Local Rule 3-9(b) and similar Restrictive Local Rules against sub-chapter S corporations, even though the Internal Revenue Code does not recognize such corporations as independent persons for the purposes of taxation, but more akin to a kind of property asset. The net effect is one of the Courts discriminating against certain kinds of property owners, who happen to pay for the Courts' operations, including the salaries of the Courts' employees, with the tax revenues derived from their property.

81. The taxation of small business owners who lack the right to self-representation of their business interests in the Courts is akin to the type of grievous injustice suffered by the British colonists of the mid-eighteenth century who founded this country. Notably, the American Revolution of 1765-1783, spurred by cries of "No taxation without representation," pre-dates the 1824 precedent used to justify the Courts' discrimination.

82. Defendants have enforced Civil Local Rule 5-1(b) and similar Restrictive Local Rules to actively discourage access to justice for *pro se* litigants.

83. Defendants, whose individual actors are mostly themselves attorneys, have made utterly meritless claims, wholly unsupported by data, with the force of law, presuming the

1   ethical nature of attorneys to be superior to the ethical nature of all other persons due to

2   attorney "duties," in a manner that blatantly defiles the Equal Protection Clause.

3       84. Nullification of the Restrictive Local Rules would not preclude the hiring of

4   attorneys by corporations at any point during legal proceedings, and might actually

5   encourage the hiring of attorneys in matters that would have otherwise never have reached

6   the Courts' various doorsteps.

7       85. All conditions precedent to the bringing of this action have occurred or have been

8   exhausted.

9       86. Plaintiffs have incurred or will incur costs for attorneys and other necessary fees

10  and costs which are recoverable in this action under the provisions of 42 U.S.C. § 1988.

11      87. Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiffs are entitled to declaratory

12  relief and a preliminary and permanent injunction invalidating and restraining enforcement of

13  Civil Local Rules 3-9(b), 5-1(b) and similar Restrictive Local Rules.

14
                            **SECOND CLAIM**
15  *Against Defendant United States District Court for the Northern District of California*
    *For Violation of the Due Process Clause of the Fourteenth Amendment (42 U.S.C. § 1983)*
16
        88. Plaintiffs re-allege and incorporate by this reference each and every allegation set
17
    forth in this Complaint as if the same were fully set forth herein.
18
        89. Civil Local Rule 3-9(b) and similar Restrictive Local Rules in district and/or
19
    appellate courts nationwide are facially unconstitutional, as they violate the Due Process
20
    Clause of the Fourteenth Amendment to the United States Constitution.
21
        90. In applying and enforcing Restrictive Local Rules, the Courts evaluate civil
22
    claims not on their merits, but by the identities of their filers, without allowing certain of
23
    those filers, namely, unrepresented corporations, any opportunity for due process via the very
24
    judicial system that is specifically designed to evaluate the merits of claims.
25

COMPLAINT                              21

91. Plaintiffs have incurred or will incur costs for attorneys and other necessary fees and costs which are recoverable in this action under the provisions of 42 U.S.C. § 1988.

92. Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiffs are entitled to declaratory relief and a preliminary and permanent injunction invalidating and restraining enforcement of Civil Local Rules 3-9(b), 5-1(b) and similar Restrictive Local Rules.

### THIRD CLAIM
***Against Defendant Administrative Office of the United States Courts***
***For Violation of the Equal Protection Clause of the Fourteenth Amendment***
***(42 U.S.C. § 1983)***

93. Plaintiffs re-allege and incorporate by this reference each and every allegation set forth in this Complaint as if the same were fully set forth herein.

94. Defendant AO's PACER Fee Schedule discriminates against low-income persons who cannot afford to pay extra, unlawful fees for access to information already in the public domain that is necessary to further their legal interests.

95. The existence of Defendant AO's $15.00-or-below per quarter PACER fee exemption demonstrates Defendant AO's awareness of the discriminatory nature of its PACER Fee Schedule.

96. Defendant AO's PACER system generally discriminates against any litigant who is unable to receive e-mail confirmations of every single electronic filing, since the free copy of each filing is contained in an e-mail link only sent once, at the time the filing is received by PACER's servers.  In many if not all districts, *pro se* filers must fill out special forms that attorneys do not need to, in order to specifically request the ability to make use of electronic filing via PACER.  "[T]he *pro se* party may not file electronically unless the *pro se* party moves for and is granted permission by the assigned judge to become an ECF user in that case."  Civil Local Rule 5-1(b).  This extra hurdle for *pro se* filers violates the Equal

1   Protection Clause on its face, and to the extent that *pro se* filers do not clear the hurdle, they

2   end up on a playing field that much more tilted as they are required to pay $0.10 per page for

3   access to their own case filings.

4       97. With some court cases involving many thousands of pages of documents, all

5   priced at $0.10 per page, researching a single case might realistically cost several hundred

6   dollars, making the $15.00-or-below per quarter PACER fee exemption practically worthless.

7       98. The Courts are clear about the need for *pro se* and *in forma pauperis* litigants to

8   act according to the same rules as represented litigants—even if such action is financially

9   impossible due to the Court's own unconstitutional policies.

10      99. Before accessing a single case, the need to possess a credit or debit card in order

11  to merely sign up for PACER discourages low-income persons without access to such

12  payment cards from pursuing their legal rights, discriminating against them on the basis of

13  their ability to engage with the financial system, which is often the primary reason why low-

14  income persons avail themselves of the Courts to start with.  Discrimination against persons

15  without access to the financial system, or without sufficient credit necessary to establish a

16  payment card account, violates the Equal Protection Clause.

17      100.   Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiffs are entitled to declaratory

18  relief and a preliminary and permanent injunction invalidating and restraining enforcement of

19  Defendant AO's PACER Fee Schedule.

20                                **FOURTH CLAIM**
            ***Against Defendant Administrative Office of the United States Courts***
21  ***For Violation of the Due Process Clause of the Fourteenth Amendment (42 U.S.C. § 1983)***

22      101.   Plaintiffs re-allege and incorporate by this reference each and every allegation

23  set forth in this Complaint as if the same were fully set forth herein.

24

25

---

102. Defendant AO unlawfully levies fees for public access to PACER far in excess of what is "necessary" to promote public access, in violation of the E-Government Act of 2002.

103. Plaintiffs repeatedly requested refunds of their unlawfully-derived PACER fees from Defendant AO and were denied each time.

104. There exists no formal process by which one may appeal Defendant AO's refusal to refund PACER fees, effectively vesting ultimate authority in a single, unelected government bureaucrat.

105. By engaging in the conduct alleged hereinabove, Defendants have established customs, policies, patterns, and practices of enforcing and collecting PACER fees under color of law, and have deprived Plaintiffs of their due process rights, in violation of the Fourteenth Amendment to the United States Constitution.

106. Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiffs are entitled to declaratory relief and a preliminary and permanent injunction invalidating Defendant AO's PACER Fee Schedule as being in violation of the E-Government Act of 2002, and restraining enforcement of Defendant AO's ability to collect any further PACER fees from Plaintiff or any other entity until such time as PACER's lifetime operational costs necessarily exceed Defendant AO's cumulative collections.

## FIFTH CLAIM
*Against Defendant United States District Court for the Northern District of California For Violation of Plaintiffs' First Amendment Rights (42 U.S.C. § 1983)*

107. Plaintiffs re-allege and incorporate by this reference each and every allegation set forth in this Complaint as if the same were fully set forth herein.

108. Plaintiffs are corporations entitled to the right to political speech the same as any other person, regardless of venue.

109.     By virtue of this action, Plaintiffs formally challenge the role of Defendant AO to use PACER as a general funding mechanism for the Courts in response to political maneuvering by Congress over several years. This action is therefore inherently political in nature, and constitutes a form of political speech.

110.     Pursuant to Civil Local Rule 3-9(b) and similar Restrictive Local Rules, Plaintiffs are not permitted to speak about such issues, or any issue, in the venue of the United States Courts, except through an expensive proxy with a financial incentive to distort Plaintiffs' statements to the extent they may represent a threat to the legal profession. Plaintiffs' choice between forced government censorship or speech forced through a government-sanctioned proxy violates Plaintiffs' First Amendment rights.

111.     All conditions precedent to the bringing of this action have occurred or have been exhausted.

112.     Plaintiffs have incurred or will incur costs for attorneys and other necessary fees and costs which are recoverable in this action under the provisions of 42 U.S.C. § 1988.

113.     Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiffs are entitled to declaratory relief and a preliminary and permanent injunction invalidating and restraining enforcement of Civil Local Rules 3-9(b), 5-1(b) and similar Restrictive Local Rules.

### SIXTH CLAIM
*Against All Defendants For Violation of the Sherman Act (15 U.S.C. § 2)*

114.     Plaintiffs re-allege and incorporate by this reference each and every allegation set forth in this Complaint as if the same were fully set forth herein.

115.     Through the imposition of Restrictive Local Rules, including but not limited to Local Rule 3-9(b), Defendants have "monopolize[d], or attempt[ed] to monopolize, or

COMPLAINT

25

1  combine[d] or conspire[d] with any other person or persons, to monopolize any part of the

2  trade or commerce among the several States" in the field of legal services.

3       116.    Legal services are frequently performed in interstate commerce, as evidenced

4  by the profusion of *pro hac vice* filings in district and appellate courts. Such services are

5  typically paid services for which the fees are often substantial.

6       117.    Even the provisioning of intrastate legal services frequently affects interstate

7  commerce. *See Goldfarb v. Virginia State Bar*, 421 U.S. 773 (1975).

8       118.    Observance of Restrictive Local Rules, including but not limited to Civil

9  Local Rule 3-9(b), is compelled by the State. Local Rules carry the force of law.

10       119.    The net effect of the Restrictive Local Rules, including but not limited to Civil

11  Local Rule 3-9(b), is one of forcing corporations to hire attorneys even in cases where non-

12  attorneys are perfectly willing and able of representing their corporations' interests in court.

13       120.    The forced hiring of attorneys promoted by the Restrictive Local Rules is in

14  complete alignment with Defendant ABA's goal of furthering law school education,

15  seemingly no matter the literal cost to law students or the figurative cost to society at large.

16       121.    Restrictive Local Rules encourage the imposition of exorbitant monopoly

17  pricing by the attorneys and law firms who benefit from their existence.

18       122.    Defendant ABA comprises various committees that work to create model

19  rules, and coordinates with state bar associations and the Courts by virtue of the fact that

20  every licensed attorney must be a member of a state bar association.

21       123.    As Clifford Winston wrote in *The New York Times* on October 24, 2011, "It is

22  worth recalling that two of the finest lawyers and civil rights advocates our country has ever

23  produced, Abraham Lincoln and Clarence Darrow, would not be allowed to practice law

24

25

COMPLAINT

1 | today under current [ABA] rules." It is therefore evident that Defendants' monopolistic

2 | policies, rules, and customs have produced absurd and detrimental consequences.

3 |      124.    Defendant ABA signed a consent decree in 1996 stemming from its violation

4 | the Sherman Act (15 U.S.C. § 1), and then admitted to violating that same consent decree in

5 | 2006, when it agreed to pay a $185,000 fine to the United States Department of Justice.

6 | Defendant ABA therefore has an established history of anti-competitive behavior.

7 |      125.    Plaintiffs have no adequate remedy at law.

8 |      126.    Plaintiffs have incurred or will incur costs for attorneys and other necessary

9 | fees and costs which are recoverable in this action under the provisions of 42 U.S.C. § 1988.

10 |      127.    Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiffs are entitled to declaratory

11 | relief and a preliminary and permanent injunction invalidating and restraining enforcement of

12 | Civil Local Rules 3-9(b), 5-1(b) and similar Restrictive Local Rules.

13 | **RELIEF REQUESTED**

14 |      WHEREFORE, Plaintiffs respectfully request the following relief:

15 | A. A declaratory judgment adjudicating that the Restrictive Local Rules, including but not

16 |    limited to Civil Local Rules 3-9(b) and 5-1(b), violate the United States Constitution and

17 |    are unenforceable;

18 | B. A declaratory judgment adjudicating that the PACER Fee Schedule violates the E-

19 |    Government Act of 2002 and is unenforceable;

20 | C. A preliminary and permanent injunction enjoining Defendant AO from collecting any

21 |    further PACER fees except to the extent "necessary" to promote public access;

22 | D. An order instructing Defendant AO to immediately refund the unlawfully-collected

23 |    PACER fees belonging to Plaintiffs and any other entities;

24 |

25 |

E.  A judgment awarding Plaintiffs reasonable costs and expenses of this action, including

attorneys' fees, in accordance with 42 U.S.C. § 1988 and other applicable law; and

F.  Such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury in

this action of all issues so triable.

Respectfully submitted,

Dated:  May 23, 2014

By: _____
Aaron Greenspan
President
THINK COMPUTER FOUNDATION

By: _____
Aaron Greenspan
President & CEO
THINK COMPUTER CORPORATION

COMPLAINT

28

## CERTIFICATE OF SERVICE

The undersigned certifies that, on May 23, 2014, a true copy of the foregoing

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND JURY**

**DEMAND** is being served via USPS Certified Mail to the following addresses:

**Administrative Office of the United States Courts**
One Columbus Circle, NE
Washington, DC  20544

**United States District Court for the Northern District of California**
280 S. 1st Street
San Jose, CA  95113

**American Bar Association**
321 North Clark Street
Chicago, IL  60654

Dated: May 23, 2014            By:    _____
                                      Aaron Greenspan
                                      President
                                      THINK COMPUTER FOUNDATION


                               By:    _____
                                      Aaron Greenspan
                                      President & CEO
                                      THINK COMPUTER CORPORATION