# EXHIBIT C

Correspondence with Defendant
Administrative Office of the United States
Courts and Congresswoman Anna Eshoo

Think Computer Foundation
20560 Shelburne Road
Shaker Heights, OH  44122

*telephone* +1 415 670 9350
*toll free* +1 888 815 8599
*fax* +1 415 373 3959
*web* http://www.thinkcomputer.org

A 501(c)3 Non-Profit Foundation
EIN 34-1937820

 **Think Computer Foundation**

February 9, 2012

Judicial Conference of the United States
c/o Administrative Office of the United States Courts
One Columbus Circle, NE
Washington, D.C.  20544

To Whom It May Concern:

As a taxpayer, a litigant, and a software engineer, I want to formally register my extreme discontent with the Judicial Conference of the United States regarding the current state of the PACER and CM/ECF systems. I have noted the results of the April, 2010 user survey conducted by Pacific Consulting Group on behalf of the Federal Judiciary (http://www.pacer.gov/documents/assessment_slides.pdf), and I wish to present an alternative viewpoint that I have reason to believe is not being heard. If you are not the right individual to address the complaints contained herein, I hope you will forward this message to those who are best suited to respond.

PACER is not merely a system with "areas for improvement," as the aforementioned survey politely suggests. It is nothing short of a national disgrace. Lest you think I exaggerate, I hope you will allow me to explain the several aspects of the system's structural deficiencies, of which the public record indicates that you should already be aware.

### 1.   PACER's Billing Model is Arbitrary and Capricious on Multiple Levels

PACER charges users a recurring fee on a per-page basis, where "pages" frequently fail to correspond to actual physical pages, and where the number of "pages" in a given document does not necessarily correspond in any way with the number of bytes required to transmit that document. For example, a blank page requires far fewer bytes to store and transmit than a page full of text or graphics. Since the Judiciary's expenses in operating PACER are proportional to bytes stored and transmitted, and not to some abstract notion of "pages," the fundamental basis for the system's billing system is completely arbitrary.

PACER charges users even when it fails to function and transmits little to no data accordingly. On a number of occasions, I have been charged eight cents for a search that produced no results.

Furthermore, PACER fails to distinguish in a systematized fashion between the authors of documents. This has the perverse effect of charging users for their own documents on a regular basis. I have several times been required to

February 9, 2012
Letter to the Judicial Conference of the United States
Page 2

pay for documents that I myself authored and submitted to PACER.

Perhaps most importantly, the price of eight cents per "page," soon to be ten cents, is additionally arbitrary and capricious. There is no fundamental or mathematically-justifiable reason why each "page" should cost eight or ten cents, as opposed to any other amount.

2. **PACER's Billing Model Discriminates Against Impoverished,** *Pro Se,* **and** *In Forma Pauperis* **Litigants**

PACER's present billing model, which involves charging users on a recurring, per-"page" basis, inherently discriminates against the poor, *pro se,* and *in forma pauperis* litigants—classes of citizens who arguably need the Court's assistance the most. The existence of a $10.00 threshold, below which access to PACER is free, does barely anything to offset the discriminatory nature of this system. Nor do fee caps on particularly long documents change the fact that the system's access rules are fundamentally unjust. They merely serve as an acknowledgement of that fact.

For a *pro se* litigant who has not yet been or will never be granted electronic access to case filings through CM/ECF (because *pro se* litigants are required, for some reason, to request a court order so that they may use CM/ECF), a handful of fifty-page legal documents, as part of a case to which the user is party, are enough to exceed the $10.00 threshold. Even *with* CM/ECF access, litigants must use PACER and pay the requisite fees to view dockets for their own cases. A single federal court case docket—even if a litigant is a party—viewed perhaps ten times over the course of a month might cost more than $10.00, let alone the hundreds or thousands of pages of accompanying documents. In a society where the disenfranchised are often unable to exercise their rights due to the high cost of litigation, PACER's fee structure serves only to further polarize individuals into two camps of those who can and those who cannot afford that cost.

Furthermore, while the Court expects *pro se* and *in forma pauperis* litigants to comply with the Federal Rules of Civil Procedure and applicable Local Rules, including formatting rules, it inhibits them from learning by example and from offering up their most compelling arguments by restricting and discouraging access to precedential cases. Law firms typically rely on private legal databases that are completely unaffordable for such litigants.

3. **The Judicial Conference is in Violation of the E-Government Act of 2002**

On January 27, 2009, Senator Joseph Lieberman sent a letter to the Judicial Conference inquiring as to its compliance with the E-Government Act of 2002. Specifically, Senator Lieberman wrote, "Seven years after the passage of the E-Government Act, it appears that little has been done to make these records freely available—with PACER charging a higher rate than 2002. Furthermore, the funds generated by these fees are still well higher than the cost of dissemination, as the Judiciary Information Technology Fund had a surplus of approximately $150 million in FY2006. Please explain whether the Judicial Conference is complying with Section 205(e) of the E-Government Act, how PACER fees are determined, and whether the Judicial Conference is only charging 'to the extent necessary' for records using the PACER system."

Ten years since Congress passed the E-Government Act of 2002, which states that the Judicial Conference may charge "reasonable" fees "only to the extent necessary," nothing has changed. The situation is arguably worse, as the

February 9, 2012
Letter to the Judicial Conference of the United States
Page 3

Judicial Conference has already authorized a fee *increase* for PACER access in the coming months. An increased fee is neither reasonable (in the context of exponentially declining data storage costs), nor necessary. Today, the entirety of PACER can be stored on a single computer available for sale at an Apple Store for less money than it would take to download a fraction of the cases on PACER.

Researchers at Princeton University have found further glaring inconsistencies regarding the implementation of PACER's fee structure. See "Using software to liberate U.S. case law" by Harlan Yu and Stephen Schultze (http://xrds.acm.org/article.cfm?aid=2043244).

**4.  The PACER Fee Structure Encourages Attorneys to Further Overcharge Their Clients**

Litigation is prohibitively expensive for most Americans. While the reasons for this state of affairs are complex, the PACER fee structure imposed by the Judicial Conference does nothing to help matters. Attorneys routinely mark up the expenses they incur, turning their costs for photocopying, telephone calls, faxes, and PACER access into significant sources of additional profit. The Judiciary does not exist to line the pockets of attorneys, but rather, to serve the people. Accordingly, it should be mindful that its policies have unintended consequences.

**5.  Comparable and Superior Technologies Have Been Developed at Little to No Cost**

PACER and CM/ECF are both based on proprietary computer software foundations that have undergone only trivial improvements over the past decade. Internet-based programming has changed significantly since the web-based version of PACER was initially developed, and although the pacer.gov facade recently benefitted from a facelift, that particular web site remains a facade, and the underlying database software was not affected in the least.

In contrast, PlainSite (http://www.plainsite.org), operated as a joint venture by Think Computer Corporation and Think Computer Foundation, started off as a personal side-project with a zero-dollar budget. It indexes approximately three-quarters of a million PACER documents, as well as Internal Revenue Service records regarding Section 527 Political Action Committees, among various other related records. PlainSite links disparate data sources in ways that PACER cannot, and was developed within approximately four months by three engineers with freely-available software. Its user interface is vastly superior to that of PACER and CM/ECF, and it further makes this information freely available to the public, either directly or via search engines.

The Judicial Conference should justify to the public why it requires a nine-figure sum of money to operate PACER, when non-profit organizations such as ours are capable of offering better, more modern, and more attractive services for free.

**6.  Numerous Court Functions Could and Should Be Automated Through Next-Generation Electronic Systems**

According to presentations publicly available on the uscourts.gov web site, the Judicial Conference is very pleased with itself for its progress with PACER and CM/ECF. It has used public opinion surveys, sent to a heavily biased audience, to justify this sense of self-satisfaction. However, the fact remains that the federal court system is commonly regarded as a slow, bureaucratic nightmare.

February 9, 2012
Letter to the Judicial Conference of the United States
Page 4

Part of the reason for this nightmare is that judicial procedure has completely failed to keep pace with technology. Certifications that could be made instantly through web-based forms must be supplied instead as printed documents or PDF files. Even filing a lawsuit should no longer require the same antiquated format; relational databases are perfectly capable of accurately and comprehensively recording disputes between parties, as evidenced by electronic dispute resolution systems employed by private industry for a number of years.

Instead of issuing self-congratulatory press releases with accompanying fake news segments (such as the one at http://www.uscourts.gov/News/NewsView/10-10-04/Judiciary_Assesses_PACER_Services.aspx), the Judicial Conference should be looking toward the future to best discern how it can serve the public interest with an efficient court system that guarantees each citizen their Sixth Amendment right to a speedy trial.

**7.  <u>Attorneys Are Afraid To Voice These Concerns Due To Fear of Retribution by Judges or Other Harm to Their Clients' Interests</u>**

I have personally discussed these issues with prominent attorneys and law professors. There is a general consensus that few, if any, attorneys are willing to explicitly state the points contained in this letter because of the potential ramifications that might ensue. Attorneys tend to be sensitive to their fiduciary duty to their clients, and accordingly they fear that taking any action not directly beneficial to a client might result in unnecessary liability of one form or another. It is therefore much easier and far safer for them to mark up PACER fees as expenses for large corporate clients, rather than highlight the multiple burdens such fees impose on the rest of society.

We live in a time of unprecedented inequality. The Judiciary is one of the few remaining institutions that is not itself completely corrupted by political donations or corporate lobbying. Instead of further polarizing the nation, the policies and procedures implemented by the Judicial Conference must guarantee equal treatment under the law to all parties, or our judicial system will never be capable of providing the kind of balance that the notion of justice inherently demands, and that the nation clearly needs.

Feel free to contact me with any questions at aaron.greenspan@plainsite.org, or +1 415 670 9350.


Sincerely,

Aaron Greenspan
President
Think Computer Foundation


CC:     Senator Joseph Lieberman
        Congresswoman Anna Eshoo



*Congress of the United States*
*House of Representatives*
*Washington, D.C. 20515*

*Anna G. Eshoo*
*Fourteenth District*
*California*

March 21, 2012

Mr. Aaron Greenspan, President and CEO
Think Computer Corporation
3260 Hillview Avenue
Palo Alto, California 94304-1220

Dear Mr. Greenspan,

Thank you for your e-mail about the Public Access to Court Electronic Records (PACER) system, and for sharing a copy of your recent letter to the Judicial Conference with me. I welcome your thoughts on this issue.

As you may know, Section 205(e) of the E-Government Act of 2002 (PL 107-347) states that the Judicial Conference may "to the extent necessary," proscribe reasonable fees for access to automated data processing systems such as PACER. I've noted your concern about these fees, as well as the importance of ensuring that PACER's level of accessibility is consistent with the public interest.

Currently, any individual may search PACER for free and can obtain copies of final opinions (including convictions) without charge. Individuals who obtain less than 100 pages per quarter are not assessed any fee whatsoever. This number will increase to 150 pages on April 1, 2012, meaning approximately 70-80% of all PACER users will pay no fees at all. I think these policies are reasonable and they ensure that no important criminal information is "hidden" from public view behind PACER's fee structure. All PACER revenues are wholly dedicated to the system's continuous operation and improvement—any excess revenues (or "profits") are held in an account for anticipated operational expenses, such as next generation Case Management and Filing systems.

I have passed your concerns on to the Judicial Conference directly, and will remain attentive for future legislative proposals which improve PACER access while also preserving the system's financial self-sufficiency. Should such legislation come before me in the House, your important thoughts will certainly inform my vote.

Most gratefully,

Anna G. Eshoo
Member of Congress

From:     Aaron Greenspan <aarong@thinkcomputer.com>
Subject:  **PACER Response Letter**
Date:     May 9, 2012 12:23:06 PM PDT
To:       Patty Kim <patty.kim@mail.house.gov>, David Grossman <David.Grossman@mail.house.gov>
Cc:       clarine_nardi_riddle@lieberman.senate.gov, tara_yurgin@lieberman.senate.gov,
          marshall_wittmann@lieberman.senate.gov, todd_stein@lieberman.senate.gov, sherry_brown@lieberman.senate.gov, Carl
          Malamud <carl@malamud.com>, John Markoff <markoff@nytimes.com>, Nick Bilton <bilton@nytimes.com>, Lawrence Lessig
          <lessig@pobox.com>, Jonathan Zittrain <zittrain@law.harvard.edu>, Benjamin Edelman <bedelman@hbs.edu>

▶     4 Attachments, 748 KB

Patty and David,

I received the Congresswoman's March 21, 2012 response (attached) to my concerns about PACER recently. Please convey my sincere appreciation that she took the time to examine and address the issues involved. Nonetheless, I would like to address two errors in her response, and a third point about general accessibility of PACER records.

First, the Congresswoman's statement that, "any individual may search PACER for free," is simply false. Every search of PACER costs money on a per-page basis. Even searches of PACER that return zero results cost money on a per-page basis--something that happens often because the search engine does not actually work (see attachment). In fact, I was recently charged by PACER for received an error message generated by the system (see attachment).

Second, the Congresswoman's highlight of the phrase "to the extent necessary" in Section 205(e) of the E-Government Act of 2002, followed by an admission that PACER collects "excess revenues (or 'profits')" in her next paragraph, only serves to emphasize my point. Congress has not authorized the courts to collect "excess revenues (or 'profits')," however those might be used, because by definition "excess" means that such revenues are BEYOND "the extent necessary." I would also emphasize once again that based on the costs associated with PlainSite, a system with similar scope, the expenses truly "necessary" to operate PACER are well under one million dollars annually. The PACER billing center likely costs more to operate than such costs. Therefore, it is my belief PACER is operating in continuous violation of the law to the detriment of the entire country, and has been for some time.

Third, just because PACER fees are waived for many users whose total fees are under a certain threshold does not mean that the system is accessible. PACER is designed in such a way that it is spread across more than 50 web sites--aside from being confusing, even attorneys registering in remote districts *pro hac vice* have considerable trouble accessing cases that they are entitled to file documents for because multiple usernames and credentials are required. Furthermore, for same day registration, a credit or debit card is required to sign up. Many citizens, including many of the Congresswoman's constituents, do not have a credit or debit card and have no means by which to obtain one. These people should not have impaired access to public records because they choose not to use certain banking services.

For my part, I'd like a refund for the fees I've paid to access my own cases, and to perform searches, if they are in fact supposed to be free.

Aaron



# Think

**Aaron Greenspan**
President & CEO
Think Computer Corporation

*telephone* +1 415 670 9350
*toll free* +1 888 815 8599
*fax* +1 415 373 3959
*e-mail* aarong@thinkcomputer.com
*web* http://www.thinkcomputer.com

 **PACER**
Case Locator

All Court Types Party Search
Wed May 9 15:06:15 2012
No Records Found

User: ag4236 P
Client:
Search: All Court Types Party Search Name Aaron Greenspan All Courts Page: 1

## No records found

Search Tip: To search for an individual party, use the name format: *last, first.* A comma should be included to separate the last name and the first name. See the help balloon for more information and example searches.

| PACER Service Center | Receipt 05/09/2012 15:06:16 27171271 |
|---|---|
| User ag4236 P | |
| Client | |
| Description All Court Types Party Search | |
| Name Aaron Greenspan All Courts Page: 1 | |
| Pages 1 ($0.10) | |



error.html (3.5 KB)



*Congress of the United States*
*House of Representatives*
*Washington, D.C. 20515*

*Anna G. Eshoo*
*Fourteenth District*
*California*

May 18, 2012

Mr. Aaron Greenspan, President and CEO
Think Computer Corporation
3260 Hillview Avenue
Palo Alto, California 94304-1220

Dear Mr. Greenspan,

I received your response to my letter of March 21st about your continuing interest in the PACER system.

I've referred your inquiries to the Judicial Conference and have asked them to respond to you directly. A copy of my letter is attached. I hope you will find their reply to be informative and useful.

Sincerely,

Anna G. Eshoo
Member of Congress



*Congress of the United States*
*House of Representatives*
*Washington, D.C. 20515*

*Anna G. Eshoo*
*Fourteenth District*
*California*

May 18, 2012

Ms. Cordia A. Strom, Assistant Director for Legislative Affairs
Administrative Office of the United States Courts
Thurgood Marshall Federal Judiciary Building
One Columbus Circle, N.E., Suite 7-110
Washington, D.C. 20544-0003

Dear Ms. Strom,

Enclosed please find correspondence between my constituent, Mr.
Aaron Greenspan and myself—as well as an earlier letter which
Mr. Greenspan sent to the Judicial Conference.

Earlier this month, Mr. Greenspan replied to my letter of March 21st
with a separate set of inquiries that would be most appropriately
addressed by a direct response from the Judicial Conference.

I would appreciate if you would please review his correspondence of
May 9th and respond to him directly. Thank you in advance for your
cooperation and timely response to this matter.

Most gratefully,

Anna G. Eshoo
Member of Congress



HONORABLE THOMAS F. HOGAN
Director

JILL C. SAYENGA
Deputy Director

# ADMINISTRATIVE OFFICE OF THE
# UNITED STATES COURTS

WASHINGTON, D.C. 20544

MICHEL ISHAKIAN
Chief
Public Access and
Records Management Division

Office of Court Administration

June 11, 2012

Mr. Aaron Greenspan
President and CEO
Think Computer Corporation
3260 Hillview Avenue
Palo Alto, CA  94304-1220

Dear Mr. Greenspan:

Your recent e-mail inquiry (enclosed) to Representative Anna Eshoo's office was forwarded to me, as Chief of the Office of Court Administration's Electronic Public Access and Records Management Division, for response.

You raised concern about how the Electronic Public Access (EPA) fee revenue is used. In accordance with Congressional direction, EPA fee revenue is used exclusively to fund program expenses that support and enhance electronic public access to the courts. At the same time, the EPA program continues to provide a significant amount of federal court information to the public at no charge. For example, free access to judicial opinions is provided, and parties to a court case receive a free copy of filings in the case.

Your letter also expressed concern regarding your bill and requested a refund of the fees you had paid. Based on a review of your Public Access to Court Electronic Records (PACER) account, it appears that the charges you have incurred are in accordance with the Judiciary's policies and procedures. Usage of the PACER service is billed on a quarterly basis, and pursuant to Judicial Conference policy, no account is billed for usage of less than $15 in a quarter. Accordingly, the charges for your usage in the fourth quarter of 2011, which amounted to $9.52, were waived. The PACER registration form, which you completed, clearly states that a per-page charge applies to the number of pages resulting from any search, and that searches resulting in no matches incur a charge for one page of usage ($0.10 as of April 1, 2012). The fees that you have incurred for such searches have been appropriately applied in accordance with this policy, and therefore, I am denying your request for a refund of the fees you have paid, which total $52.96 for the first quarter of 2012. Should you seek a credit request in the future, please refer to the PACER Service Center's website http://www.pacer.gov/billing/ for instructions or call 1-800-676-6856 for assistance.

A TRADITION OF SERVICE TO THE FEDERAL JUDICIARY

Mr. Aaron Greenspan
Page 2

Your letter suggests that you believe the PACER registration process to be burdensome. We have made every effort to make the process as easily accessible as possible. Registration information for access to PACER can be submitted via fax or the Internet, and there is no registration fee. A credit card is not required for registration, and a login and password are sent to the registrant via the United States Postal Service within one business day. For same-day registration, a registrant must provide credit card and password security information. The credit card holder's name and billing address are then verified through Pay.gov before a login and password are issued to the user. These procedures ensure that the Judiciary has a valid billing address on file at the time of registration, as required by law, thus ensuring that persons using PACER can be properly billed for their use of the service.

Moreover, we continue to seek new ways to improve the process. The Judiciary recently completed gathering requirements for the Next Generation of Case Management/Electronic Case File (CM/ECF) system, which included an Additional Stakeholders Functional Requirements Group (ASFRG) that focused on how the federal courts interact with others in the legal system. The group's members (including representatives from the Judiciary, the Department of Justice, the American Bar Association, the Internal Revenue Service, the Association of American Law Schools, and the National Association of Bankruptcy Trustees) contacted more than 60 constituent groups for feedback regarding the present system and requirements for the future. Though all groups reported a high level of satisfaction with the current systems, and a desire that the next version not lose any current functionality, requests for role-based, streamlined access were clearly heard and are being included in the requirements for the Next Generation of CM/ECF. The ASFRG's final report has been published on the Judiciary's website at http://www.uscourts.gov/uscourts/FederalCourts/Publications/ASFRG-Final-Report.pdf.

If you have any additional questions or concerns, please contact Wendell Skidgel, Senior Attorney, at 202-502-3095 or by e-mail at Wendell_Skidgel@ao.uscourts.gov.

Sincerely,

Michel Ishakian

Enclosure

cc:     Honorable Anna G. Eshoo

From: Wendell_Skidgel@ao.uscourts.gov
Subject: Re: Illegal and Erroneous PACER Fees
Date: March 24, 2014 at 3:46 PM
To: Aaron Greenspan aaron.greenspan@plainsite.org

Dear Mr. Greenspan,

Prior to downloading a document from the PACER service, a receipt is displayed. The receipt shows whether the document to be downloaded will, or will not, incur a charge. The user is thereby provided with an option to avoid incurring a fee by electing to not download the document.

If your account does not show a receipt prior to download a document, the PACER Service Center staff can assist you is setting that option for your account. They may be contacted at (210) 301-6440 or at (800) 676-6856.

As you may be aware, the Judicial Conference of the United States' policy regarding written opinions clearly states that the authoring judge determines which a document meets the definition of a written opinion.

The document you attached to your email incurs a charge when downloaded from the PACER service because it is an order denying a motion for partial summary judgement, but was not deemed to be a written opinion. Not all orders meet the definition of a written opinion.

Requests for refunds are handled via the Refund Request Form available at
http://www.pacer.gov/documents/PSC_RefundForm.pdf

Should you have additional questions or comments, please feel free to utilize the "Send Us a Message" screen at
http://www.pacer.gov/contact.html

Sincerely,

Wendell Skidgel
Senior Attorney
DPS-CS-PRG

From: Aaron Greenspan <aaron.greenspan@plainsite.org>
To: Michel Ishakian <michel_ishakian@ao.uscourts.gov>, Wendell Skidgel <wendell_skidgel@ao.uscourts.gov>
Date: 03/17/2014 03:11 PM
Subject: Illegal and Erroneous PACER Fees

Ms. Ishakian and Mr. Skidgel,

I was just charged $3.00 by PACER to download the attached document, which contains the opinion of a federal district judge. I have this experience all the time. I should not have to pay for federal court opinions, because the law (and your own Judicial Council) says I don't have to (and as I interpret the law, it says I shouldn't have to pay for anything on PACER). So why am I being charged? And how do you plan to refund my money for every opinion I've paid for that I should not have had to? What about every other PACER user who has had the same experience?

Please advise.

Aaron

PlainSite I http://www.plainsite.org[attachment "document.pdf" deleted by Wendell Skidgel/DCA/AO/USCOURTS]

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | CV 06-7821AHM (AJWx) | Date | March 26, 2010 |
| Title | ROSEMARY DORSETT v. SANDOZ, INC. | | |

Present: The
Honorable     A. HOWARD MATZ, U.S. DISTRICT JUDGE

| Stephen Montes | Not Reported | |
|---|---|---|
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

Attorneys **NOT** Present for Plaintiffs:          Attorneys **NOT** Present for Defendants:

**Proceedings:**          IN CHAMBERS (No Proceedings Held)

## I.   INTRODUCTION

This is a products liability case arising from the suicide death of Noe Carrasco, the son of Plaintiff Rosemary Dorsett. Defendant Sandoz, Inc. ("Sandoz") originally filed this motion on March 27, 2007, as a motion to dismiss on the ground that federal law preempted Plaintiff's claims. On April 2, 2007, the Court granted Plaintiff's ex parte application to convert the motion into a motion for summary judgment and gave Plaintiff additional time to respond. On February 14, 2008, the Court granted Sandoz's unopposed motion to stay this case pending the Supreme Court's decision in *Wyeth v. Levine*, — U.S. —, 129 S. Ct. 1187 (2009). While the case was stayed, the Court granted Plaintiff's motion to temporarily lift the stay to substitute Eli Lilly and Company ("Lilly") in place of one of the Doe defendants. Plaintiff then filed her operative pleading, the Second Amended Complaint ("SAC"), on January 6, 2009. *Wyeth* was decided on March 4, 2009 and the Court reopened the case on March 24, 2009. Thereafter, Lilly filed a motion for judgment on the pleadings on statute of limitations grounds, which the Court denied on October 28, 2009. Lilly has also filed a motion for summary judgment on the ground of federal preemption, presenting similar, though not identical, arguments to those of Sandoz. The Court will refer to Lilly and Sandoz collectively as "Defendants" when appropriate. For the following reasons, the Court DENIES Defendants' motions for summary judgment and finds that Plaintiff's claims are not preempted.[1]

---

[1]Docket Nos. 31 & 79.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | | |
|---|---|---|---|---|
| Case No. | CV 06-7821AHM (AJWx) | | Date | March 26, 2010 |
| Title | ROSEMARY DORSETT v. SANDOZ, INC. | | | |

## TABLE OF CONTENTS

I.     INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.    BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    A. Crux of This Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    B. Statutory and Regulatory Background . . . . . . . . . . . . . . . . . . 4
    C. SSRIs, Suicidality, and SSRI Litigation . . . . . . . . . . . . . . . . . 7
        1. Pre-2000 SSRI suicidality knowledge and labeling . . . . . . . 7
        2. The Court's opinion in *Motus v. Pfizer*, 127 F. Supp. 2d 1085
           (C.D. Cal. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
        3. SSRI-suicidality knowledge and labeling to August 2004. 10
        4. SSRI-suicidality knowledge and labeling after Carrasco's
           August 2004 death. . . . . . . . . . . . . . . . . . . . . . . . . . . 12
        5. The FDA's evolving position on preemption . . . . . . . . . . 15

III.   LEGAL STANDARDS FOR SUMMARY JUDGMENT . . . . . . . . 16

IV.   DISCUSSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
    A. Standards for Federal Preemption . . . . . . . . . . . . . . . . . . . . 18
    B. The Supreme Court's Decision in *Wyeth* . . . . . . . . . . . . . . . . 19
    C. Both Defendants' Claims on Conflict Preemption . . . . . . . . . . . 20
    D. Sandoz's Claim Unique to Generics . . . . . . . . . . . . . . . . . . . 24
    E. Both Defendants' Claims of Frustration of Congressional Purpose
       (Obstacle Preemption). . . . . . . . . . . . . . . . . . . . . . . . . . . 28

V.    CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

## II.   BACKGROUND[2]

### A. Crux of This Case

---

[2]All the facts recited in this order are undisputed unless otherwise noted.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 06-7821AHM (AJWx) | Date | March 26, 2010 |
|---|---|---|---|

| Title | ROSEMARY DORSETT v. SANDOZ, INC. |
|---|---|

On August 20, 2004, Carrasco committed suicide by shooting himself in the garage of his friend's home. Second Amended Complaint ("SAC") ¶ 5. Carrasco was 26 years old. He had been taking fluoxetine, the generic version of the drug Prozac, for approximately 36 days before his death. SAC ¶ 55.

Carrasco began taking fluoxetine on or about July 15, 2004. SAC ¶ 55; Mem. at 3. Fluoxetine, like Prozac, is a selective seratonin reuptake inhibitor ("SSRI"). Mem. at 3. SSRIs are a class of antidepressants used to treat depression, anxiety disorders, and some personality disorders.

Defendant Sandoz manufactures and markets generic fluoxetine. Its warning label for fluoxetine was identical to the label on its brand name equivalent, Prozac, manufactured by Lilly. At the time of Carrasco's death, the Sandoz label contained the following language, which was standard for all SSRIs:

> Suicide: The possibility of a suicide attempt is inherent in major depressive disorder and may persist until significant remission occurs. Close supervision of high-risk patients should accompany initial drug therapy. Prescriptions for Drug Z should be written for the smallest quantity of tablets consistent with good patient management, in order to reduce the risk of overdose.

As for Lilly, it asserts that its label was changed at some point in July 2004 (shortly before Carrasco's death) to include an enhanced warning, which stated, in part:

> **Clinical worsening and suicide risk** – Patients with major depressive disorder, both adult and pediatric, may experience worsening of their depression and/or the emergence of suicidal ideation and behavior (suicidality), whether or not they are taking antidepressant medications, and this risk may persist until significant remission occurs. Although there has been a longstanding concern that antidepressants may have a role in inducing worsening of depression and the emergence of suicidality in certain patients, a causal role for antidepressants in inducing such behaviors has not been established. **Nevertheless, patients being treated with antidepressants should be observed closely for clinical worsening and suicidality, especially at the**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 06-7821AHM (AJWx) | Date | March 26, 2010 |
|---|---|---|---|

| Title | ROSEMARY DORSETT v. SANDOZ, INC. |
|---|---|

**beginning of a course of drug therapy, or at the time of dose changes, either increases or decreases.**

Lilly's Exs. X & Z; SUF ¶¶ 24, 27 (emphasis in original). The warning went on to state that "[a]lthough there has been a long-standing concern that antidepressants may have a role in inducing or worsening of depressions and emergence of suicidality in certain patients, a causal role for antidepressants in inducing such behaviors has not been established." *Id.* Sometime afterward—at the hearing, the parties represented that it was in December 2004—Sandoz placed this language in its label.

Plaintiff Rosemary Dorsett ("Dorsett") is Carrasco's mother. She alleges that Defendants failed to provide any warning through any medium about the association between fluoxetine and suicidality;[3] and that based upon the state of knowledge as it existed at the time, Defendants knew or should have known that fluoxetine was a substance associated with producing preoccupation about and acts of self-harm and could be dangerous and unsafe. SAC ¶¶ 55-57. According to Dorsett, Defendants should have provided "a stronger warning regarding the association between fluoxetine and suicidality through a variety of mediums, including but not limited to labeling, continuing education, symposiums, posters, advertisements. . . ." SAC ¶ 53. *See also* SAC ¶¶ 56-57. Dorsett has not provided a specific warning about a causal relationship between SSRIs and suicidality in adults that she says should have been placed on the label. *See infra*, p. 23-24.

Dorsett is suing for common law negligence, strict liability, breach of express warranty, and for survival. SAC ¶¶ 54-85. Defendants have moved for partial summary judgment of Plaintiff's failure-to-warn claims on the grounds that Plaintiff's state product-liability claims are preempted by the Federal Food, Drug and Cosmetic Act ("FDCA") and by regulations promulgated by the Food and Drug Administration ("FDA"). Defendants seek an order that as a matter of law they may not be held liable for their failure, as of July 2004, to include in the labeling for fluoxetine *any* warning regarding the risk of suicide beyond that which was approved by the FDA.

**B. Statutory and Regulatory Background**

The "essential purpose" of the FDCA is "to ensure that any product regulated by the

---

[3]"Suicidality" is suicidal thinking and behavior.

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 06-7821AHM (AJWx) | Date | March 26, 2010 |
|---|---|---|---|

| Title | ROSEMARY DORSETT v. SANDOZ, INC. |
|---|---|

FDA is 'safe' and 'effective' for its intended use." *Food and Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000). The FDA's mission is to "promote the public health by promptly and efficiently reviewing clinical research and taking appropriate action on the marketing of regulated products in a timely manner" and to "protect the public health by ensuring that . . . human and veterinary drugs are safe and effective." 21 U.S.C. § 393(b)(1), (2). The FDA fulfills its mission, in part, by overseeing the approval process for new drug products, regulating drug labeling content, and issuing public health advisories if the safety of a drug product comes into question.

In 1962, Congress amended the FDCA to require all drug manufacturers to submit a new drug application ("NDA") to the FDA for permission to market a new drug product. *See generally* 21 U.S.C. § 355; Public Law 87-781 (1962). Applications for new drugs must include scientific data showing the drug's safety as well as its effectiveness for its intended use. 21 U.S.C. § 355(b); 21 C.F.R. pt. 314.

In 1984, pursuant to the Hatch-Waxman Act, the FDA implemented an abbreviated new drug application procedure ("ANDA") for manufacturers of generic drug products. 21 U.S.C. § 355(j). By using the "innovator" drug as the basis for the generic drug's approval, ANDA applicants are not required to include clinical data to demonstrate the drug's safety and effectiveness. *Id.* Instead, ANDA applicants must demonstrate that their product is bioequivalent to (that is, performs in the same manner as) the innovator drug. *See generally* 21 C.F.R. § 320.

The statutory provision governing the ANDA procedure provides:
> An abbreviated application for a new drug shall contain. . .information to show that the labeling proposed for the new drug is the same as the labeling approved for the listed drug referred to in clause (i) except for changes required because of differences approved under a petition filed under subparagraph (C) or because the new drug and the listed drug are produced or distributed by different manufacturers.

21 U.S.C. § 355(j)(2)(A)(v). Thus, the ANDA procedure is only available for those generic drug products that are "the same as" an already-approved FDA drug. *See* 21 C.F.R. § 314.92(a)(1). "[T]he term 'same as' means identical in active ingredient(s), dosage form, strength, route of administration, and conditions of use . . . ." *See* 21 C.F.R. § 314.92(a)(1). This means that the packaging and labeling of the innovator drug and generic drug

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 06-7821AHM (AJWx) | Date | March 26, 2010 |
|---|---|---|---|

| Title | ROSEMARY DORSETT v. SANDOZ, INC. |
|---|---|

must—with limited exceptions—be identical at the time the ANDA application is submitted.

In January 2006 the FDA issued a new final rule on the content and format of labeling, which went into effect in June 2006. Under both the new and old rule, the labeling "must contain a summary of the essential scientific information needed for the safe and effective use of the drug." 21 C.F.R. § 201.56(a)(1). Also, it "must be informative and accurate and neither promotional in tone nor false or misleading in any particular." 21 C.F.R. § 201.56(a)(2).

The FDA must withdraw approval if, after notice and hearing, subsequent evidence shows that the drug is unsafe, if the application contains any untrue statement of material fact, or for a number of other statutorily prescribed reasons. 21 U.S.C. § 355(e); 21 C.F.R. § 314.150(a). In addition, the FDA "may" seek to withdraw approval for a new or generic drug for a number of other reasons. 21 C.F.R. § 314.150(b). One of those reasons is if the labeling for the drug is "false or misleading in any particular" and the manufacturer did not correct the labeling after receiving notice from the FDA. 21 C.F.R. § 314.150(b)(3). The FDA may also seek to withdraw approval if the labeling for a generic drug "is no longer consistent with that for the listed drug," with two exceptions that are not relevant here. 21 C.F.R. § 314.150(b)(10).

FDA regulations also provide for changes to approved drug labels initiated by the manufacturer.[4] *See* 21 C.F.R. § 314.70 (concerning supplements and other changes to an approved application); 21 C.F.R. § 314.97 (applying §§ 314.70 and 314.71 to approved abbreviated applications). Under the so-called Changes Being Effected ("CBE") regulation, after the FDA receives a supplemental application from a manufacturer, the manufacturer may distribute products with changes in the labeling that "add or strengthen a contraindication, warning, precaution, or adverse reaction" or "add or strengthen an instruction about dosage and administration that is intended to increase the safe use of the

---

[4] Prior to 1965, "the FDA regulations applicable to drugs prohibited companies from adding warnings or other information without prior approval." *Caraker v. Sandoz Pharma. Corp.*, 172 F. Supp. 2d 1018, 1034 (S.D. Ill. 2001) (citing 25 Fed. Reg. 12,592, at 12,595 (1960)).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 06-7821 AHM (AJWx) | Date | March 26, 2010 |
|---|---|---|---|

| Title | ROSEMARY DORSETT v. SANDOZ, INC. |
|---|---|

drug product." 21 C.F.R. §§ 314.70(c)(6)(iii) (effective to June 29, 2006).[5] *See Wyeth*, 129 S. Ct. at 1196 (discussing the CBE process). If the FDA disapproves the supplemental application, it may order the manufacturer to cease any distribution that may have begun. 21 C.F.R. § 314.70(c)(7).

Finally, the regulations require manufacturers to revise their labeling to "include a warning as soon as there is reasonable evidence of an association of a serious hazard with a drug; a causal relationship need not have been proved." 21 C.F.R. § 201.57(e) (effective to Jun. 29, 2006), *cited in Cartwright v. Pfizer, Inc.*, 369 F. Supp. 2d 876, 883 (E.D. Tex. 2005).[6]

### C. SSRIs, Suicidality, and SSRI Litigation

In the past two decades there has been significant debate and inquiry in the medical, pharmaceutical and regulatory communities about the link between SSRIs and suicide. *See* Def. Ex. 7, Memorandum from Thomas P. Laughren, M.D., Director of Division of Psychiatry Products, FDA Center for Drug Evaluation and Research, to Members of the Psychopharmacologic Drugs Advisory Committee ("PDAC") (November 16, 2006). This section of this Order summarizes scientific and regulatory developments, this Court's opinion in *Motus v. Pfizer,* 127 F. Supp. 2d 1085 (C.D. Cal. 2000), and the changes that have occurred since *Motus*.

---

[5]The regulation was amended in 2008 to specify that a manufacturer may only change its label "to reflect newly acquired information." Supplemental Applications Proposing Labeling Changes for Approved Drugs, Biologics, and Medical Devices, 73 Fed. Reg. 49,603, at 49,609 (Aug. 22, 2008) (to be codified at 21 C.F.R. pts. 314, 601, and 814). The Court will base its decision on the regulations as they existed at the time of Carrasco's death in 2004, but, as the Supreme Court has noted, the addition to the regulation does not change the preemption analysis. *Wyeth v. Levine*, — U.S. —, 129 S. Ct. 1187, 1196-97 (2009).

[6]This section of the C.F.R. was amended in a new rule affecting prescription drugs, issued on January 24, 2006 and effective on June 30, 2006. *See* section C.1 *infra*. The new language reads " reasonable evidence of *a causal association* with a drug; a causal relationship need not have been definitely established." 21 C.F.R. § 201.57(e) (effective to Jun. 30, 2006) (emphasis added).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 06-7821AHM (AJWx) | Date | March 26, 2010 |

| Title | ROSEMARY DORSETT v. SANDOZ, INC. |

### 1. Pre-2000 SSRI suicidality knowledge and labeling.

As noted above, for many decades antidepressant drug labels, presumably including Sandoz's fluoxetine label at the time Noe Carrasco was given his prescription,[7] carried the following standard language:

> Suicide: The possibility of a suicide attempt is inherent in major depressive disorder and may persist until significant remission occurs. Close supervision of high-risk patients should accompany initial drug therapy. Prescriptions for Drug Z should be written for the smallest quantity of tablets consistent with good patient management, in order to reduce the risk of overdose.

Pl.'s Ex. 11, Memo from Thomas Laughren, M.D., FDA Center for Drug Evaluation and Research, to Members of the PDAC at 1 (January 5, 2004). As Dr. Laughren noted, this warning "does not explicitly warn of the possibility that antidepressant drugs may have a causal role in the emergence of suicidality early in treatment." *Id.* Concern about the connection between suicide and SSRIs intensified in 1990, when a Harvard Medical School psychiatrist published a paper suggesting that some patients became suicidal as a result of their treatment with Fluoxetine (Prozac). Def. Ex. 7 at 2. As Dr. Laughren of the FDA noted, however, demonstrating a causal link between increased risk of suicide and SSRIs may be elusive because "depression is a serious disorder that itself is associated with suicidality." Def. Ex. 7 at 3.

In the 1990s, the FDA considered and rejected citizen petitions requesting that the FDA revise the labeling of SSRIs – including Prozac – to include warnings about an increased risk of suicide or suicidal thoughts. *Motus*, 127 F. Supp. 2d at 1089-90. In its July 1991 denial of a citizen petition, the FDA stated that "[t]he data and information available at this time do not indicate that Prozac causes suicidality or violent behavior . . . ." *Motus*, 127 F. Supp. 2d at 1089. In its June 1992 decision, the FDA stated that evidence was "not sufficient to reasonably conclude that the use of Prozac is possibly associated with suicidal ideation and behavior." *Id.* at 1090. In a February 17, 1995 letter, the FDA drew Lilly's attention to an article in the British Journal of Medicine by Susan S. Jick, et al., which found that fluoxetine treatment was associated with a higher relative risk of suicide than the other

---

[7] The Court cannot find in the record any evidence of precisely what was said in the label on the product he was given.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 06-7821AHM (AJWx) | Date | March 26, 2010 |
|---|---|---|---|
| Title | ROSEMARY DORSETT v. SANDOZ, INC. | | |

antidepressants in that study. Pl. Ex. 44. The letter stated, "Although the study was less than ideal for addressing this question and included no other selective serotonin reuptake inhibitors, it may be desirable to inform prescribers of this finding." *Id.* Lilly declined to include a suicidality warning in its label at that time, and the FDA took no regulatory action against it. SGI & Lilly's Response to SGI ¶¶ 114-115. In its June 1997 response to a citizen petition, the FDA stated that "no credible scientific evidence has caused the agency to depart from its conclusion that the current Prozac labeling appropriately reflects the level of concern about Prozac and suicidality." *Id.*

<u>2. The Court's opinion in *Motus v. Pfizer*, 127 F. Supp. 2d 1085 (C.D. Cal. 2000).</u>

In 2000, this Court denied a motion for summary judgment based on a claim of preemption in a failure-to-warn case involving another antidepressant, Zoloft. Because Defendants have relied heavily on what they perceive as the differences between this case and *Motus*, the Court will summarize *Motus* and review the scientific and regulatory developments since 2000.

Victor Motus took Zoloft sometime in November 1998, and on November 12, 1998, he committed suicide. *Motus*, 127 F. Supp. 2d at 1086. His widow sued Pfizer, the manufacturer. Pfizer argued that under conflict preemption principles, Motus's state law-based failure to warn claims were preempted, because the FDA had considered and rejected the inclusion of suicide warnings in Zoloft's labeling. *Id.* at 1087. This Court disagreed.

The FDA had instructed Pfizer to use specific text in its labeling. That text is the "standard language" quoted above and used in the Sandoz label at the time Carrasco was given his prescription. In reaching the conclusion that Pfizer had not established impossibility of compliance with state law requirements, the Court agreed with prevailing court opinions that FDA standards for labeling were minimum standards. *Id.* at 1092. Construing the regulations, the Court found that they permitted Pfizer to strengthen Zoloft's warnings without prior FDA approval. *Id.* at 1093-94. In light of FDA decisions rejecting stronger warnings for Prozac, this Court wrote:

> Moreover, and perhaps most importantly, although FDA did not require Pfizer to include suicide-related warnings in Zoloft's label, FDA has not prohibited Pfizer from doing so. On the occasions cited by Pfizer that FDA considered

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 06-7821AHM (AJWx) | Date | March 26, 2010 |
|---|---|---|---|
| Title | ROSEMARY DORSETT v. SANDOZ, INC. | | |

links between suicide and SSRIs, FDA did find that the evidence did not support requiring manufacturers to include additional suicide-related warnings. But FDA never stated that it would be impermissible to include additional warnings. This is consistent with the regulatory provision governing warning labels, 21 C.F.R. § 201.57(e), which indicates only those warnings that must be included in drug labeling, but does not prohibit any warnings.

*Id.* at 1096.

Pfizer had produced evidence that in 1991, 1992, and 1997 the FDA refused to require suicide warnings for Prozac (fluoxetine), the SSRI in question in this case. *See Motus*, 127 F. Supp. 2d at 1089-90. The Court also reviewed Pfizer's "independent" expert-prepared evidence in support of the proposition that stronger warnings would over-deter the use of Zoloft, and concluded that there was "an absence of persuasive evidence establishing a threat of overdeterrence." *Id.* at 1097-98. Pfizer had also proffered a comment by a doctor on the PDAC committee to the effect that there was concern in the scientific community that modifications to the labeling "might" result in a reduction in use, thereby ultimately causing overall injury to the public health, but that he was making no statement as to the correctness of the different positions on the debate on this question. *Id.* at 1098. The Court found that this statement by the PDAC member did not demonstrate "that FDA has found or has relied on a finding that strengthened suicide warnings would overdeter SSRI use." *Id.*

### 3. SSRI-suicidality knowledge and labeling to August 2004.

Over the years, as new drug applicants submitted information to the FDA, additional scientific data about the risks of suicide was developed. *See* Memorandum from Thomas P. Laughren, M.D., to Members of PDAC and Peds AC (Jan. 5, 2004), Lilly's Ex. U. Between 1995 and 2003, the FDA found no increased risk of suicidality from Prozac in adults, but the parties dispute the thoroughness of the FDA's analysis. *See* SGI ¶¶ 19, 128-132. Although the FDA and its advisors had been studying the relationship between SSRIs and suicidality for some time, its consideration of this issue reached an "important milestone" in September 2003, when it received a report from GlaxoSmithKline ("Glaxo") that pediatric patients taking Paxil were at an increased risk for suicide. *Id.* at 11. After PDAC assessed Glaxo's data, the FDA issued a public health advisory, warning that "preliminary data suggested an

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 06-7821AHM (AJWx) | Date | March 26, 2010 |
|---|---|---|---|

| Title | ROSEMARY DORSETT v. SANDOZ, INC. |
|---|---|

excess of reports for suicidality in pediatric patients." *Id.* at 12.[8] However, on January 5, 2004, the FDA's Dr. Thomas Laughren issued a memorandum stating that "there does not appear to be an increased risk of completed suicide associated with assignment to either active drug or placebo in *adults* with [major depressive disorder]." Lilly's Ex. U, SUF ¶ 22 (emphasis added).

In August 2003, Wyeth (the manufacturer of Effexor) voluntarily enhanced its suicide precaution with respect to pediatric patients without any repercussions by the FDA. SGI ¶ 135. Later on, in May 2006, Glaxo *sua sponte* issued its own adult suicide warning using the CBE process, and the FDA did not object to Glaxo's label change. SGI ¶¶ 163-64. As noted above, the CBE regulation allowed Glaxo to "add or strengthen a contraindication, warning, precaution, or adverse reaction" or to "add or strengthen an instruction about dosage and administration that is intended to increase the safe use of the drug product . . . ." 21 C.F.R. §§ 314.70(c)(6)(iii)(A) & (C).

Since late 2003, the FDA has been strengthening and refining its warning labels for SSRIs. In March 2004, the FDA sent a letter to Lilly instructing it to revise its Prozac warning label regarding suicidality. Lilly's Ex. X. That month, the FDA also issued a Public Health Advisory entitled "Worsening Depression and Suicidality in Patients Being Treated by Anti-Depressant." Lilly's Ex. Y; SUF ¶¶ 26-27. In that advisory the FDA noted that it "asked manufacturers of the following antidepressant drugs [which included fluoxetine] to include in their labeling a Warning statement that recommends close supervision of adult and pediatric patients treated with those agents for worsening depression or the emergence of suicidality." *Id.* The FDA's recommended "Warning Information" stated, in part:

> Health care providers should carefully monitor patients receiving antidepressants for possible worsening of depression or suicidality...Although FDA has not concluded that these drugs cause worsening depression or suicidality, health care providers should be aware that worsening of symptoms could be due to the underlying disease or might be the result of drug therapy.

---

[8] The Health Advisory was addressed to Health Care Professionals. It discussed increased reports of suicide and suicidality among pediatric patients who were being treated with some antidepressant drugs (including Fluoxetine) and emphasized that the drugs should be used with caution. Plaintiff's Ex. 57.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 06-7821 AHM (AJWx) | Date | March 26, 2010 |

| Title | ROSEMARY DORSETT v. SANDOZ, INC. |

*Id.* Lilly incorporated the recommended changes in July 2004. SUF ¶¶ 27.

At no point prior to Carrasco's suicide in August 2004 did Lilly request to add suicide
or suicidality language to the Prozac warning label. SUF ¶¶ 206-07. Consequently, of
course, the FDA never rejected any such request.

> ### 4. SSRI-suicidality knowledge and labeling after Carrasco's August 2004 death.

On September 3, 2004, two weeks after Carrasco's suicide, the FDA issued a letter to
all generic fluoxetine manufacturers, including Sandoz, instructing them to revise their labels
to include the stronger suicide warning that Lilly had already incorporated in July 2004.
Pl.'s Ex. 3. The FDA mandatory warning label stated, in relevant part:

> **Clinical worsening and suicide risk** – Patients with major depressive
> disorder, both adult and pediatric, may experience worsening of their
> depression and/or the emergence of suicidal ideation and behavior
> (suicidality), whether or not they are taking antidepressant medications,
> and this risk may persist until significant remission occurs. Although
> there has been a longstanding concern that antidepressants may have a
> role in inducing worsening of depression and the emergence of
> suicidality in certain patients, a causal role for antidepressants in
> inducing such behaviors has not been established. **Nevertheless,
> patients being treated with antidepressants should be observed
> closely for clinical worsening and suicidality, especially at the
> beginning of a course of drug therapy, or at the time of dose
> changes, either increases or decreases.**

Pl.'s Ex. 3 at 6 (emphasis in original).

In January, February and March of 2005, the FDA issued letters to manufacturers
mandating, for the first time, a black box warning concerning the increased risk of
suicidality for children and adolescents. In March 2005, Sandoz submitted revised warning
labels to the FDA. The new Sandoz label included a black-box warning stating, in relevant
part:

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 06-7821AHM (AJWx) | Date | March 26, 2010 |
|---|---|---|---|

| Title | ROSEMARY DORSETT v. SANDOZ, INC. |
|---|---|

> **Antidepressants increased the risk of suicidal thinking and behavior
> (suicidality) in short-term studies in children and adolescents with
> major Major Depressive Disorder (MDD) and other psychiatric
> disorders. Anyone considering the use of fluoxetine or any other
> antidepressant in a child or adolescent must balance this risk with
> the clinical need. Patients who are started on therapy should be
> observed closely for clinical worsening, suicidality, or unusual
> changes in behavior.**

Pl.'s Ex. 4 (emphasis in original). On Sandoz's label, the warning following the black box
stated:

> **Clinical worsening and suicide risk**: Patients with major depressive
> disorder, both adult and pediatric, may experience worsening of their
> depression and/or the emergence of suicidal ideation and behavior
> (suicidality), whether or not they are taking antidepressant medications,
> and this risk may persist until significant remission occurs. There has
> been a long standing concern that antidepressants may have a role in
> inducing worsening of depression and the emergence of suicidality in
> certain patients. Antidepressants increased the risk of suicidal thinking
> and behavior (suicidality) in short-term studies in children and
> adolescents with Major Depressive Disorder (MDD) and other
> psychiatric disorders.

Pl.'s Ex. 4 at 8 (emphasis in original).

As is apparent in the evolution of warnings from 2003 to 2005, the initial focus of
PDAC's inquiry and of FDA and manufacturer revisions to warning labels was on pediatric
patients. However, in 2005, the FDA began a "comprehensive review of 295 individual
antidepressant trials that included over 77,000 adult patients with major depressive disorder
(MDD) and other psychiatric disorders, to examine the risk of suicidality in adults who are
prescribed antidepressants." Third Supp. Authority Ex 1 at 8.[9] On December 13, 2006, the

---

[9]Press Release, U.S. FDA, "FDA Proposes New Warnings About Suicidal
Thinking, Behavior in Young Adults Who Take Antidepressant Medications." (May 2,
2007).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 06-7821AHM (AJWx) | Date | March 26, 2010 |
|---|---|---|---|
| Title | ROSEMARY DORSETT v. SANDOZ, INC. | | |

PDAC met to consider the FDA's meta-analysis of the data. Def. Ex. 8.[10] According to the minutes of the PDAC meeting, the PDAC found that the FDA's analysis demonstrated that "the finding of increased short-term risk for suicidality with antidepressant treatment in pediatric patients does appear to extend into the younger adults." Def. Ex. 8 at 247. The PDAC also found that "beyond age 30, antidepressants begin to show an expected protective effect for suicidality, which is most pronounced beyond age 65." Def. Ex. 8 at 247. Finally, the PDAC "was clear to note that age is a possible proxy to a different causation which the FDA needs to further investigate." Def. Ex. 8 at 247. The PDAC meeting concluded with a vote recommending the revision of labeling to include extension to young adults and further recommending that the label change be extended into the black box. Def. Ex. 8 at t 248. The PDAC decided to leave it to the FDA to determine the precise age limit for a required warning. Mem. Ex. 9 at 249.

Based on the PDAC's recommendation, the FDA on August 2, 2007 approved revisions to labels to incorporate the PDAC's recommendations. Lilly's SUF ¶ 37. These remain the suicidality warnings as they exist today. The FDA's new black box warning states, in relevant part:

> **Suicidality & Antidepressant Drugs—Antidepressants increased the risk compared to placebo of suicidal thinking and behavior (suicidality) in children, adolescents, and young adults in short-term studies of major depressive disorder (MDD) and other psychiatric disorders. Anyone considering the use of [Insert established name] or any other antidepressant in a child, adolescent, or young adult must balance this risk with the clinical need. Short-term studies did not show an increase in the risk of suicidality with antidepressants compared to placebo in adults beyond age 24; there was a reduction in risk with antidepressants compared to placebo in adults aged 65 and older. . . .**

SUF ¶ 37 (emphasis in original). The warning following the black box is similar to that

---

[10]According to the briefing material for the PDAC's meeting on December 13, 1006, the meta-analysis involved 372 placebo-controlled antidepressant trials and almost 100,000 patients. Def. Ex. 7, Thomas P Laughren, M.D., FDA Center for Drug Evaluation and Research, to Members of the PDAC (Nov. 16, 2006).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | CV 06-7821AHM (AJWx) | Date | March 26, 2010 |
| Title | ROSEMARY DORSETT v. SANDOZ, INC. | | |

inside the black box, with the addition of the age-bracket information:

> **WARNINGS – Clinical worsening and suicide risk**
> Patients with major depressive disorder, both adult and pediatric, may experience worsening of their depression and/or the emergence of suicidal ideation and behavior (suicidality), whether or not they are taking antidepressant medications, and this risk may persist until significant remission occurs. Suicide is a known risk of depression and certain other psychiatric disorders, and these disorders themselves are the strongest predictors of suicide. There has been a long standing concern, however, that antidepressants may have a role in inducing worsening of depression and the emergence of suicidality in certain patients during the early phases of treatment. Pooled analyses of short-term placebo-controlled trials of antidepressant drugs. . . showed that these drugs increase the risk of suicidal thinking and behavior (suicidality) in children, adolescents, and young adults (ages 18-24) with major depressive disorder and other psychiatric disorders. Short-term studies did not show an increase in the risk of suicidality with antidepressants compared to placebo in adults beyond age 24; there was a reduction in risk with antidepressants compared to placebo in adults aged 65 and older.

Pl.'s Ex. 6 (emphasis in original).

### 5. The FDA's evolving position on preemption

Starting in 2001, the FDA began to take a position in favor of preemption in SSRI litigation. After this Court's decision in *Motus*, the FDA submitted an *amicus* brief in support of preemption in Pfizer's appeal.[11] Prior to its *Motus* brief, the FDA had not

---

[11]Def. Ex. 1, FDA *Amicus* Brief, *Motus v. Pfizer, Inc.*, Nos. 02-55372, 02-55498 (9th Cir. Sep. 19, 2002). The Ninth Circuit affirmed this Court's decision to dismiss for lack of proximate cause and did not reach the preemption issue. *Motus v. Pfizer, Inc.*, 358 F.3d 659 (9th Cir. 2004).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 06-7821AHM (AJWx) | Date | March 26, 2010 |
|---|---|---|---|

| Title | ROSEMARY DORSETT v. SANDOZ, INC. |
|---|---|

intervened on its own initiative in private tort litigation on behalf of manufacturers.[12]
Following *Motus*, the FDA submitted four more *amicus* briefs: in *Dowhal v. SmithKline
Beecham Consumer Healthcare*, No. S109306 (Cal. July 18, 2003), *Kallas v. Pfizer*, No.
2:04CV0998 PGC (D. Utah Sept. 15, 2005), *Colacicco v. Apotex, Inc.*, No. 05-5500-MMB
(E.D. Pa. May 10, 2006), and the appeal in *Colacicco v. Apotex, Inc.*, No. 06-3107 (3d Cir.
Dec. 4, 2006).[13] Not long after its submission in the *Colacicco* appeal, the FDA issued a
detailed position paper on preemption in a 2006 regulatory preamble. Requirements on
Content and Format of Labeling for Human Prescription Drug and Biological Products, 71
Fed. Reg. 3922 (Jan. 24, 2006) (to be codified at 21 C.F.R. pts. 201, 314, & 601).

In *Wyeth*, the Supreme Court found that the FDA's position in its 2006 preamble
"does not merit deference" for several reasons: the FDA did not provide notice to States and
interested parties of its "sweeping position" on the FDA's pre-empting effect; the preamble
was "at odds with what evidence we have of Congress' purposes; and it reverses the FDA's
own longstanding position without providing a reasoned explanation . . . ." *Wyeth v. Levine*,
— U.S. —, 129 S. Ct. 1187, 1201 (2009). After the *Wyeth* decision, the FDA withdrew its
*amicus* briefs in the *Colacicco* case, which was the only one of the above-listed cases still
pending. Thus, this Court will give no weight whatsoever to the position the FDA
articulated in these *amicus* briefs and in the 2006 preamble.

## III. LEGAL STANDARDS FOR SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56(c) provides for summary judgment when "the
pleadings, depositions, answers to interrogatories, and admissions on file, together with the
affidavits, if any, show that there is no genuine issue as to any material fact and that the
moving party is entitled to judgment as a matter of law." The moving party bears the initial
burden of demonstrating the absence of a "genuine issue of material fact for trial." *Anderson
v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). A fact is material if it could affect the

---

[12]In 1996 the Supreme Court invited the FDA to intervene as amicus in a case
involving a medical device. In that case, the FDA took the position that preemption
should not apply to the tort claims at issue. *See* Brief for the United States as Amicus
Curiae Supporting Respondents/Cross-Petitioners, *Medtronic v. Lohr*, 518 U.S. 470 (Nos.
95-754, 95-886) (March 13, 1996).

[13]Def. Exs. 2-5.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 06-7821AHM (AJWx) | Date | March 26, 2010 |
|---|---|---|---|

| Title | ROSEMARY DORSETT v. SANDOZ, INC. | | |

outcome of the suit under the governing substantive law. *Id.* at 248. The burden then shifts to the nonmoving party to establish, beyond the pleadings, that there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

"When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial. In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co., Inc. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citations omitted). In contrast, when the non-moving party bears the burden of proving the claim or defense, the moving party can meet its burden by pointing out the absence of evidence from the non-moving party. The moving party need not disprove the other party's case. *See Celotex*, 477 U.S. at 325. Thus, "[s]ummary judgment for a defendant is appropriate when the plaintiff 'fails to make a showing sufficient to establish the existence of an element essential to [his] case, and on which [he] will bear the burden of proof at trial.'" *Cleveland v. Policy Mgmt Sys. Corp.*, 526 U.S. 795, 805-06 (1999) (citing *Celotex*, 477 U.S. at 322).

When the moving party meets its burden, the "adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ.P. 56(e). Summary judgment will be entered against the non-moving party if that party does not present such specific facts. *Id.* Only admissible evidence may be considered in deciding a motion for summary judgment. *Id.*; *Beyene v. Coleman Sec. Serv., Inc.*, 854 F.2d 1179, 1181 (9th Cir.1988).

"[I]n ruling on a motion for summary judgment, the nonmoving party's evidence 'is to be believed, and all justifiable inferences are to be drawn in [that party's] favor.'" *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999) (quoting *Anderson*, 477 U.S. at 255). But the non-moving party must come forward with more than "the mere existence of a scintilla of evidence." *Anderson*, 477 U.S. at 252. Thus, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).

## IV.   DISCUSSION

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| | | | |
|---|---|---|---|
| Case No. | CV 06-7821 AHM (AJWx) | Date | March 26, 2010 |

| | |
|---|---|
| Title | ROSEMARY DORSETT v. SANDOZ, INC. |

### A. Standards for Federal Preemption

In this section the Court will merely reiterate what it said in *Motus*. This analysis does not necessarily take into account other courts' *post-Motus* characterizations of the scope or nature of pre-emption.

The Supreme Court has explained that there are three ways in which federal law will preempt a state law:

> First, Congress can define explicitly the extent to which its enactments pre-empt state law. . . .
> Second, in the absence of explicit statutory language, state law is pre-empted where it regulates conduct in a field that Congress intended the Federal Government to occupy exclusively. Such an intent may be inferred from a "scheme of federal regulation . . . so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it," or where an Act of Congress "touch[es] a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." . . . Although this Court has not hesitated to draw an inference of field pre-emption where it is supported by the federal statutory and regulatory schemes, it has emphasized: "Where . . . the field which Congress is said to have pre-empted" includes areas that have "been traditionally occupied by the States," congressional intent to supersede state laws must be "clear and manifest." . . .
> Finally, state law is pre-empted to the extent that it actually conflicts with federal law. Thus, the Court has found pre-emption where it is impossible for a private party to comply with both state and federal requirements, . . . or where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."

*English v. General Elec. Co.*, 496 U.S. 72, 78-79 (1990) (citations omitted) (holding that nuclear fuel production employee's state law claim for intentional infliction of emotional distress was not preempted by the Energy Reorganization Act). These categories are not "rigidly distinct;" in particular, "conflict" and "field" preemption often overlap. *Id.* at 79 n.5.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 06-7821AHM (AJWx) | Date | March 26, 2010 |
| --- | --- | --- | --- |
| Title | ROSEMARY DORSETT v. SANDOZ, INC. | | |

The party contending that a claim is preempted bears the burden of establishing preemption. *Jimeno v. Mobil Oil Corp.*, 66 F.3d 1514, 1526 n.6 (9th Cir. 1995). The Supreme Court has established a presumption against finding preemption, especially where state or local regulation of matters related to health and safety are concerned. *See Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996)("[T]he historic police powers of the States were not to be superceded by the Federal Act unless that was the clear and manifest purpose of Congress."); *N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Inc. Co.*, 514 U.S. 645, 654-55 (1995); *Hillsborough County v. Automated Medical Labs.*, 471 U.S. 707, 715 (1985).

## B. The Supreme Court's Decision in *Wyeth*

In *Wyeth*, the Supreme Court addressed the question of whether the FDA's regulation of drug labeling under federal law preempts a plaintiff's state law tort claim for failure to provide an adequate warning. *Wyeth v. Levine*, — U.S. —, 129 S. Ct. 1187, 1194 (2009). Levine sued Wyeth, a major drug manufacturer in Vermont state court, alleging common law negligence and strict liability for failure to adequately warn of the risks of intravenous administration of an anti-nausea drug. Levine alleged that as a result of that failure her arm had to be amputated. *Id.* at 1191. The jury verdict for plaintiff was upheld by the Vermont Supreme Court. *Wyeth* appealed to the United States Supreme Court, asserting that it could not be found liable under state tort law because Levine's claims were subject to both conflict preemption—*i.e.*, Wyeth claimed it could not comply with both the state-law duties on which Levine based her claims and its federal labeling duties—and to "obstruction preemption"— *i.e.*, requiring Wyeth to comply with a state-law duty to provide a stronger warning "would obstruct the purposes and objectives of federal drug-labeling regulation," *Id.*, at 1199.

On the issue of conflict preemption, the *Wyeth* Court held that the tort claims were not preempted, because "absent clear evidence that the FDA would not have approved a change to [the drug's] label, we will not conclude that it was impossible for [the manufacturer] to comply with both federal and state requirements." *Id.* at 1198. The Court found it very unlikely that the FDA would bring an enforcement action against a manufacturer for strengthening a warning pursuant to its authority to do so under the CBE regulation. It stated, "And the very idea that the FDA would bring an enforcement action against a manufacturer for strengthening a warning pursuant to the CBE regulation is difficult to accept—neither Wyeth nor the United States has identified a case in which the FDA has

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 06-7821 AHM (AJWx) | Date | March 26, 2010 |
|---|---|---|---|
| Title | ROSEMARY DORSETT v. SANDOZ, INC. | | |

done so." *Id.* at 1197. The Court explained that the "manufacturer bears responsibility for the content of its label at all times. It is charged both with crafting an adequate label and with ensuring that its warnings remain adequate as long as the drug is on the market . . . . Thus, when the risk of gangrene from [the method of drug administration] became apparent, Wyeth had a duty to provide a warning that adequately described that risk and the CBE regulation permitted it to provide such a warning before receiving the FDA's approval." *Id.* at 1198. The Court also relied on the findings that the FDA had not intended to prohibit a more stringent warning and that the manufacturer had not presented data to the FDA specifying dangers of such a warning, or proposing a warning that the FDA rejected. *Id.* *Compare* SGI ¶¶ 206-207 (stating that prior to Carrasco's suicide, Lilly never proposed and the FDA never rejected a request by Lilly to add suicide or suicidality language to its warning labels).

The Supreme Court also rejected Wyeth's "obstruction pre-emption" argument that "requiring it to comply with a state-law duty to provide a stronger warning about IV-push administration would obstruct the purposes and objective of federal drug labeling regulation." The Court found "no merit in this argument, which relies on an untenable interpretation of congressional intent and an overbroad view of an agency's power to preempt state law." *Id.* at 1199. (*See* section II C(5), *supra*.) Although the Court noted "that an agency regulation with the force of law can pre-empt conflicting state requirements," it went on to reject the FDA's reliance on its 2006 "Preamble": "We are faced with no such regulation in this case, but rather with an agency's mere assertion that state law is an obstacle to achieving its statutory objectives." *Id.* at 1200-01.

The parties have cited various lower courts' decisions on FDA preemption since *Wyeth*. The overwhelming weight of the authority has rejected pre-emption claims by both brand-name and generic drugs. The most recent decision to find no pre-emption for generic manufacturers is *Demahy v. Actavis, Inc.*, 593 F.3d 428 (5th Cir. 2010). The most recent decision to find no preemption for a brand name manufacturer in connection with an SSRI suicide case (involving Paxil) is *Mason v. SmithKline Beecham Corp.*, — F.3d —, 2010 WL 605922 (7th Cir. Feb. 23, 2010).

**C. Both Defendants' Claims on Conflict Preemption**

The Defendants argue that *Wyeth* does not foreclose preemption here because there is stronger evidence in this case than in *Wyeth* that the FDA would have refused to permit a

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 06-7821AHM (AJWx) | Date | March 26, 2010 |
|---|---|---|---|
| Title | ROSEMARY DORSETT v. SANDOZ, INC. | | |

more stringent label.

Preemption may be implied where compliance with both federal and state requirements is impossible. *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142-43 (1963). The Defendants argue that federal law precluded them from including any additional warnings of a risk of suicide or suicidality in their labeling. They assert that additional warnings of a risk of suicide/suicidality in SSRI drug labeling would have rendered the label misbranded under the FDCA and the FDA regulations. *See* 21 U.S.C. §§ 352(a),(f). Sandoz additionally argues that regulations prohibit generic manufacturers from changing a label without prior FDA approval.

The risk of FDA enforcement action against Sandoz would have rendered compliance impossible as of July 15, 2004, when Carrasco began taking fluoxetine, only if there was "clear evidence that the FDA would not have approved a change" to Prozac's label. *Wyeth*, 129 S. Ct. at 1198. Like the defendant in *Motus*, the Defendants here rely on the fact that prior to Carrasco's prescription, the FDA had rejected citizen petitions to add a warning to the Prozac label about the risk of suicide. Defendants also point to a 2002 FDA decision to the effect that, based on a review of all SSRI drugs, the scientific evidence did not show an association between SSRIs and suicide, as well as a January 2004 FDA memorandum stating that there did not appear to be an increased risk of suicide in adults from use of SSRIs.

The FDA's rejections of citizen petitions in the 1990s do not constitute clear evidence that warnings of such an association in July 2004 would have been false and misleading, and hence not permitted. As this Court concluded in *Motus*, the FDA's rejection of those petitions constituted determinations that the warnings should not be *mandated*; they were not determinations that manufacturers could not choose to add warnings that they believed were scientifically substantiated. *Motus* at 1096.

In the period between 2002 and Carrasco's prescription, the FDA's position was changing and had changed, at least in part because of GlaxoSmithKline's report to the FDA in September 2003 that company studies showed an increased risk for pediatric patients. As a result of the Glaxo report, the FDA replaced its prior opposition to any possible warning with the position that there was no evidence to support a finding of increased risk of suicidality in adults, as evidenced in the January 5, 2004 Dr. Laughren memorandum. Lilly's SUF ¶ 22. However, in March 2004, the FDA issued a Public Health Advisory asking manufacturers to include in their labeling a warning recommending close supervision

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 06-7821AHM (AJWx) | Date | March 26, 2010 |
|---|---|---|---|

| Title | ROSEMARY DORSETT v. SANDOZ, INC. |
|---|---|

of adult and pediatric patients treated with those agents for worsening depression or the emergence of suicidality." Def. Ex. 6 at 231. Therefore, unlike in 2002 and earlier, by March 2004 the FDA accepted that scientific evidence did show an association between SSRIs and suicide in pediatric patients and it was in the process of determining whether such an association existed for adult patients as well.

Given these developments in the state of scientific knowledge in the SSRI industry leading up to July 2004, it cannot be said that there is clear evidence that in July 2004 the FDA would have prohibited additional suicidality warning language.[14]

Defendants do not offer evidence of any instances where additional safety warnings for an approved drug, whether through a labeling change or some other medium, rendered a drug "misbranded." On the contrary, there have been several notable instances in which SSRI drug manufacturers' strengthened warnings were *not* rejected as "misbranding" by the FDA. For example, in 2003, amid concerns that the SSRI Effexor caused increased risk of suicide among pediatric patients, the drug's manufacturer, Wyeth, unilaterally added additional warnings to its labels and issued a "Dear Health Care Professional" letter noting the warnings to practitioners. Pl.'s Ex. 10. In 2006, GlaxoSmithKline, manufacturer of Paxil, unilaterally strengthened the suicide and suicidality warnings in Paxil's label to warn of an increased risk for young adults and issued a "Dear Health Care Professional" letter notifying practitioners of the new warning. Pl.'s Ex. 12. These manufacturers' actions were consistent with their obligation under the regulations to revise their labeling to "include a warning as soon as there is reasonable evidence of an association of a serious hazard with a drug." 21 C.F.R. § 201.57(e) (effective to Jun. 29, 2006)." Defendant has provided the Court with no evidence that the FDA took any action against either Wyeth or GlaxoSmithKline for "misbranding" their products. On the contrary, after these manufacturers voluntarily strengthened the warnings on their labels, the FDA issued new *mandatory* labeling requirements to reflect the same conclusions about the risk of suicidality in pediatric patients and, later, in young adult patients. Pl.'s Exs. 10 & 12. At the hearing,

---

[14]At the hearing, Lilly relied on the FDA's August 2007 warning label change, which stated, "Short-term studies did not show an increase in the risk of suicidality with antidepressants compared to placebo in adults beyond age 24." SUF ¶ 37. However, this language, from 2007, does not provide "clear evidence" that the FDA would not have approved a broader suicidality warning that pertained to young adults in 2004. *See Wyeth*, 129 S. Ct. at 1198.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 06-7821AHM (AJWx) | Date | March 26, 2010 |
|---|---|---|---|

| Title | ROSEMARY DORSETT v. SANDOZ, INC. |
|---|---|

counsel for Lilly attempted to distinguish Wyeth's and GlaxoSmithKline's actions, saying that their enhanced warning labels were based on data for Effexor and Paxil, not Prozac, and that the studies focused primarily on pediatric patients. *See* Pl.'s Supp. Exs. 56 & 75. Lilly's counsel is incorrect. Though the Wyeth studies and warning pertained to pediatric patients, Ex. 56, the GlaxoSmithKline warning also addressed adult patients, Ex. 75 at 12. Moreover, and more fundamentally, Lilly's argument fails because Lilly ignores its burden here. To establish a preemption defense, a drug manufacturer must produce "clear evidence that the FDA would not have approved a change to [the drug's] label." *Wyeth*, 129 S.Ct. at 1198. A mere possibility that the FDA might not have allowed an enhanced suicidality warning for Prozac, despite allowing it for Effexor and Paxil, is not enough to warrant preemption.

As stated in *Cartwright v. Pfizer, Inc.,* 369 F. Supp. 2d 876, 885-86 (E.D. Tex. 2005), "Given the hearings by both Congress and the FDA regarding suicidality, the FDA's PDAC's recent decision to recommend black box warnings regarding suicidality in children and adolescents, and the numerous experts who have concluded that there is a link between SSRIs, like Zoloft, and suicidality, it would be inconceivable to this Court to argue that an additional warning regarding suicidality would be false or misleading." Defendants offer nothing but theoretical assumptions of what the FDA would have done , and that is not enough to warrant a finding of preemption. *See Witczak v. Pfizer, Inc.*, 377 F. Supp. 2d 726, 731 (D. Minn. 2005) (finding no direct conflict where Pfizer's claim of direct conflict rests on "speculative hypotheticals") (citing *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 110 (1992) (Kennedy, J., concurring)).

Providing additional warning to a drug label is a far cry from the types of labeling that the FDA has deemed "misbranded." *Cf. United States v. Snoring Relief Labs, Inc.,* 210 F.3d 1081 (9th Cir. 2000) (holding that an over-the-counter anti-snoring mouthpiece was misbranded because of inadequate directions for safe use); *United States v. Johnson*, 471 F.3d 764 (7th Cir. 2006) (affirming criminal sentence of petitioner who sold misbranded repackaged cough suppressant labeled "for research and development only" to Internet customers for recreational use); *United States v. Lane Labs-U.S.A., Inc.,* 427 F.3d 219 (3d Cir. 2005) (affirming district court award of restitution to customers who purchased misbranded topical skin cream and dietary supplement claiming to treat HIV and cancer).

As previously noted, Plaintiff has not proffered the precise language she thinks should have been used. So Defendants have presented a challenge to plaintiff's general allegation of failure to warn. That challenge is, like the one in *Motus*, "overbroad." *Motus*, 127 F.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 06-7821AHM (AJWx) | Date | March 26, 2010 |
|---|---|---|---|

| Title | ROSEMARY DORSETT v. SANDOZ, INC. | | |

Supp. 2d at 1095.  As the Court previously concluded:

> Although certain suicide warnings could violate federal law because they were
> false or misleading or were not based on "the essential scientific information
> needed" for safe use, the Court does not think that any and every suicide-related
> warning that might be required under state law is necessarily false or
> misleading, or not based on "the essential scientific information needed" for
> safe use.

*Id.*  Plaintiff *has* provided examples of warnings that are stronger than the one Defendants
provided in July 2004, but still fall short of warning of an actual "association" between
SSRIs and suicidality in adults.  (Defendants claim such a warning would be preempted.)
For example, Dorsett points to the warning that has been on Sandoz's labeling since
September 2004:  "Patients with major depressive disorder, both adult and pediatric, may
experience worsening of their depression and/or the emergence of suicidal ideation and
behavior (suicidality), whether or not they are taking antidepressant medications, and this
risk may persist until significant remission occurs."  Opp'n at 4; Pl.'s Ex. 3.

The theoretical possibility that the FDA might have found a given warning to be
misleading is insufficient to support a finding that Defendants faced a direct conflict between
state and federal law.  What matters is not whether manufacturers perceive a potential
conflict that might subject them to FDA enforcement action, but whether there is clear
evidence that the FDA would not have approved any stronger warning—and Defendants
have not shown that.

### D. Sandoz's Claim Unique to Generics

Sandoz makes another argument, one unique to it:  FDA regulations prohibited it from
making *any* changes to Fluoxetine labeling that would deviate from that of the "innovator"
(or "listed")  drug—*i.e.*, , Prozac—because generic drug manufacturers may not make any
change in a warning label without prior FDA approval.  This contention was not addressed
in *Wyeth*.  It lacks merit.

Supplements and other changes to an approved generic drug application are governed

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 06-7821 AHM (AJWx) | Date | March 26, 2010 |
|---|---|---|---|

| Title | ROSEMARY DORSETT v. SANDOZ, INC. |
|---|---|

by 21 C.F.R. § 314.97. That section states: "The applicant shall comply with the requirements of §§ 314.70 and 314.71 regarding the submission of supplemental applications and other changes to an approved abbreviated application." In turn, the CBE regulation in section 314.70(c) allows manufacturers to distribute products with strengthened warnings upon FDA's receipt of a supplemental application. 21 C.F.R. § 314.70(c)(6)(iii).

Sandoz argues that section 314.70(c) does not apply to generic manufacturers, because generic labels must match those of the innovator drug.[15] It argues that a generic manufacturer may change its warnings only if the FDA approves the changed labels for both the generic and innovator drugs. In support of this contention, Sandoz cites the statutory requirement that generic drug applicants must "show that the labeling proposed for the new drug is the same as the labeling approved for the listed drug," 21 U.S.C. § 355(j)(2)(A)(v). Recently, the Fifth Circuit rejected the argument proffered by Sandoz, noting that "[w]hile Congress plainly intended for a generic drug manufacturer to submit labeling identical to—or the 'same as'—the brand name drug when seeking ANDA approval, the statutory scheme is silent as to the manufacturer's obligations after the ANDA is granted." *Demahy*, 593 F.3d at 436. *See also Laisure-Radke v. Par Pharm., Inc.*, 426 F. Supp. 2d 1163, 1169 (W.D. Wash. 2006) ("[O]nce a generic manufacturer holds an approved ANDA for a particular product, it can add or strengthen a contraindication, warning, precaution, or adverse reaction at any time without prior FDA approval.").

The ANDA process merely frees a manufacturer from the pre-approval clinical trial requirements so long as it can prove that the generic is bioequivalent to the innovator drug. *Schering Corp. v. Food and Drug Admin.*, 866 F. Supp. 821, 823 (D.N.J. 1994), *judgment aff'd*, 51 F.3d 390 (3d Cir. 1995). After the bifurcated application process, generic drug manufacturers and brand name drug manufacturers are treated the same. By the plain text of 21 C.F.R. § 314.97, the CBE process applies to both generic and brand name manufacturers. Both are permitted to distribute drugs containing changes within thirty days of the FDA's

---

[15]At the hearing, Plaintiff's counsel directed the Court's attention to Sandoz's (then called "Geneva Pharmaceuticals, Inc.") Application to Market a New Drug, where the company representative signed a statement agreeing to "comply with all applicable laws and regulations that apply to approved applications, including . . . [r]egulations on making changes in application in 21 CFR 314.70, 314.71, and . . . 314.97 . . . ." Pl.'s Supp. Ex. 112 at 2. This document is not dispositive of the question of whether section 314.70 applies to Sandoz, but it does lend some support to Plaintiff's position.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 06-7821AHM (AJWx) | Date | March 26, 2010 |
|---|---|---|---|

| Title | ROSEMARY DORSETT v. SANDOZ, INC. |
|---|---|

receipt of the supplement, and generic and brand name manufacturers alike are required to revise the labeling to "include a warning as soon as there is reasonable evidence of an association of a serious hazard with a drug; a causal relationship need not have been proved." 21 C.F.R. § 314.70(c)(4); 21 C.F.R. § 201.57(e) (effective to Jun. 29, 2006).[16]

Sandoz nevertheless argues that the Court should find that the FDA has consistently interpreted section 314.70 to be inapplicable to generic manufacturers, and that the Court should defer to this interpretation.[17] In support of this position, Sandoz refers the Court to several guidance documents issued by the FDA. *See* Abbreviated New Drug Applications Regulations, 57 Fed. Reg. 17950, 17961 (Apr. 28, 1992) (to be codified at 21 C.F.R. pts. 2, 5, 10, 310, 314, 320, and 433) ("[T]he ANDA product's labeling must be the same as the listed drug product's labeling . . . . After approval of an ANDA, if an ANDA holder believes that new safety information should be added, it should provide adequate supporting information to FDA, and FDA will determine whether the labeling for the generic and listed drugs should be revised."); the FDA's withdrawn *Amicus Curiae* brief in *Colacicco v. Apotex, Inc.*, No. 06-3107 (3rd. Cir. Dec 4, 2006) ("*Colacicco II Amicus* Br.") at 8, n.4; Supplemental Applications Proposing Labeling Changes for Approved Drugs, Biologics, and Medical Devices, 73 Fed. Reg. 2848, 2849 n.1 (proposed Jan. 16, 2008) ("CBE changes are not available for generic drugs approved under an abbreviated new drug application under 21 U.S.C. 355(j). To the contrary, a generic drug manufacturer is required to conform to the approved labeling for the listed drug.").

First of all, it is not clear that these pronouncements merit consideration. The *Colacicco amicus* brief has been withdrawn and the 2008 proposed regulation was never adopted. With respect to the comments in the 1992 regulation, the one circuit court to have analyzed these comments—the Fifth Circuit—found that the comments did not speak directly to the ability of a generic manufacturer to use the CBE regulation to revise a

---

[16]In a memo dated January 5, 2004 to the members of the FDA's Pharmacological Drugs Advisory Committee ("PDAC"), FDA Psychiatric Drug Products Team Leader Dr. Thomas P. Laughren specifically noted that "sponsors have the authority to make changes of this nature, i.e. that are perceived to strengthen labeling from the standpoint of safety, without prior approval of FDA." (Pl.'s Ex. 11 at 11).

[17]The Supreme Court in *Wyeth* did not explicitly address the issue of deference to the FDA on the issue of preemption for generics, so the Court will address this issue here.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 06-7821AHM (AJWx) | Date | March 26, 2010 |
|----------|----------------------|------|----------------|

| Title | ROSEMARY DORSETT v. SANDOZ, INC. |
|-------|----------------------------------|

warning label. *Demahy v. Actavis*, 593 F.3d 428, 442 (5th Cir. 2010). According to the
Fifth Circuit, FDA's comment that "if an ANDA holder believes that new safety information
should be added, it should provide adequate supporting information to FDA, and FDA will
determine whether the labeling for the generic and listed drugs should be revised," 57 Fed.
Reg. at 17961, means only that "the FDA is the ultimate arbiter for all changes—whether
prompted by a pioneer manufacturer or a generic one." 593 F.3d at 442. "*Every* submitted
change requires FDA approval, even one that takes effect immediately through the CBE
process." *Id.* Thus, the one presently valid document interpreting the ANDA regulatory
scheme does not necessarily prescribe that the CBE process is inapplicable to generic
manufacturers.

Moreover, even if the 1992 comments, described on page 26, are read to exclude
generic manufacturers from using the CBE process, they would not be entitled to deference
in this interpretation. An agency's interpretation of its own regulations is "controlling unless
'plainly erroneous or inconsistent with the regulation.'" *Auer v. Robbins*, 519 U.S. 452, 461
(1997) (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 359 (1989));
*accord Federal Express Corp. v. Holowecki*, 552 U.S. 389, 397 (2008). Here, section
314.97 makes it clear that the CBE regulation in section 314.70 applies to generic drug
manufacturers. Section 314.70, in turn, does not contain any language exempting generic
drug manufacturers. The position that Sandoz ascribes to the FDA impermissibly stretches
the meaning of the provisions at issue, and is inconsistent with sections 314.97 and
201.57(e).

Not only is there no support in the plain text of the regulations for Sandoz's position,
there is no support in the Congressional history of the Hatch-Waxman Act of 1984 for
shielding generic manufacturers from liability for their warnings. In *Foster v. American
Home Products Corp.*, 29 F.3d 165 (4th Cir. 1994), the Fourth Circuit addressed this issue
directly:

> Although generic manufacturers must include the same labeling
> information as the equivalent name brand drug, they are also permitted
> to add or strengthen warnings and delete misleading statements on
> labels, even without prior FDA approval. The statutory scheme
> governing premarketing approval for drugs simply does not evidence
> Congressional intent to insulate generic drug manufacturers from
> liability for misrepresentations made regarding their products, or to
> otherwise alter state products liability law. Manufacturers of generic

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 06-7821AHM (AJWx) | Date | March 26, 2010 |
| --- | --- | --- | --- |

| Title | ROSEMARY DORSETT v. SANDOZ, INC. |
| --- | --- |

drugs, like all other manufacturers, are responsible for the representations they make regarding their products.

*Foster*, 29 F.3d at 170. *See also Demahy*, 593 F.3d at 449; *Mensing v. Wyeth, Inc.*, 588 F.3d 603, 607-08 (8th Cir. 2009) (no preemption for a generic manufacturer of a diabetes drug). Like the Fourth, Fifth, and Eighth Circuits, this Court finds the argument distinguishing generic manufacturers from their brand name counterparts unpersuasive.[18]

### E. Both Defendants' Claims of Frustration of Congressional Purpose (Obstacle Preemption).

The Defendants also assert what is known as obstacle preemption. Under this doctrine, a court will find preemption where "'under the circumstances of [a] particular case, [the challenged state law] stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)). If the purposes of a Congressional statute cannot be accomplished if state law were allowed to operate, then the state law must yield. *Crosby*, 530 U.S. at 373.

The Defendants argue that allowing state failure-to-warn lawsuits would frustrate the FDA's objectives by interfering with the agency's role in ensuring the accuracy of prescription drug labeling and by over-deterring use of SSRI drugs. This argument was effectively foreclosed by the holding in *Wyeth* that a state failure-to-warn claim did not obstruct the purposes and objectives of federal drug labeling regulation. *Wyeth*, 129 S. Ct. at 1199-1204. The Court held that the manufacturer had not demonstrated that "failure-to-warn claims like Levine's obstruct the federal regulation of drug labeling." *Id.* at 1204. Both *Wyeth* and this case involve failure-to-warn claims, and there is no

---

[18]Sandoz also cites, and at the hearing relied heavily upon, 21 C.F.R. § 314.150(b)(10). This section merely provides that the FDA "may" initiate a hearing for the withdrawal of a drug's approval if the labeling is "no longer consistent with that for the listed drug;" it does not *require* that the generic drug label be *identical* at all times with the listed drug label. Sandoz cites no evidence to show that the FDA in fact has ever acted under § 314.150(b)(10) to withdraw approval for a strengthened generic drug warning on the grounds that the stronger warning has rendered the generic drug labeling "no longer consistent" with that of the listed drug.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 06-7821AHM (AJWx) | Date | March 26, 2010 |
| --- | --- | --- | --- |

| Title | ROSEMARY DORSETT v. SANDOZ, INC. |
| --- | --- |

meaningful basis on which to distinguish this case from *Wyeth*.

## V.    CONCLUSION

FDA labeling regulations and state law adequacy of warning duties have coexisted
from the time the FDCA was first enacted.  Under California law "a manufacturer
discharges its duty to warn if it provides adequate warnings to the physician about any
known or reasonably knowable dangerous side effects."  *Motus v. Pfizer, Inc.*, 196 F.
Supp. 2d 984, 990-91 (C.D. Cal. 2001) (citing *Carlin v. The Superior Court of Sutter
County*, 13 Cal. 4th 1104, 1112-13 (1996).  Likewise, the FDA requires manufacturers to
proactively revise their labels upon learning of "reasonable evidence" of "an association
of a serious hazard with a drug" (after June 2006, a "causal association).  21 C.F.R. §
201.57(e).  A direct and positive conflict would arise "if a state, by positive law, required
a drug manufacturer to include a warning that the FDA had previously rejected as
scientifically unsubstantiated, [so] that inclusion could expose the manufacturer to
liability for misbranding."  *Souther v. Eli Lilly & Co. (In re Zyprexa Products Liability
Litigation)*, 489 F. Supp. 2d 230, 275(E.D.N.Y. 2007) (citing 21 U.S.C. § 352).  Here,
there is no such conflict between the state law duty and the FDA's standard.  Even
assuming a difference in the state and federal standards, a jury verdict of negligence,
which imposes damages but does not compel a manufacturer to change its labels, does
not necessarily create a direct and positive conflict.  *See id.* at 276-77 (citing *Bates v.
Dow Agrisciences LLC*, 544 U.S. 431, 444 (2005) ("None of these common-law rules
requires that manufacturers label or package their products in any particular way.")).

Based on the evidence before it, the Court cannot find that it would have been
impossible for Defendants to comply with federal and state law or that the application of
state law would frustrate Congress's purpose in enacting the FDCA.  The Defendants
have not provided evidence that state law here "actually conflicts with federal law."
*English*, 496 U.S. at 78-79.  Absent clear Congressional intent to do so, the Court will not
foreclose the traditionally available state law remedy for which the FDCA provides no
substitute.  *See Medtronic, Inc.*, 518 U.S. at 487 (plurality opinion) ("It is, to say the least,
'difficult to believe that Congress would, without comment, remove all means of judicial
recourse for those injured by illegal conduct.' ") (quoting *Silkwood v. Kerr-McGee Corp.*,
464 U.S. 238, 251 (1984)); *Bates*, 544 U.S. at 449 ("If Congress had intended to deprive
injured parties of a long available form of compensation, it surely would have expressed
that intent more clearly."); *Desiano v. Warner-Lambert & Co.*, 467 F.3d 85, 97 n.9 (2d

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 06-7821AHM (AJWx) | Date | March 26, 2010 |
|---|---|---|---|

| Title | ROSEMARY DORSETT v. SANDOZ, INC. |
|---|---|

Cir. 2006) ("An agency cannot supply, on Congress's behalf, the clear legislative statement of intent required to overcome the presumption against preemption.") (citations omitted). Thus, the Defendants have failed to meet their burden of establishing preemption.

Accordingly, the Court DENIES Defendants' motions for partial summary judgment.[19]

|  | : |  |
|---|---|---|
| Initials of Preparer | | SMO |

---

[19]Docket No. 31 & 79.