1

2  AARON J. GREENSPAN
   THINK COMPUTER FOUNDATION
3  1132 Boranda Avenue
   Mountain View, CA 94040-3145
   Telephone: (415) 670-9350
4  Fax: (415) 373-3959
   E-Mail: legal@thinkcomputer.org

5  *PRO SE*



6              UNITED STATES DISTRICT COURT

7            NORTHERN DISTRICT OF CALIFORNIA

8                  SAN JOSE DIVISION

9

10 | AARON GREENSPAN; THINK | Case No. 5:14-cv-02396-BLF
   | COMPUTER FOUNDATION, an Ohio |
11 | 501(c)3 non-profit corporation; and THINK | **FIRST AMENDED COMPLAINT FOR**
   | COMPUTER CORPORATION, a Delaware | **INJUNCTIVE AND DECLARATORY**
   | corporation, | **RELIEF**

12

                 Plaintiffs,                    JURY TRIAL DEMANDED

13
                                               Judge Beth Labson Freeman
                      v.
14

15 ADMINISTRATIVE OFFICE OF THE
   UNITED STATES COURTS; MICHEL
   ISHAKIAN, in her official capacity on behalf
16 of the Administrative Office of the United
   States Courts; WENDELL SKIDGEL, in his
17 official capacity on behalf of the
   Administrative Office of the United States
18 Courts; UNITED STATES DISTRICT
   COURT FOR THE NORTHERN DISTRICT
19 OF CALIFORNIA; RICHARD WIEKING, in
   his official capacity on behalf of the United
20 States District Court for the Northern District
   of California; CLAUDIA WILKEN in her
21 official capacity on behalf of the United States
   District Court for the Northern District of
22 California; and AMERICAN BAR
   ASSOCIATION,
23
                  Defendants.
24

---

FIRST AMENDED COMPLAINT                                    5:14-cv-02396-BLF

1   Pursuant to Federal Rule of Civil Procedure 15(a)(1)(A), Plaintiffs Aaron Greenspan,

2   Think Computer Foundation (the "Foundation") and Think Computer Corporation

3   (collectively, "Plaintiffs") hereby allege and state as their amended claims against the

4   Defendants as follows:

5   ## INTRODUCTION AND SUMMARY OF THE CASE

6   1.  This case stems from the systematic inequitable treatment of litigants in the

7   federal court system, including but not limited to *pro se* litigants and small businesses.

8   Unlike large corporations who dominate our legal system, *pro se* and small business litigants

9   are best characterized by the fact that they have limited resources with which to assert their

10  legal rights.  The United States Courts (the "Courts") discriminate against these types of

11  litigants in a number of ways, but two stand out: the imposition of an unreasonable and

12  unlawful cost structure for access to public domain materials vital to the successful

13  prosecution of a case; and the imposition of unconstitutional Local Rules and policies that are

14  designed to favor the financial interests of attorneys and harm the interests of non-attorneys.

15  2.  As the direct embodiment of Article III of the United States Constitution, the

16  Courts are a vital public resource and asset.  According to publicly available statistics, from

17  the period starting June 30, 2012 and ending June 30, 2013, the Courts handled 283,087 civil

18  case filings and 69,642 criminal case filings nationwide at the district level.  At the appellate

19  level, the Courts saw 56,360 filings.  These statistics represent typical caseload levels in

20  recent years.

21  3.  In general, rather than embracing modern computer technology as a means for

22  boosting efficiency and promoting equal access, the Courts have used technology as a

23  weapon to defend themselves against the poor, by restricting access, imposing hurdles, and

24

1  maintaining a paper-based system so Byzantine that only the wealthiest echelon of society

2  can afford to navigate its myriad twists and turns.

3      4.  Even this lawsuit faced significant hurdles in filing, both because the lack of

4  attorney involvement prohibited it from being filed electronically, and because staff for the

5  Clerk required the undersigned to needlessly return to court a *second* time to file, based upon

6  an imaginary "Local Rule" that supposedly closed the Clerk's office a half-hour early on a

7  Thursday.

8      5.  Many of the Courts' technology woes are a direct result of their antiquated case

9  management system. Individual federal court cases at the district and appellate levels are

10  tracked and published on-line through an electronic filing system known somewhat

11  interchangeably as CM/ECF and PACER, which are respectively acronyms for Case

12  Management/Electronic Case Files (the system's "write" component) and Public Access to

13  Court Electronic Records (the system's "read" component, used in this document to refer to

14  the entire system for the sake of simplicity). PACER is managed, developed and maintained

15  by Defendant Administrative Office of the United States Courts (the "AO"). The central

16  PACER web site, http://www.pacer.gov, is one of many individual PACER web sites that the

17  various district, bankruptcy and appellate courts each maintain with some degree of

18  autonomy. The United States Supreme Court does not maintain a PACER site.

19      6.  Throughout the nation, for every federal district, bankruptcy and appellate court,

20  Defendant AO mandates and collects public access fees for electronic access to PACER web

21  pages, such as dockets, and court documents. Such fees are authorized by Congress, but only

22  to the "extent necessary." For years, the AO has completely ignored and/or twisted this

23  deliberate Congressional limitation, and has exploited its limited authorization, transforming

24

1 | PACER into a highly profitable crutch to prop up the Courts' budget. The AO's willful
2 | disregard of Congressional intent violates at least the E-Commerce Act of 2002 and promotes
3 | societal inequality that violates the spirit of the Equal Protection Clause.

4 |     7. The AO has imposed policies granting extremely limited free access to PACER to
5 | its least demanding users and certain select academics, in an attempt to gloss over, quell
6 | discussion around and otherwise excuse its unlawful activity.

7 |     8. The imposition of un-"necessary" fees on litigants and the public inherently
8 | biases the Courts in favor those parties with larger budgets, especially because PACER is
9 | designed in such a way that it functions in an unreliable and erratic manner, often billing
10 | users for the AO's programming mistakes. *Pro se* and *in forma pauperis* litigants are among
11 | the least able to afford such unlawful, unnecessary and erroneous fees, and in a precedent-
12 | based system, access to court documents is necessary for the successful prosecution of a case.

13 |     9. Plaintiffs are active users of PACER through account AG4236, registered to
14 | Plaintiff Aaron Greenspan since November 14, 2011. Since that date, Plaintiffs have
15 | collectively paid at least $1,077.56 in unlawful, unnecessary and erroneous fees to the AO
16 | simply to access public information that the AO incurs zero marginal cost to provide. At
17 | various times, the AO has been compensated directly by each Plaintiff, with reimbursements
18 | taking place between the other two Plaintiffs as necessary.

19 |     10. The Courts are further biased in favor of parties with large budgets, and against
20 | small businesses, through the imposition of specific Local Rules in each district and appellate
21 | court that serve to collectively prohibit corporate self-representation in the United States of
22 | America. Such local rules ("the Restrictive Local Rules"), including Civil Local Rules 3-
23 | 9(b) and 5-1(b) in the Northern District of California, are unconstitutional, in violation of the
24 |

First Amendment, as well as the Equal Protection and Due Process Clauses of the Fourteenth Amendment to the United States Constitution.

11. The Restrictive Local Rules exist not to further the interests of justice, but as protectionist measures designed to solidify the economic monopoly of Defendant American Bar Association (the "ABA").

12. To remedy these present, on-going and continuous facial and applied constitutional violations, and to put an end to the ongoing harm caused by Defendants, Plaintiffs seek declaratory and injunctive relief invalidating Civil Local Rules 3-9(b), 5-1(b) and any other Restrictive Local Rules, and striking down the AO's fee structure for PACER to the extent that it fails to comport with the E-Government Act of 2002 and/or other laws.

## JURISDICTION

13. This action arises under 42 U.S.C. § 1983 and the First and Fourteenth Amendments to the Constitution of the United States; the Sherman Act, 15 U.S.C. § 2; the Federal Tort Claims Act, 28 U.S.C. § 1346; and the Cartwright Act, Cal. Bus. and Prof. Code §§ 16700 *et seq.*

14. This Court has original jurisdiction over these federal claims pursuant to 28 U.S.C. §§ 1331, 1337 and 1343. Jurisdiction is further proper pursuant to 28 U.S.C. § 1367 as all of the claims in this Complaint are part of the same case and controversy.

15. This Court has authority to award the requested declaratory relief under 28 U.S.C. § 2201; the requested injunctive relief under 28 U.S.C. § 1343(3); and any attorney's fees under 42 U.S.C. § 1988.

1

**VENUE**

2    16. Venue is proper under 28 U.S.C. § 1391 in the Northern District of California

3  because a substantial part of the actions or omissions giving rise to this case occurred within

4  this District, and at least one Defendant resides or operates within this District.

5

**THE PARTIES**

6

**Plaintiffs**

7    17. Plaintiff Aaron Greenspan is an individual person residing in Mountain View,

8  California, in Santa Clara County, within this District.  Aaron Greenspan is the founder,

9  President, CEO, Chairman of the Board of Directors, and 100% owner of Think Computer

10  Corporation, as well as the founder, President, and Chairman of the Board of Directors of

11  Think Computer Foundation.  To date, aside from reimbursements for PACER fees paid out

12  of pocket, Plaintiff Greenspan has received no compensation for his work on behalf of the

13  Foundation, nor have his family members, who have also contributed significant time and

14  energy to furthering the Foundation's various goals.

15    18. Plaintiff Think Computer Foundation is an Ohio non-profit corporation

16  recognized by the Internal Revenue Service as a tax-exempt organization under § 501(c)(3)

17  of the Internal Revenue Code.  The Foundation operates PlainSite (http://www.plainsite.org),

18  a popular web site that compiles government information, including information from the

19  Courts via PACER, in order to make such information more accessible to the general public

20  (or put another way, in "plain sight.")  PlainSite is hosted on servers physically located in

21  Santa Clara County, in this District.

22    19. Plaintiff Think Computer Corporation is a Delaware corporation located in

23  Mountain View, California, in Santa Clara County, in this District.  Think Computer

24

---

Corporation develops the PlainSite software and plays an active role in its management.

Think Computer Corporation is also a litigant in this District and as such, is a frequent user

of PACER.

### Defendants

20. Defendant Administrative Office of the United States Courts "serves the federal

Judiciary in carrying out its constitutional mission to provide equal justice under law,"

according to its web site. The AO is a federal governmental entity headquartered in

Washington, D.C. with offices in Richardson, Texas, and oversees PACER in all respects.

21. Defendant Michel Ishakian is Chief, Public Access and Records Management of

the AO in or near Washington, D.C. Ms. Ishakian is a federal employee tasked with

managing PACER, including its fee schedule, and personally communicated with Plaintiffs

in regard to issues surrounding PACER and its fees. She is sued in her official capacity.

22. Defendant Wendell Skidgel is Senior Attorney Advisor for the Public Access and

Records Management Division of the AO in or near Washington, D.C. He works with

Defendant Ishakian to carry out the AO's policies with regard to PACER, and personally

communicated with Plaintiffs on a number of occasions in regard to issues surrounding

PACER and its fees. Mr. Skidgel is a federal employee. He is sued in his official capacity.

23. Defendant United States District Court for the Northern District of California (the

"District Court") is a federal district court in the Ninth Circuit with control over its own

Local Rules. According to its web site, "the boundaries of the Northern District of California

encompass fifteen counties: Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin,

Mendocino, Monterey, Napa, San Benito, San Francisco, San Mateo, Santa Clara, Santa

Cruz, and Sonoma. The court has four courthouses (in San Francisco, Oakland, San Jose and

1   Eureka), fourteen district judgeships (also known as Article III judgeships) and eleven

2   magistrate judgeships."

3   24. Defendant Richard Wieking is Clerk of the District Court. Mr. Wieking is a

4   federal employee directly responsible for carrying out the District Court's policies, including

5   its Local Rules, with regard to *pro se* and *in forma pauperis* litigants. He is sued in his

6   official capacity.

7   25. Defendant Claudia Wilken is the Chief Judge of the District Court, responsible for

8   maintaining and setting the direction of the District Court's Local Rules, and for structuring,

9   overseeing and interpreting the recommendations of the Local Rules Advisory Committee of

10  the District Court pursuant to 28 U.S.C. § 2077(b). She is sued in her official capacity.

11  26. Defendant American Bar Association is an Illinois corporation whose

12  headquarters and principal place of business are located in Chicago, Illinois. According to

13  the ABA web site, "Since 1952, the Council of the Section of Legal Education and

14  Admissions to the Bar of the American Bar Association has been recognized by the United

15  States Department of Education as the national agency for the accreditation of programs

16  leading to the J.D. degree in the United States." The ABA is the sole entity responsible for

17  the accreditation of law schools within the United States, whose degrees are required to sit

18  for virtually all states' bar exams and thus to enter the legal profession; the ABA has

19  participated jointly and severally with various state bar associations and courts to

20  promulgate, validate, and enforce its anti-competitive policies. The ABA also writes various

21  model rules designed to regulate the legal profession and prospective entrants. The ABA

22  conducts business in this District in a variety of manners: the 2013 ABA Annual Meeting

23  took place in San Francisco, California; the ABA has bestowed highly-publicized awards on

24

judges in the District Court; the ABA issues qualification ratings regarding judges in the District Court; the ABA sells various written publications in this District; and the ABA solicits and collects membership dues from residents of this District.

## FACTUAL BACKGROUND

A. *The AO Defies Congress by Relying on PACER Fees for General Revenue*

27. The AO's fee schedule for PACER (the "Fee Schedule"), supposedly "Issued in accordance with 28 U.S.C. § 1913, 1914, 1926, 1930, 1932," and attached to this Complaint as Exhibit A, generally specifies that users must pay $0.10 per "page" for PACER data and $2.40 per audio file.

28. Many PACER documents are stored as Adobe Acrobat Portable Document Format (PDF) files, which are paginated. However, numerous non-PDF pages on PACER are not explicitly paginated, forcing the AO's PACER software developers to guess how many pages *might* be needed to print such pages, and to charge accordingly. The fee for many PACER documents, and especially reports, is therefore arbitrarily determined.

29. PACER frequently charges a fee even for web pages that indicate that PACER encountered an error and/or no results and failed to return the user's requested information.

30. The Fee Schedule states, "No fee is charged for access to judicial opinions." This is false; PACER very often charges $0.10 per page for access to judicial opinions.

31. Defendant Skidgel stated in a March 24, 2014 e-mail to Plaintiffs, "the Judicial Conference of the United States' policy regarding written opinions clearly states that the authoring judge determines which a *[sic]* document meets the definition of a written opinion." This "policy," which in fact does not appear in the Fee Schedule, results in the arbitrary and unlawful levying of fees on users who have no obligation to pay them.

---

1    Furthermore, the word "judge" does not appear anywhere in the Fee Schedule at all,

2    suggesting that it is a uniform, nationwide policy.

3            32. The distinction between opinions, orders, and other materials on PACER is

4    entirely arbitrary. All non-sealed data on PACER is public, non-copyrightable information

5    already in the public domain. Recent attempts by attorneys to enforce copyright law to cover

6    their legal briefs have been struck down. *See White et al v. West Publishing Corporation et*

7    *al*, Case No. 1:12-cv-01340 (S.D.N.Y. 2013).

8            33. The E-Government Act of 2002 (Public Law 107-347) was enacted on December

9    17, 2002, with an effective date for most provisions of April 17, 2003. § 205(e) of the E-

10   Government Act of 2002 reads:

11           "(e) COST OF PROVIDING ELECTRONIC DOCKETING
             INFORMATION.—Section 303(a) of the Judiciary Appropriations Act, 1992
12           (28 U.S.C. 1913 note) is amended in the first sentence by striking 'shall
             hereafter' and inserting 'may, only to the extent necessary,'."
13
     The relevant note attached to 28 U.S.C. § 1913 was therefore modified to read as follows:
14
             "(a) The Judicial Conference may, only to the extent necessary, prescribe
15           reasonable fees, pursuant to sections 1913, 1914, 1926, 1930, and 1932 of title
             28, United States Code, for collection by the courts under those sections for
16           access to information available through automatic data processing equipment.
             These fees may distinguish between classes of persons, and shall provide for
17           exempting persons or classes of persons from the fees, in order to avoid
             unreasonable burdens and to promote public access to such information."
18
     The inclusion of the phrase "to promote public access to such information" is material to the
19
     dual limitations of "reasonable" and "to the extent necessary," representing Congress's clear
20
     goal of making court information easily accessible to the general public, with as few
21
     obstacles as possible.
22
             34. Researchers at the Princeton University Center for Information Technology
23
     Policy ("CITP") examined PACER's financial records for 2010 and prior years. According
24

1  to their findings, "[W]e discovered that the Courts claim PACER expenses of roughly $25

2  million per year. But in 2010, PACER users paid about $90 million in fees to access the

3  system."

4      35. The AO's profit of $65 million from PACER fees in 2010 alone represents a gross

5  abuse of the AO's statutory authorization to collect "reasonable" fees "to the extent

6  necessary." Yet even the quoted figure of $25 million per year grossly inflates the true

7  market cost of operating an information system comparable in scope to PACER. Such a

8  system could be effectively run for under $1 million per year.

9      36. To the extent the AO interprets the words "to the extent necessary" to allow for a

10  "slush fund" against which *potential* future expenses necessary to improve PACER *might* be

11  billed, this interpretation lacks any valid legal support and the AO has failed to disclose any

12  concrete plans for improvement. To the extent that the AO uses PACER-derived funds to

13  acquire various technological resources for the Courts, such as flat-panel televisions or

14  digital projectors, that have no direct bearing upon PACER's functionality, such funds are

15  misspent on purchases that are hardly "necessary."

16      37. The AO has failed to actually improve PACER's functionality in any substantial

17  manner for decades. Attorney Alan D. Sugarman, CEO of HyperLaw, Inc., sent extremely

18  detailed letters to the AO on at least May 7, 2008 and July 10, 2009 raising many of the same

19  concerns contained within this Complaint. The AO's response, on which Defendant Ishakian

20  was BCCed, was perfunctory and no remedying action was taken. *See* Exhibit B.

21      38. To this day, virtually all of Sugarman's concerns are still completely valid. For

22  example, even as of 2014, five years later, several district courts' PACER implementations

23  do not properly display the Summary page for cases, instead admonishing users wishing to

24

1    access routine information with a threat: "Security violation: You do not have access rights to

2    this program (qrySummary.pl). Please contact the Systems Administrator if you feel this is

3    in error. This access attempt has been logged." Such broken and arbitrary functionality is

4    routine.

5         39. For the sake of comparison, Plaintiffs' PlainSite web site, which surpasses

6    PACER's functionality in a number of respects[1] while still mirroring its core purpose and

7    much of its contents, cost less than $5,000 to develop using commodity hardware and open-

8    source software, and costs less than $2,500 to run on an annual basis. PlainSite houses

9    approximately 7 million dockets. Even if PlainSite were 100 times as large, with 700 million

10   dockets, and were correspondingly 100 times as expensive, it would still only cost $250,000

11   at most to run on an annual basis at the same level of service—or ten times less than PACER

12   in 2010. *See* Exhibit C.

13        40. PACER only stores data corresponding to approximately 50 million dockets.

14        41. On March 25, 2010, United States Senator Joseph I. Lieberman wrote to the

15   United States Senate Committee on Appropriations, stating in part:

16   > "Since the passage of the E-Government Act, the vision of having information
>    'freely available to the greatest extent possible' is far from being met, despite
17   > the technological innovations that should have led to reduced costs in the past
>    eight years. In fact, cost for these documents has gone up, from $.07 to $.08-
18   > per-page. The Judiciary has attempted to mitigate the shortcomings of the
>    current fee approach in a variety of ways, including limiting charges to $2.40-
19   > per-document and the recent announcement that any charges less than $10-
>    per-quarter will be waived. While these efforts should be commended, I
20   > continue to have concerns that these steps will not dramatically increase
>    public access as long as the pay-per-access model continues."

21

22   _____

[1] Unlike PACER, PlainSite is a universal docketing system that can track a case across courts and/or agencies,
23   improving navigation. PlainSite also indexes parties, law firms, judges, assets, and attorneys, taking into
account clerical errors, typographical errors, and ever-changing law firm names. According to server logs,
24   Defendant AO and many of the Courts use PlainSite on a daily basis.

---

FIRST AMENDED COMPLAINT                    11                    5:14-cv-02396-BLF

1    42. Defendants Ishakian, Skidgel and AO (collectively, "Washington Defendants")

2    reacted to Senator Lieberman by doubling down on their unlawful and discriminatory

3    behavior. Defendant AO notified PACER users of *another* price increase effective April 1,

4    2012, causing the cost per PACER "page" to increase from $0.08 to $0.10, the current price.

5    43. Due to Defendant AO's continuous, multi-year, willful abuse of its statutory

6    authorization, users of PACER who have paid fees, including but not limited to Plaintiffs, are

7    owed refunds totaling several hundred million dollars.

8    44. Washington Defendants' unlawful activities regarding PACER are significant

9    even beyond the serious concerns expressed by several users, politicians, and respected

10   media publications. They have directly contributed to the loss of at least one life, namely,

11   open information activist Aaron Swartz.

12   45. Defendant AO launched a pilot program at certain law libraries nationwide in

13   September, 2008 involving free access to PACER. Swartz was one member of a team of

14   researchers affiliated with CITP, and personally assisted in the acquisition of PACER data

15   (approximately 710,000 dockets plus associated documents) from the pilot program.

16   Defendant AO reacted by suspending the pilot program on October 1, 2008 and referring the

17   matter to the Federal Bureau of Investigation. *See* Exhibit D. Though criminal charges were

18   never filed against Swartz directly regarding the PACER pilot program, Swartz was charged

19   in a similar incident on July 14, 2011 involving academic (as opposed to legal) texts, despite

20   the plain requests of some involved parties (namely, the academic database JSTOR) not to

21   proceed with any charges. Under intense pressure due to the trumped-up criminal

22   prosecution, and with dwindling financial resources due to typically outrageous attorney fees,

23   Swartz committed suicide on January 11, 2013.

24

46. The criminal charges ultimately filed against Aaron Swartz were only made possible due to Defendant AO's attempts to portray and punish Swartz as a malicious "hacker" three years earlier.  In this way, the charges were largely informed by and/or retribution for the 2008 PACER pilot program episode.

47. Upon information and belief, Defendant AO encouraged the United States Department of Justice to file criminal charges against Aaron Swartz.

48. Aaron Swartz's premature death was entirely avoidable.

B.   ***Plaintiffs' Attempts to Clarify Their Own PACER Fees***

49. Plaintiffs have attempted on a number of occasions to clarify the reason why they must pay $0.10 per page to receive PACER error messages, documents that are clearly court opinions, or any court documents at all, including but not limited to judicial financial disclosure forms, which are also billed at $0.10 per page and not available on-line.

50. On February 9, 2012, the Foundation wrote an open letter to Defendant AO and Plaintiffs' representative in Congress, Anna Eshoo, highlighting the many problems with PACER's billing structure, including but not limited to its discriminatory nature.

51. Congresswoman Eshoo's March 21, 2012 response erroneously stated, "Currently, any individual may search PACER for free and can obtain copies of all final opinions (including convictions) without charge."

52. Defendant AO did not respond to the Foundation at all until Congresswoman Eshoo directed them to do so.  The eventual June 11, 2012 response from Defendant Ishakian contained the outright falsehood, later contradicted by Defendant Skidgel, that "free access to judicial opinions is provided."  *See* Exhibit E.

1    53. In her response, Defendant Ishakian also attempted to portray satisfaction with

2  PACER as being at a "high level." This was typical of Defendant Ishakian, whose efforts on

3  behalf of Defendant AO have consisted primarily of whitewashing a broken system. A May

4  1, 2014 letter to the editor of the *ABA Journal* highlighted a different take:

5      "PACER is evocative of our broken criminal justice system: willfully
      deficient, where justice is only available to those who can afford it. The real
6      obstacle to change is the fear of government officials, who have become
      accustomed to the lack of transparency that has become the platform for their
7      corrupt practices. Because fixing PACER is only the first step.

8      What crimes does the government often charge, only to later drop? How
      many people like Aaron Swartz are there, bullied and threatened with inflated
9      accusations? How often is a particular person a witness in a case, e.g., a
      known corrupt cop or expert witness? Those are questions only machine-
10    readable bulk data, accessible to everyone for free, can answer.

11     It is high time the chief justice of the United States—as the presiding officer
      of the Judicial Conference of the United States, the supervisory body with
12     authority over both the Administrative Office of the United States Courts and
      PACER—takes action. And if he won't do his job, then Congress should.

13
      Eric Branson
14    Denver"

15    54. Defendant AO has repeatedly refused to refund Plaintiffs' PACER fees for any

16  reason, even when such fees were generated for error messages or court opinions, let alone

17  any other kind of public domain information. On behalf of all Plaintiffs, Plaintiff Greenspan

18  contacted the PACER Service Center at +1 800 676 6856 on at least one occasion to request

19  a refund; even a partial refund of duplicate and erroneous fees was denied. On June 8, 2014,

20  Plaintiff Greenspan sent the PACER Service Center two faxes: the first containing a signed

21  and completed Refund Form with accompanying letter; and the second containing a signed

22  and completed Standard Form 95, Claim for Damage, Injury or Death, along with evidence

23  of payment to Defendant AO in the form of multiple PACER Service Center invoices

24

showing zero balances from each prior quarter. Both faxes were confirmed as received the same day. *See* Exhibit F.

C. **The United States Courts Routinely Deny Small Businesses and Non-Profit Organizations "Access to Justice"**

55. "Access to Justice" is a buzzword frequently used in legal academic circles and the Courts that has largely become devoid of meaning as the price of legal services has skyrocketed beyond the affordability of much of the American middle class. Typical hourly rates for associates range from $300 to $400 per hour, while partners often charge in excess of $500 per hour. In 2012, median household income in the United States was $51,017, which, if entirely devoted to attorney fees (an unfortunately common occurrence), would pay for only 170 hours of an "inexpensive" associate's time, or only 102 hours of a partner's time—about enough time to research, draft, review and file one or two complex motions.

56. Self-representation is a right, grounded in 28 U.S.C. § 1654 since 1948, and 28 U.S.C. § 394 before that, long afforded to individuals in the United States. The statute itself uses the term "parties," but delegates authority to "the rules of such [United States] courts."

57. The landmark case of *Gideon v. Wainwright*, 372 U.S. 335 (1963) linked the separate concepts of effective legal representation and affordability by ruling that state courts were required to provide counsel in criminal cases where defendants could not afford a lawyer. Of course, individuals are not required to hire lawyers. Yet corporations are.

58. Paradoxically, there is no inverse principle to *Gideon* for corporations involved in civil cases. If counsel is too expensive, a case cannot proceed.[2] This notable gap in the legal

---

[2] Frequently, civil litigation is a "life-or-death" proposition for a small business; an unfavorable outcome, or the inability of the corporation to access the justice system at all, can mean the end of the business. "'Obviously Fourteenth Amendment cases dealing with state action have no application here, but if they did, we believe that to deprive civilian dependents of the safeguards of a jury trial here...would be as invalid under those cases as it would be in cases of a capital nature.' 361 U.S., at 246-247." *Gideon, supra,* at 348-349.

1  system, caused by a combination of the protectionist rules described herein and general

2  market failure, eviscerates the legal rights of an enormous class of corporate persons and the

3  underlying individual entrepreneurs, who tend to be those very persons most in need of the

4  Courts' services.

5      59. The District Court's Civil Local Rule 3-9(b), under the heading "Parties," states:

6          "(b) Corporation or Other Entity. A corporation, unincorporated association,
        partnership or other such entity may appear only through a member of the bar

7          of this Court."

8      60. Small businesses, which are typically incorporated as corporations, are generally

9  thought to be responsible more than 50% of the United States Gross Domestic Product

10 (GDP), and "represent 99.7 percent of all employer firms" according to the United States

11 Small Business Administration. *See* Exhibit G.

12     61. Plaintiff Think Computer Corporation is one such small business. In mid-2011 its

13 main product, FaceCash®, became inoperable after a financial industry attorney-lobbyist

14 convinced the California legislature to begin regulating domestic money transmission for the

15 first time, in an unconstitutional manner. In order to continue operating FaceCash, the

16 company's only option was to sue over the constitutionality of the relevant state statute in

17 this Court, and eventually, to attempt to protect itself from the resulting unfair competition

18 that the new statute encouraged, as well. *See Think Computer Corp v. Venchiarutti et al*,

19 Case No. 5:11-cv-05496-HRL (N.D. Cal. 2011); *see also Think Computer Corp. v. Dwolla,*

20 *Inc. et al*, Case No. 5:13-cv-02054-EJD (N.D. Cal. 2013). Doing so required Think to spend

21 large sums on attorney fees solely in order to comply with to Civil Local Rule 3-9(b).

22     62. In 2012, Plaintiff Think Computer Corporation would have turned a small profit

23 were it not for the attorney fees necessitated by Civil Local Rule 3-9(b). The corporation

24

posted a 2012 net loss of $41,226.95, having spent $52,552.95 on attorney fees throughout the fiscal year. In 2013, attorney fees of $36,778.75 constituted the vast majority (82.65%) of the corporation's $44,501.86 net loss.

63. Think Computer Foundation is primarily funded by Think Computer Corporation. For every dollar spent by the Corporation on avoidable and unnecessary attorney fees and not donated to the Foundation, the Foundation cannot use those same funds to further the goals of its charter.

64. Due to attorney fees necessitated by Civil Local Rule 3-9(b), Plaintiff Greenspan has not paid himself a salary as President & CEO of Plaintiff Think Computer Corporation since 2011.

65. Civil Local Rule 3-9(b) is frequently cited in rulings denying access to justice to small businesses and non-profit organizations that cannot afford or for any other reason do not want counsel, as is the case with Restrictive Local Rules in other districts. *See Dr. JKL Ltd. v. HPC IT Education Center*, 749 F. Supp. 2d 1038 (N.D. Cal. 2010). *See also Walnut Creek Manor, LLC v. Mayhew Center, LLC*, Case No. 4:07-cv-05664-CW (N.D. Cal. 2013).

66. The legal rationale for Restrictive Local Rules is inconsistent. The issue of corporate self-representation has hardly been given any serious consideration since the Supreme Court's cursory and tangential mention of the topic in *Rowland v. California Men's Colony, Unit II Men's Advisory Council*, 506 U.S. 194 (1993), two years prior to the advent of the commercial internet—a technological transformation that has changed how citizens and corporations alike interact with Government. Nonetheless, even in *Rowland*, the Supreme Court explained that while 28 U.S.C. § 1915 once made reference to "citizens"—a term that courts in the 1930s considered to be exclusive of corporations—it had been changed to "persons" in 1959. In the ruling, Footnote 2 surrounding this discussion points

1 | out that the change emanated from the Judicial Conference's concern that singling out aliens

2 | from citizens "may be unconstitutional." *Id.* Either way, Congress has never made any

3 | statutory determination that corporations should be exempt from the ability to represent

4 | themselves or appear *in forma pauperis.*

5 |     67. In *Palazzo v. Gulf Oil Corporation*, 764 F.2d 1381 (11th Cir. 1985), the Court

6 | ruled that a business owner, Frank Palazzo, could not represent the interests of his

7 | corporation despite his repeated attempts to do so. In its ruling, the Court cited a long string

8 | of precedential cases dating back to *Osborn v. Bank of United States*, 22 U.S. 738 (1824), all

9 | variously interpreting 28 U.S.C. § 1654 in an artificially limited fashion, excluding

10 | corporations from representing themselves "personally" due to the lack of a physical person

11 | that might appear. The Response to the Court's Order To Show Cause As To Why The

12 | Complaint Should Not Be Dismissed by Plaintiffs Think Computer Foundation and Think

13 | Computer Corporation filed contemporaneously with this document (the "Response")

14 | explores the precedent since *Osborn* in detail, and is hereby incorporated by reference.

15 |     68. At least four instances of corporate self-representation in the Courts have been

16 | documented, with one of the most recent being in 1976, when a District Judge of the Eastern

17 | District of New York allowed a bankruptcy case to proceed with a corporation representing

18 | itself. *In the Matter of Holliday's Tax Services, Inc.*, 417 F.Supp. 182 (E.D.N.Y. 1976). In

19 | his ruling, Judge Weinstein pointed out:

20 |     "Were counsel freely available to lower and middle income persons in civil
    cases, the traditional rule requiring corporations, whether large or small, to

21 |     appear by a lawyer would work no hardship. But the lack of a guarantee of
    counsel to persons of modest means like Mr. Holliday remains one of the

22 |     scandals of our judicial system."

23 | *Id.* at 183. Judge Weinstein continued:

24 |

---

FIRST AMENDED COMPLAINT           18           5:14-cv-02396-BLF

1

2

3

4

> "The traditional rule is unnecessarily harsh and unrealistic when applied in bankruptcy to small, closely-held corporations. They are set up by the thousands. Many, such as the one before us, are in the name of the person doing business. In these instances, incorporation is merely a technicality, facilitating competitive economic activity by individuals. Failure of the 'corporation' is, for all practical purposes, the failure of the individual entrepreneur."

5    69. In 1958, Congress passed the Technical Amendments Act of 1958 (72 Stat. 1650),

6 which amended the Internal Revenue Code of 1954 by creating a new sub-chapter S at the

7 end of chapter 1. Since then, millions of "S corporations" have come into being. Instead of

8 being taxed at the corporate level, as corporations typically are, businesses that have availed

9 themselves of a sub-chapter S election pass all of their earnings (or losses) through to their

10 shareholders for tax purposes, of whom there may be no more than 75 (though the initial

11 limit was 10).

12    70. For subchapter-S corporation owners, the District Court's Civil Local Rule 3-9(b)

13 and other Restrictive Local Rules lead to a situation involving taxation without

14 representation, in which shareholders in—and frequently 100% owners of—sub-chapter S

15 corporations are responsible for paying taxes not as corporations, but *as individuals, on their*

16 *personal Internal Revenue Service Form 1040 tax return via Schedule E*, on both their

17 personal income *and their business earnings*, yet are legally prohibited from representing

18 those same individual business interests in court. Put another way, an election to convert a

19 sole proprietorship—which could appear *pro se* in a federal court without issue—to an S

20 corporation solely for tax reasons has the undesired, unintended, and wholly arbitrary side

21 effect of waiving a business owner's First Amendment right to free speech in a court of law,

22 solely because of Restrictive Local Rules such as Civil Local Rule 3-9(b).

23

24

---

1    71. Small businesses sometimes pay more taxes than the largest companies in the

2    United States of America, whose ethically-bound attorneys exploit tax loopholes to move

3    income overseas. For example, General Electric filed a 57,000 page tax return on $14 billion

4    in profits in 2010, but paid no taxes. Restrictive Local Rules therefore prohibit those same

5    small businesses who fund the Courts from making use of them, while large corporations

6    who can afford counsel (thanks in part to their tax evasion schemes) get a free ride.

7    72. In *Citizens United v. Federal Election Com'n*, 130 S. Ct. 876 (2010), the Supreme

8    Court held that "The Government may regulate corporate political speech through disclaimer

9    and disclosure requirements, but it may not suppress that speech altogether," and that "the

10   First Amendment does not allow political speech restrictions based on a speaker's corporate

11   identity." *Id*. at 903. Yet suppression of corporate political speech occurs daily in federal

12   courtrooms as corporations—but only the smallest ones—are kicked out simply by virtue of

13   the fact that they are corporations who generally cannot afford counsel.

14   73. Corporations are no more themselves able to "decide" to "donate" to political

15   candidates that they are able to "sign" contracts or "represent" themselves. Yet they do. In

16   each case, the corporation, comprised of individuals, acts through the actions of its officers,

17   employees, and/or its Board of Directors. In this regard, the issues of political speech and

18   courtroom speech are one in the same, especially considering that many court cases involving

19   businesses affected by Restrictive Local Rules may also involve decidedly political issues.

20   74. Historical rationales for prohibiting corporate self-representation are thinly veiled

21   arguments for economic protection of attorneys. "The reasons for requiring that a party,

22   unless exercising his constitutional right to represent himself, be represented by an attorney

23   are principally that the conduct of litigation by a non-attorney creates unusual burdens for his

24

adversaries and the court, as well as for the party he would represent. 'The lay litigant frequently brings pleadings that are awkwardly drafted, motions that are inarticulately presented, [and] proceedings that are needlessly multiplicative.'[3] *Jones v. Niagara Frontier Transportation Authority*, 722 F.2d 20, 22 (2d Cir.1983); see also id. (the lay litigant also lacks many of the attorney's ethical responsibilities, such as to avoid litigating unfounded or vexatious claims)." *Berrios v. New York City Housing Authority*, 564 F. 3d 130 (2nd Cir. 2009). In no other context is any court permitted to deny justice to a party simply because that party's potential future activity *might* prove to be a nuisance. Such reasoning is *prima facie* evidence of discrimination against small businesses and those generally unable to afford what is typically overpriced legal counsel.

75. Though some attorneys attempt to conduct themselves in an ethical manner, the notions that attorneys are uniquely able to represent corporations because they are more likely to behave ethically due to rules that bind them, or due to professional training, or because they are inherently ethically superior to laymen, are similarly without merit and demonstrably false. Plaintiffs have encountered, and via PlainSite, documented, catalogued, and indexed, a wide variety of unscrupulous behavior on the part of lawyers, ranging from chronic over-billing, to forgery, to fraud, to outright malpractice. *See* Response.

76. The effects of Restrictive Local Rules are disproportionately felt by small businesses. Due to the shareholder limitation, S corporations tend to be small, with less than $1 million per year in revenue, while larger companies opt for C corporation status. Large corporations that can afford to hire lawyers regardless of the situation, and do, are by

---

[3] Even if this were true, the Courts' various workload issues could be resolved through better use of web-based error-checking technology, commonly found on commercial web sites that process much higher volumes of customer requests.

definition not affected by the Restrictive Local Rules, further focusing their impact on the small business sector.

77. Restrictive Local Rules set the Courts apart from the rest of the legal world. Corporations are permitted to represent their own interests via officers or directors before the executive branch, such as in the context of the United States Patent and Trademark Office Trademark Trial and Appeal Board. Corporations are also permitted to represent themselves in small claims courts nationwide. In those venues, the alleged unusual challenges of "needlessly multiplicative" and/or inarticulate pleadings are somehow managed.

78. In the aforementioned non-Court venues, *pro se* filers are permitted to file electronically as would anyone else. Yet Civil Local Rule 5-1(b) in this District mandates that *pro se* filers must file manually on paper until such time as a motion for electronic filing is approved by a judge. Attorneys can file electronically, which is less expensive and more efficient, without any needed approval. In this way, the Courts actually *mandate* that *pro se* filers *must* file "needlessly multiplicative" motions, starting with the motion for approval to file electronically.

79. Manual filing makes compliance with some judges' Standing Orders virtually impossible, as such Standing Orders sometimes require that chambers copies of documents contain standard PACER headers. If those headers have not been generated at the time of filing, then lodging chambers copies requires yet another avoidable and/or expensive trip.

80. Civil Local Rule 5-1(b) forces *pro se* filers to violate, at least for a time at the outset of each case, Civil Local Rule 5-1(e)(2), which states, "Documents which the filer has in an electronic format must be converted to PDF from the word processing original, not scanned, to permit text searches and to facilitate transmission and retrieval." Notably, Civil

1  Local Rule 5-1(d)(1) only exempts *pro se* filers from this conflict for "Initiating Documents,"

2  i.e. complaints, civil cover pages, summonses, etc.

3      81. Civil Local Rule 5-1(b) has the side-effect of forcing *pro se* filers to pay

4  additional and otherwise unnecessary PACER fees to view on-line dockets and filings *for*

5  *their own cases* because they are not permitted to receive the automatic e-mail notifications

6  containing one-use-only links to fee-free copies.  Paper copies always take far longer to

7  arrive by mail, and discussions with opposing counsel must therefore take place regarding

8  documents that have not yet traversed the postal system.

9      82. Yet another side-effect of forcing only *pro se* filers to use the paper process is that

10  of subjecting *pro se* filers to the arbitrary whims and errors of Clerk of Court staff.  In this

11  filing of this case, which should have taken place on the afternoon of May 22, 2014, Clerk of

12  Court staff pretended that their office was closed prior to 4:00 P.M. despite the door being

13  open, pretended that they lacked the authority and/or ability to process a payment,

14  deliberately stamped documents with the wrong date, and flat-out lied about the contents of

15  the Local Rules.  When informed by e-mail of his staff's outrageous behavior, witnessed by

16  another *pro se* filer, Defendant Wieking conveyed his "sincere regret[s]," but did not offer to

17  compensate Plaintiffs for the additional expense of redundant and unnecessary travel or

18  parking, and cited a web page full of errors—one not clearly on display anywhere in the

19  Clerk's office—as justifying his staff's actions.  The case was filed when the undersigned

20  was forced to return the following day, May 23, 2014.  *See* Exhibit H.

21      83. The same Clerk of Court staff compounded their errors on May 28, 2014 by

22  needlessly re-scanning the entirety of the District Court's summons and complaint into the

23

24

file for this case (almost 200 pages in all), in turn generating still more additional and unnecessary PACER fees for Plaintiffs.

84. All of the Clerk's errors would have been completely avoided were Plaintiffs permitted to file electronically, contrary to the mandate of Local Rule 5-1(b).

D.    *The Impact of Defendant ABA's Monopoly on the Legal Profession*

85. Many legitimate cases involving corporate litigants either cannot be prosecuted due to the prohibitive expense of counsel or due to the fact that many lawyers simply refuse to take the time to understand a litigant's needs without the promise of a large monetary incentive at some point during the proceedings. Therefore, the Restrictive Local Rules frequently quash meritorious civil claims and defenses before they ever see the inside of a courtroom, often driving companies out of business.

86. Pursuant to 28 U.S.C. § 2077(b), which instructs courts to "appoint an advisory committee for the study of the rules and practice and internal operating procedures of such court," the District Court maintains Local Rules Advisory Committees. However, as the District Court's web site at http://www.cand.uscourts.gov/pages/1014 indicates, the Committee in the Northern District of California is referred to as the "Local Rules *Attorney* Advisory Committee" (emphasis added). In other words, in order to advise the District Court on its Local Rules, which apply to all litigants and not just attorneys, one must be an attorney (who has, in almost every state, attended an ABA-certified law school) to serve, despite there being no statutory basis whatsoever for such a limitation. *See* Exhibit I.

87. Although non-attorneys may submit comments *suggesting* changes to the Local Rules to the District Court pursuant to Civil Local Rule 83-2, their speech is automatically trumped by the considerations and/or suggestions of attorneys. As Civil Local Rule 83-1 states, "Attorney Advisory Committees will be appointed to advise and assist the Court when

1  called upon to do so by the Local Rules Committee." At no point in the process do non-

2  attorneys have any real input into the Local Rules that govern their own cases.

3      88. Bruce A. Ericson and Niall P. McCarthy, two of the five members who presently

4  comprise the District Court's "Civil Rules & Practice" Local Rules Attorney Advisory

5  Committee, have identified themselves publicly as members of Defendant ABA.

6      89. Regardless of whether Mr. Ericson, Mr. McCarthy or any other present or past

7  ABA members or affiliates serving on the Local Rules Attorney Advisory Committee had

8  any personal involvement with the instigation of the Restrictive Local Rules, their actions *or*

9  *inaction* as members of the Committee have played an active role in preserving and

10  maintaining Defendant ABA's unlawful monopoly.

11      90. As sophisticated, experienced attorneys and accomplished leaders in their

12  respective areas of law, Mr. Ericson, Mr. McCarthy, and any other present or past ABA

13  members or affiliates serving on the Local Rules Attorney Advisory Committee knew or

14  should have known that their actions or inaction as Committee members would help to

15  maintain Defendant ABA's unlawful monopoly.

16      91. Defendant ABA's monopoly on the legal profession is widely acknowledged. A

17  May 8, 2013 article by Michael L. Coyne in the *National Law Journal* entitled "ABA and

18  Legal Education: Change Won't Come from Within" states:

19  > "DOJ ultimately allowed the ABA to settle that antitrust action by entering
>  into a 10-year consent decree with the ABA. The ABA agreed to eliminate

20  > some of its needless—and illegal—cost-increasing standards and to allow
>  DOJ to monitor its control over legal education in the United States. It was

21  > the third time DOJ had to institute legal proceedings to curb the ABA's
>  violations of U.S. law. While DOJ's consent decree was akin to putting a

22  > Band-Aid on a bullet wound, the ABA nonetheless disdainfully violated the
>  limited restrictions imposed on it on multiple occasions. For its multiple

23  > violations of that consent decree, the ABA, a billion-dollar enterprise, paid a

24

modest fine roughly equivalent to the starting salary of a first-year associate at a big law firm. It was a return to business as usual.

Today, completely free of the DOJ consent decree, the ABA continues its monopolistic control over access to legal education and the legal profession. Tuitions at ABA law schools now exceed $50,000, and facing new challenges from new fronts, the ABA has reverted to its oft-successful formula of creating a blue ribbon task force to 'address' self-created problems in legal education, with a panel strongly influenced by the ABA insiders who created the problem, along with a sprinkling of outsiders. All acknowledge the crisis in ABA legal education while expressing a seriousness of purpose and good intentions."

In the May, 2014 issue of the Fordham Law Review, University of Connecticut School of Law Professor Leslie C. Levin begins her article "The Monopoly Myth and Other Tales About the Superiority of Lawyers" with:

"The U.S. legal profession's so-called monopoly on the practice of law is under siege. The monopoly depends on barriers to entry such as costly legal education, character and fitness inquiries, and other licensing requirements that are under sustained attack. These barriers not only limit entry to the profession, but also are used to justify the profession's claim of technical and moral superiority over nonlawyer providers of legal services." (footnotes omitted)

Levin, Leslie C., 82 FORDHAM L. REV. (2014). It is one of several articles in the same issue acknowledging and criticizing Defendant ABA's monopoly from a variety of standpoints.

92. Meetings of the Local Rules Attorney Advisory Committee constituted actual "meetings of the minds" that were intended to exclude potential competitors and willfully prevent forward development of the legal profession by suggesting rules that would stifle technology to better enable litigants, whether represented or unrepresented by attorneys.

93. Defendant ABA's own Section of Litigation has a long history of impacting both the Federal Rules of Civil Procedure as well as Local Rules, sometimes directly, such as when working groups are formed to examine and make recommendations around a specific

1   area, and sometimes indirectly, such as when courts unexpectedly adopt recommendations

2   meant for one area in another.

3       94. The decision in *Jones v. Niagara Frontier Transportation Authority*, noted above

4   for its reference to that court's fear of "multiplicative" *pro se* filings, included the text, "*See*

5   *Model Code of Professional Responsibility* DR 7-102(A) (1 & 2) (1976)" immediately after

6   the portion cited by *Berrios*, *supra*. The Model Code of Professional Responsibility is a

7   document compiled and published by Defendant ABA. Its citation demonstrates how

8   Defendant ABA's publications have twisted judicial reasoning.

9       95. On February 13, 2006, Defendant ABA issued a Recommendation and Report

10  adopted by the House of Delegates concerning "Local Rules for Electronic Case Filing in the

11  Bankruptcy Courts." Notably, this Report included a Proposed Rule that suggested allowing

12  *only* attorneys to obtain ECF passwords necessary to file electronically, excluding

13  unrepresented filers in the exact same manner as Civil Local Rule 5-1(b) does in this District

14  Court. *See* Exhibit J.

15      96. The true purpose of the Restrictive Local Rules is to attempt to increase demand

16  for and exclude competition with attorneys, whose private interests are collectively

17  represented by Defendant ABA.

18      97. Defendant ABA has conspired, itself and through its members, with state bar

19  associations and the various Courts, including Defendant United States District Court for the

20  Northern District of California, to impose Restrictive Local Rules. Many officials of the

21  Courts are also current or former ABA members or officials.

22      98. *Pro se* and *in forma pauperis* litigants do not have lobbying or other special

23  interest groups they can rely upon to represent their interests before Congress—for they are

24

not a special interest; they are simply the American people. Minority rights and civil liberties

special interest groups and organizations whose interests might overlap tend to focus on more

acute and cohesive issues, leaving ordinary citizens without advocates.

99. Few lawyers, if any, are willing to sign their name to a complaint that could

weaken the legal profession's monopoly, let alone a complaint that might be (incorrectly)

perceived as antagonistic toward the Courts. Even academic lawyers who might be

interested in the underlying legal principles might plan to file other cases in the long term,

and are loathe to take any action that might jeopardize a career or future case.

## CLAIMS FOR RELIEF

### FIRST CLAIM

*Against Defendants Wieking, Wilken, and United States District Court for the Northern District of California*
*For Violation of the Equal Protection Clause of the Fourteenth Amendment*
*(42 U.S.C. § 1983)*

100.    Plaintiffs re-allege and incorporate by this reference each and every allegation

set forth in this Complaint as if the same were fully set forth herein.

101.    Civil Local Rules 3-9(b), 5-1(b) and similar Restrictive Local Rules in district

and/or appellate courts nationwide are facially unconstitutional, as they violate the Equal

Protection Clause of the Fourteenth Amendment to the United States Constitution.

102.    Civil Local Rules 3-9(b), 5-1(b) and similar Restrictive Local Rules in district

and/or appellate courts nationwide, including but not limited to Defendant United States

District Court for the Northern District of California, have the effect of granting equal

protection under the law to only those corporations, limited liability companies, limited

partnerships, and other such entities that can afford or otherwise desire counsel. In this

manner, Civil Local Rules 3-9(b), 5-1(b) and similar Restrictive Local Rules discriminate

against small businesses in an unconstitutional manner.

103.    In 1976, District Judge Weinstein of the Eastern District of New York

recognized the constitutional flaw in disallowing corporate representation:

> "'Equal' application of the law to all corporations, large and small, is,
> likewise, a specious rationale for the grossly inequitable treatment of small
> businesses.  Equal-rights-to-sleep-under-bridges jurisprudence is no longer
> viewed with favor."

*In the Matter of Holliday's Tax Services, Inc., supra* at 184.

104.    Defendants Wieking, Wilken, and United States District Court for the

Northern District of California (collectively, "California Defendants"), acting under color of

law for the purported goal of protecting the Courts, have enforced Civil Local Rules 3-9(b),

5-1(b) and similar Restrictive Local Rules based upon the supposed grounds that to do

otherwise would mire the Courts in meritless and vexatious litigation, despite simultaneously

permitting notorious copyright and patent trolls—all represented by counsel—to instigate a

plethora of meritless and vexatious litigation.

105.    California Defendants have enforced Civil Local Rule 3-9(b) and similar

Restrictive Local Rules merely for the convenience of the Courts and the economic benefit of

the attorneys associated therewith.  Yet in the words of Judge Weinstein, "[A] person's day

in court is more important than the convenience of the court." *Id.*

106.    California Defendants have enforced Civil Local Rule 3-9(b) and similar

Restrictive Local Rules against sub-chapter S corporations, even though the Internal Revenue

Code does not recognize such corporations as independent persons for the purposes of

taxation, but more akin to a kind of property asset.  The net effect is one of the Courts

discriminating against certain kinds of property owners, who happen to pay for the Courts'

1  operations, including the salaries of the Courts' employees, with the tax revenues derived

2  from their business property.

3      107.    Civil Local Rule 5-1(b) needlessly subjects *pro se* litigants to human error on

4  the part of Court staff, needless additional expense (such as for travel and postage), travel

5  risk, as well as delay related to mailing, that could otherwise be entirely avoided through the

6  use of existing electronic systems that attorneys are already permitted to use.

7      108.    California Defendants have enforced Civil Local Rule 5-1(b) and similar

8  Restrictive Local Rules to actively discourage access to justice for *pro se* litigants.

9      109.    Nullification of the Restrictive Local Rules would not preclude the hiring of

10  attorneys by corporations at any point during legal proceedings, and might actually

11  encourage the hiring of attorneys in matters that would have otherwise never have reached

12  the Courts' various doorsteps.

13      110.    By restricting membership in the District Court's Local Rules Advisory

14  Committee to attorneys, without any statutory, regulatory, or other rule-based basis for doing

15  so, California Defendants deny non-attorneys equal protection under the law and equal

16  access to justice.

17      111.    All conditions precedent to the bringing of this action have occurred or have

18  been exhausted.

19      112.    Plaintiffs have incurred or will incur costs for attorneys and other necessary

20  fees and costs which are recoverable in this action under the provisions of 42 U.S.C. § 1988.

21      113.    Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiffs are entitled to declaratory

22  relief and a preliminary and permanent injunction invalidating and restraining enforcement of

23  Civil Local Rules 3-9(b), 5-1(b) and similar Restrictive Local Rules.

24

## SECOND CLAIM
*Against Defendants Wieking, Wilken, and United States District Court for the Northern District of California*
*For Violation of the Due Process Clause of the Fourteenth Amendment (42 U.S.C. § 1983)*

114.    Plaintiffs re-allege and incorporate by this reference each and every allegation set forth in this Complaint as if the same were fully set forth herein.

115.    Civil Local Rule 3-9(b) and similar Restrictive Local Rules in district and/or appellate courts nationwide are facially unconstitutional, as they violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

116.    In applying and enforcing Restrictive Local Rules, California Defendants evaluate civil claims not on their merits, but by the identities of their filers, without allowing certain of those filers, namely, unrepresented corporations, any opportunity for due process via the very judicial system that is specifically designed to evaluate the merits of claims.

117.    By restricting membership in the District Court's Local Rules Advisory Committee to attorneys, without any statutory, regulatory, or other rule-based basis for doing so, California Defendants deny non-attorneys due process in the evaluation of suggested changes to the Local Rules.

118.    Plaintiffs have incurred or will incur costs for attorneys and other necessary fees and costs which are recoverable in this action under the provisions of 42 U.S.C. § 1988.

119.    Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiffs are entitled to declaratory relief and a preliminary and permanent injunction invalidating and restraining enforcement of Civil Local Rules 3-9(b), 5-1(b) and similar Restrictive Local Rules.

## THIRD CLAIM
*Against Defendants Wieking, Wilken, and United States District Court for the Northern District of California*
*For Violation of Plaintiffs' First Amendment Rights (42 U.S.C. § 1983)*

120.    Plaintiffs re-allege and incorporate by this reference each and every allegation set forth in this Complaint as if the same were fully set forth herein.

121.    Individual Plaintiff Greenspan, as the owner of a corporation, is entitled to the right to free speech concerning his corporation's interests, whether financial, political, or legal, and whether inside or outside of a courtroom.

122.    Corporate Plaintiffs Think Computer Corporation and Think Computer Foundation are corporations entitled to the right to free political speech the same as any other person, regardless of venue.

123.    By virtue of this lawsuit, Plaintiffs are engaging in litigation as a form of political expression and association.

124.    According to the United States Supreme Court, "[C]ollective activity undertaken to obtain meaningful access to the courts is a fundamental right within the protection of the First Amendment." *United Transportation Union v. Michigan Bar*, 401 U.S. 576, 585 (1971).

125.    By virtue of this action, Plaintiffs formally challenge the role of Defendant AO to use PACER as a general funding mechanism for the Courts in response to political maneuvering by Congress over several years. This action is therefore inherently political in nature, and constitutes a form of political speech.

126.    Pursuant to Civil Local Rule 3-9(b) and similar Restrictive Local Rules, Corporate Plaintiffs are not permitted to speak about such issues, or any issue, in the venue of the United States Courts, except through an expensive Government-sanctioned proxy with a financial incentive to distort Plaintiffs' statements to the extent they may represent a threat to

the legal profession. Corporate Plaintiffs' choice between forced Government censorship or no speech at all violates Corporate Plaintiffs' First Amendment rights.

127. The taxation of small business owners who lack the right to self-representation of their business interests in the Courts is akin to the type of grievous injustice suffered by the British colonists of the mid-eighteenth century who founded this country. Notably, the American Revolution of 1765-1783, spurred by cries of "No taxation without representation," was fought to give taxpayers a voice before their Government.

128. By restricting membership in the District Court's Local Rules Advisory Committee to attorneys, without any statutory, regulatory, or other rule-based basis for doing so, California Defendants censor the political speech of non-attorneys in violation of the First Amendment.

129. All conditions precedent to the bringing of this action have occurred or have been exhausted.

130. Plaintiffs have incurred or will incur costs for attorneys and other necessary fees and costs which are recoverable in this action under the provisions of 42 U.S.C. § 1988.

131. Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiffs are entitled to declaratory relief and a preliminary and permanent injunction invalidating and restraining enforcement of Civil Local Rules 3-9(b), 5-1(b) and similar Restrictive Local Rules.

## FOURTH CLAIM
*Against Defendants Ishakian, Skidgel, and Administrative Office of the United States Courts*
*For Violation of the Equal Protection Clause of the Fourteenth Amendment*
*(42 U.S.C. § 1983)*

132. Plaintiffs re-allege and incorporate by this reference each and every allegation set forth in this Complaint as if the same were fully set forth herein.

FIRST AMENDED COMPLAINT                    33                    5:14-cv-02396-BLF

133.    The PACER Fee Schedule collectively authored by Washington Defendants discriminates against low-income persons who cannot afford to pay extra, unlawful fees for access to information already in the public domain that is necessary to further their legal interests.

134.    The existence of Defendant AO's $15.00-or-below per quarter PACER fee exemption demonstrates Defendant AO's awareness of the discriminatory nature of its PACER Fee Schedule.

135.    Washington Defendants' PACER system generally discriminates against any litigant who is unable to receive e-mail confirmations of every single electronic filing, since the free copy of each filing is contained in an e-mail link only sent once, at the time the filing is received by PACER's servers. In many if not all districts, *pro se* filers must fill out special forms that attorneys do not need to, in order to specifically request the ability to make use of electronic filing via PACER. "[T]he *pro se* party may not file electronically unless the *pro se* party moves for and is granted permission by the assigned judge to become an ECF user in that case." Civil Local Rule 5-1(b). This extra hurdle for *pro se* filers violates the Equal Protection Clause on its face, and to the extent that *pro se* filers do not clear the hurdle, they end up on a playing field that much more tilted as they are required to pay $0.10 per page for access to their own case filings.

136.    With some court cases involving many thousands of pages of documents, all priced at $0.10 per page, researching a single case might realistically cost several hundred dollars, making the $15.00-or-below per quarter PACER fee exemption practically worthless.

137.    The Courts are clear about the need for *pro se* and *in forma pauperis* litigants to act according to the same rules as represented litigants—even if such action is financially impossible due to the Court's own unconstitutional policies.

138.    Before accessing a single case, the need to possess a credit or debit card in order to merely sign up for PACER discourages low-income persons without access to such payment cards from pursuing their legal rights, discriminating against them on the basis of their ability to engage with the financial system, which is often the primary reason why low-income persons avail themselves of the Courts to start with. Discrimination against persons without access to the financial system, or without sufficient credit necessary to establish a payment card account, violates the Equal Protection Clause.

139.    Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiffs are entitled to declaratory relief and a preliminary and permanent injunction invalidating and restraining enforcement of The AO's PACER Fee Schedule.

### FIFTH CLAIM
*Against Defendants Ishakian, Skidgel, and Administrative Office of the United States Courts*
*For Violation of the Due Process Clause of the Fourteenth Amendment (42 U.S.C. § 1983)*

140.    Plaintiffs re-allege and incorporate by this reference each and every allegation set forth in this Complaint as if the same were fully set forth herein.

141.    Defendant AO unlawfully levies fees for public access to PACER far in excess of what is "necessary" to promote public access, in violation of the E-Government Act of 2002.

142.    Having filed verbal and written requests, Plaintiffs repeatedly requested refunds of their unlawfully-derived PACER fees from Washington Defendants and were denied or left without a clear answer each time.

143.     There exists no formal process by which one may appeal Washington Defendants' refusal to refund PACER fees because ultimate, unfettered authority is vested in a single, unelected government bureaucrat, Defendant Ishakian.

144.     By engaging in the conduct alleged hereinabove, Washington Defendants have established customs, policies, patterns, and practices of enforcing and collecting PACER fees under color of law, and have deprived Plaintiffs of their due process rights, in violation of the Fourteenth Amendment to the United States Constitution.

145.     Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiffs are entitled to declaratory relief and a preliminary and permanent injunction invalidating Washington Defendants' PACER Fee Schedule as being in violation of the E-Government Act of 2002, and restraining enforcement of Defendant AO's ability to collect any further PACER fees from Plaintiff or any other entity until such time as PACER's lifetime operational costs necessarily exceed Defendant AO's cumulative collections.

## SIXTH CLAIM
*Against Defendants Ishakian, Skidgel, and Administrative Office of the United States Courts*
*For Violation of Plaintiffs' First Amendment Rights (42 U.S.C. § 1983)*

146.     Plaintiffs re-allege and incorporate by this reference each and every allegation set forth in this Complaint as if the same were fully set forth herein.

147.     Through the PlainSite joint venture between Plaintiffs Think Computer Corporation and Think Computer Foundation, Plaintiffs collectively endeavor to improve access to the federal judiciary by designing software to re-publish case data and by writing articles for popular consumption concerning court cases.

148.    Washington Defendants have, acting under color of law, interfered with Plaintiff's ability to write and speak about government activities by imposing an unlawful cost structure for PACER data, in violation of Plaintiffs' First Amendment rights.

149.    Washington Defendants have, acting under color of law, interfered with all academic researchers' abilities to write and speak about government activities by imposing an unlawful cost structure for PACER data. A recent paper by Stanford Law School Professor Mark Lemley made frequent references to PACER's stifling and incomplete nature, such as "…a reasonable approach given the limitations of the PACER dataset." Lemley, Li, Urban, "Does familiarity breed contempt among judges deciding patent cases?", 66 STAN. L. REV. XX (2014). Notably, Professor Lemley's research was instead based on a proprietary dataset that required millions of dollars of venture capital financing to compile.

150.    All conditions precedent to the bringing of this action have occurred or have been exhausted.

151.    Plaintiffs have incurred or will incur costs for attorneys and other necessary fees and costs which are recoverable in this action under the provisions of 42 U.S.C. § 1988.

152.    Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiffs are entitled to declaratory relief and a preliminary and permanent injunction invalidating and restraining enforcement of Civil Local Rules 3-9(b), 5-1(b) and similar Restrictive Local Rules.

## SEVENTH CLAIM
*Against Defendants Ishakian, Skidgel, and Administrative Office of the United States Courts*
*For Declaratory Relief of Violation of the E-Government Act of 2002 (28 U.S.C. § 1913)*

153.    Plaintiffs re-allege and incorporate by this reference each and every allegation set forth in this Complaint as if the same were fully set forth herein.

154.    Defendants, acting under color of law for the purported goal of recovering the Courts' "costs," have proscribed fees, presently of $0.10 per page, for access to public domain information on PACER, as well as judicial financial disclosure forms not presently available on PACER, far in excess of the actual cost of provisioning such information.

155.    Defendants' fee structure has violated and continues to violate the E-Government Act of 2002, which Congress intended to promote access to public domain information, by being unreasonable and far in excess of the extent necessary to operate and improve PACER.

156.    Defendants have willfully ignored the written concerns of a variety of individuals who use PACER, including Plaintiffs, as well as at least one member of Congress.

157.    Plaintiffs have incurred or will incur costs for attorneys and other necessary fees and costs which are recoverable in this action under the provisions of 42 U.S.C. § 1988.

## EIGHTH CLAIM
### *Against Defendants Ishakian, Skidgel, and Administrative Office of the United States Courts*
### *For Violation of Federal Tort Claims Act (28 U.S.C. § 1346)*

158.    Plaintiffs re-allege and incorporate by this reference each and every allegation set forth in this Complaint as if the same were fully set forth herein.

159.    Washington Defendants, acting under color of law for the purported goal of recovering the Courts' "costs," have caused the conversion of $1,077.56 of United States currency, by causing funds that were previously in the rightful possession of Plaintiffs to be transferred to the improper possession of Defendant AO.

160.   The funds transferred to Defendant AO on a quarterly basis in response to specific invoices were not at any point considered a "tax," but were rather fees for access to public documents.

161.   On June 8, 2014, using Standard Form 95, Plaintiff Greenspan informed Defendant AO of his tort claim in writing, in the exact amount of $1,077.56, pursuant to 28 U.S.C. § 1346(b).

162.   Some or all of the $1,077.56 in question was paid to Defendant AO within two years prior to June 8, 2014.

163.   Were Defendant AO or the United States a private person, that person would be liable to Plaintiffs for conversion, theft of funds, wire fraud and/or bank fraud under California and federal laws.

164.   Plaintiffs have incurred or will incur costs for attorneys and other necessary fees and costs which are recoverable in this action under the provisions of 42 U.S.C. § 1988.

## NINTH CLAIM
### Against Defendant American Bar Association For Violation of the Sherman Act
### (15 U.S.C. § 2)

165.   Plaintiffs re-allege and incorporate by this reference each and every allegation set forth in this Complaint as if the same were fully set forth herein.

166.   By virtue of its ability to restrict the number of ABA-accredited law schools issuing degrees, which are necessary as a prerequisite for Bar membership in almost every state in the United States, by virtue of the fact that Defendant ABA has so restricted that number, and by virtue of Restrictive Local Rules that Defendant ABA has lobbied for directly or otherwise inspired, Defendant ABA has monopoly power in the submarket for

1   individuals capable of representing corporations before the federal courts, as well as in the

2   market for legal professionals.

3      167. Defendant ABA has willfully sought to acquire and/or maintain monopoly

4   power in the submarket for individuals capable of representing corporations before the

5   federal courts, as well as in the market for legal professionals more broadly, as evidenced by

6   its Washington, D.C.-based lobbying operations, the publication of documents including but

7   not limited to its February 13, 2006 Recommendation and Report: "Local Rules for

8   Electronic Case Filing in the Bankruptcy Courts" and its Model Code of Professional

9   Responsibility, and the participation of its members in various Courts' rulemaking bodies,

10   such as this Court's Local Rules [Attorney] Advisory Committee.

11      168. Defendant ABA's monopoly power in the submarket for individuals capable

12   of representing corporations before the federal courts, as well as in the market for legal

13   professionals, has directly caused grave harm to competition in the market for legal

14   professionals and all submarkets thereof.  As a result of Defendant ABA's actions described

15   herein, otherwise qualified prospective legal professionals:

16       a) cannot obtain a license practice law without obtaining a small number of

17        extraordinarily expensive ABA-certified law schools;

18       b) for various reasons must, or at the very least do, bill supracompetitive

19        hourly rates, typically ranging from $250 to $1,000 per hour;

20       c) have participated in schemes designed to further exclude non-attorneys

21        from having access to justice in any way and thereby to restrict

22        competition with attorneys;

23

24

d)  have restricted the aggregate output of the legal profession such that the
vast majority of the American public no longer has access to affordable
and necessary legal assistance.

169.    Through the imposition of and/or recommendations for Restrictive Local
Rules and state bar policies, including but not limited to this Court's Civil Local Rule 3-9(b),
Defendant ABA has "monopolize[d], or attempt[ed] to monopolize, or combine[d] or
conspire[d] with any other person or persons, to monopolize any part of the trade or
commerce among the several States" in the field of legal services.

170.    Restrictive Local Rules such as Civil Local Rule 3-9(b) and associated state
bar policies that restrict the supply of licensed attorneys to graduates of ABA-accredited law
schools harm competition in the market for legal services as a whole, by granting a monopoly
on the representation of corporate and small business interests to such lawyers, excluding
even business owners from representing themselves as permitted by statute.

171.    For small business owners, the alternative to hiring an attorney, e.g. becoming
an attorney oneself—a process involving three years of study at a law school accredited by
Defendant ABA or four years of Bar-supervised study in some states such as California—
requires an investment of time and money so extreme (often more than the value of any
underlying claims) that ultimately the most sensible alternative is to abandon valid legal
claims altogether.

172.    Legal services are frequently performed in interstate commerce, as evidenced
by the profusion of *pro hac vice* filings in district and appellate courts.  Such services are
typically paid services, for which the fees are typically artificially inflated.

173.     Even the provisioning of intrastate legal services frequently affects interstate commerce. *See Goldfarb v. Virginia State Bar*, 421 U.S. 773 (1975).

174.     Observance of Restrictive Local Rules, including but not limited to Civil Local Rule 3-9(b), is compelled by the State. Local Rules carry the force of law.

175.     The net effect of the Restrictive Local Rules, including but not limited to Civil Local Rule 3-9(b), is one of forcing corporations to hire attorneys even in cases where non-attorneys are perfectly willing and able of representing their corporations' interests in court.

176.     Defendant ABA has an active lobbying organization that promotes the economic interests of lawyers at the expense of all others. The forced hiring of attorneys promoted by the Restrictive Local Rules is in complete alignment with Defendant ABA's goals of furthering the legal profession, seemingly no matter the literal cost to law students or the figurative cost to society at large.

177.     Restrictive Local Rules encourage the imposition of exorbitant monopoly pricing by the attorneys and law firms who benefit from their existence.

178.     Defendant ABA comprises various "sections" and committees that work to create model rules, and coordinates with state bar associations and the Courts by virtue of the fact that every licensed attorney must be a member of a state bar association.

179.     As Clifford Winston wrote in *The New York Times* on October 24, 2011, "It is worth recalling that two of the finest lawyers and civil rights advocates our country has ever produced, Abraham Lincoln and Clarence Darrow, would not be allowed to practice law today under current rules." It is therefore evident that Defendants' monopolistic policies, rules, and customs have produced absurd and detrimental consequences.

180. Defendant ABA signed a consent decree in 1996 stemming from its violation the Sherman Act (15 U.S.C. § 1), and then admitted to violating that same consent decree in 2006, when it agreed to pay a $185,000 fine to the United States Department of Justice. Defendant ABA therefore has an established history of monopolistic and anti-competitive behavior.

181. As a direct consequence of Defendant ABA's unlawful actions, leading to the creation and/or maintenance of Restrictive Local Rules preventing corporate self-representation, Corporate Plaintiffs have spent at least $50,000.00 on otherwise unnecessary, and often counter-productive, legal services offered by licensed attorneys.

182. Plaintiffs have no adequate remedy at law.

183. Corporate Plaintiffs are entitled to treble damages, as well as attorney's fees and costs.

184. Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiffs are entitled to declaratory relief and a preliminary and permanent injunction invalidating the United States Department of Education's grant of monopoly power on law school accreditation to Defendant ABA.

## TENTH CLAIM
### *Against Defendant American Bar Association For Violation of the Cartwright Act (Cal. Bus. and Prof. Code §§ 16700 et seq.)*

185. Plaintiffs re-allege and incorporate by this reference each and every allegation set forth in this Complaint as if the same were fully set forth herein.

186. Defendant ABA is an unlawful trust designed to restrict trade and market competition in the market for legal services.

187.     Defendant ABA limits the quantity of ABA-accredited law schools, which in turn limits the quantity of individuals eligible to sit for state Bar exams, which in turn limits the number of practicing lawyers.

188.     Defendant ABA knowingly imposes and/or recommends policies intended to artificially increase the market price of legal services.

189.     Defendant ABA has paying members in the State of California and impacts the market for legal services in the State of California.

190.     Defendant ABA's restraint of trade in the market for legal services cannot be considered "reasonable" given its adverse consequences, including but not limited to the recent closure of California courts and the unaffordability of legal services for the California public.

191.     Defendant ABA has inspired and/or encouraged Restrictive Local Rules and policies that amount to refusals to deal with non-attorneys.

192.     Corporate Plaintiffs have been damaged in the amount spent on unnecessary attorney's fees as a result of Defendant ABA's unlawful activity, or at least $50,000.00.

193.     Corporate Plaintiffs are entitled to treble damages, as well as attorney's fees and costs.

194.     Plaintiffs have no adequate remedy at law.

## **RELIEF REQUESTED**

WHEREFORE, Plaintiffs respectfully request the following relief:

A. A declaratory judgment adjudicating that the Restrictive Local Rules, including but not limited to Civil Local Rules 3-9(b) and 5-1(b), violate the United States Constitution and are unenforceable;

B.  A declaratory judgment adjudicating that the PACER Fee Schedule violates the E-Government Act of 2002 and is unenforceable;

C.  A preliminary and permanent injunction enjoining Defendant AO from collecting any further PACER fees except to the extent "necessary" to promote public access;

D.  An order instructing Defendant AO to immediately refund the unlawfully-collected PACER fees belonging to Plaintiffs and any other entities;

E.  A judgment awarding Plaintiffs reasonable costs and expenses of this action, including attorneys' fees, in accordance with 42 U.S.C. § 1988 and other applicable law;

F.  Treble damages and costs for losses incurred due to Defendant ABA's actions; and

G.  Such other and further relief as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury in this action of all issues so triable.

Respectfully submitted,

Dated:  June 16, 2014

By: _____

Aaron Greenspan

President
THINK COMPUTER FOUNDATION

President & CEO
THINK COMPUTER CORPORATION

## CERTIFICATE OF SERVICE

The undersigned certifies that, on June 16, 2014, a true copy of the foregoing **FIRST**

**AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF** is being

served via USPS Certified Mail to the following addresses:

**Michel Ishakian**
Administrative Office of the United States Courts
One Columbus Circle, NE
Washington, DC 20544

**Wendell Skidgel**
Administrative Office of the United States Courts
One Columbus Circle, NE
Washington, DC 20544

**Richard Wieking**
United States District Court for the Northern District of California
450 Golden Gate Avenue
San Francisco, CA 94102-3489

**Honorable Claudia Wilken**
1301 Clay Street
Courtroom 2, 4th Floor
Oakland, CA 94612

Additionally, service is being provided via CM/ECF to parties already enrolled, as well as via e-mail to other non-enrolled parties subject to a prior written agreement.

Dated: June 16, 2014                    By: _____
                                             Aaron Greenspan

                                             President
                                             THINK COMPUTER FOUNDATION

                                             President & CEO
                                             THINK COMPUTER CORPORATION