AARON J. GREENSPAN
THINK COMPUTER FOUNDATION
1132 Boranda Avenue
Mountain View, CA  94040-3145
Telephone: (415) 670-9350
Fax: (415) 373-3959
E-Mail: legal@thinkcomputer.org

*PRO SE*

FILED

JUN 16 2014

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| THINK COMPUTER FOUNDATION, an Ohio 501(c)(3) non-profit corporation; THINK COMPUTER CORPORATION, a Delaware corporation,<br><br>　　　　Plaintiffs,<br><br>　　　　v.<br><br>ADMINISTRATIVE OFFICE OF THE UNITED STATES COURTS; UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA; and AMERICAN BAR ASSOCIATION,<br><br>　　　　Defendants. | Case No. 5:14-cv-02396-BLF<br><br>**CORPORATE PLAINTIFFS' RESPONSE TO THE COURT'S ORDER TO SHOW CAUSE**<br><br>Judge Beth Labson Freeman |

1    Plaintiffs Think Computer Foundation (the "Foundation") and Think Computer

2  Corporation ("Think," and collectively, "Corporate Plaintiffs") hereby file this Response to

3  the Court's Order To Show Cause As To Why The Complaint Should Not Be Dismissed

4  dated June 11, 2014 (and its Correction thereof dated June 13, 2014), and, for the reasons

5  stated herein, respectfully request that the Court not dismiss Corporate Plaintiffs from this

6  action.

7    1.    On May 23, 2014, Corporate Plaintiffs filed this action against Government

8  Defendants Administrative Office of the United States Courts and United States District

9  Court for the Northern District of California, as well as Defendant American Bar Association

10  ("ABA"), to raise constitutional concerns regarding procedures within the federal courts,

11  specifically with regard to the discriminatory treatment of *pro se* litigants and unlawful

12  conduct preventing electronic access to public information via the official PACER database.

13  These concerns are closely intertwined with the unlawful, decades-long actions of Defendant

14  ABA, a private corporation whose monopoly on legal education accreditation in the United

15  States has had severe and negative consequences for the legal profession, the Courts, and the

16  populace at large that depends upon them.

17    2.    Plaintiff Think Computer Foundation is an Ohio non-profit corporation

18  recognized by the Internal Revenue Service ("IRS") as being tax-exempt pursuant to Internal

19  Revenue Code § 501(c)(3). Plaintiff Think Computer Corporation is a Delaware sub-chapter

20  S corporation 100% owned by the undersigned, which does not accrue or pay its income tax

21  as a separate legal entity, but rather passes those taxes through to its owner.

22    3.    The Internal Revenue Service permits the Foundation and similarly-

23  designated 501(c)(3) non-profit organizations to take part in non-partisan, non-campaign,

24

---

CORPORATE PLAINTIFFS' RESPONSE TO THE    1                              5:14-cv-02396-BLF
COURT'S ORDER TO SHOW CAUSE

non-lobbying political activities. The restriction on impacting legislation through lobbying "does not include actions by executive, judicial, or administrative bodies" according to the IRS web site at http://www.irs.gov/Charities-&-Non-Profits/Lobbying, last updated April 10, 2014 and accessed June 12, 2014.

4.     On June 16, 2014, simultaneous with the filing of this Response, Corporate Plaintiffs have filed a First Amended Complaint ("FAC") pursuant to Rule 15(a)(1)(A) in which the undersigned is named as an individual Plaintiff alongside the aforementioned corporate Plaintiffs. Pursuant to 28 U.S.C. § 1654, described more fully below, individual Plaintiff Aaron Greenspan has an irrefutable and incontrovertible right to represent himself and his interests before this Court *pro se*, without an attorney.

5.     Although attorneys play a vital and important role in our society, the United States Constitution does not require that counsel be forced upon any litigant. "Under appropriate circumstances the Constitution requires that counsel be tendered; it does not require that under all circumstances counsel be forced upon a defendant. *United States ex rel. McCann v. Adams*, 320 U.S. 220." *Carter v. Illinois*, 329 U.S. 173 (1946).

6.     Self-representation is a right, grounded in 28 U.S.C. § 1654 since 1948, and 28 U.S.C. § 394 before that, long afforded to individuals in the United States. 28 U.S.C. § 1654 reads as follows:

> "In all courts of the United States the parties may plead and conduct their own cases personally or by counsel as, by the rules of such courts, respectively, are permitted to manage and conduct causes therein."

7.     No explicit statement in 28 U.S.C. § 1654 requires a corporation to retain counsel.

1        8.     Courts have therefore interpreted the purported need for a corporation to hire

2   counsel based on 28 U.S.C. § 1654 and its predecessor statutes and traditions. Courts'

3   interpretations in this regard have been inconsistent in both their underlying legal reasoning

4   and in their ultimate result, for in some instances, non-attorneys actually *have* represented

5   corporations.

6        9.     In three related cases before the First Circuit concerning Las Colinas, Inc., the

7   company's "nonlawyer president and majority stockholder (94%)," Vigdor Schreibman,

8   represented his corporation without counsel due to "extraordinary legal ability that had been

9   demonstrated by the corporate officer." *In re Las Colinas Dev. Corp.*, 585 F. 2d 7 (1st Cir.

10  1978). *In re Las Colinas* also cites *In the Matter of Holliday's Tax Services, Inc.*, 417

11  F.Supp. 182 (E.D.N.Y. 1976). In that case, District Judge Weinstein wrote:

> "Modifying the absolute rule of corporate representation in bankruptcy cases,
> rather, rests on the inherent power of a court to supervise the proper
> administration of justice. *Cf.* Note, 1960 Duke L.J. 649, 652. The traditional
> rule is unnecessarily harsh and unrealistic when applied in bankruptcy to
> small, closely-held corporations. They are set up by the thousands. Many,
> such as the one before us, are in the name of the person doing business. In
> these instances, incorporation is merely a technicality, facilitating competitive
> economic activity by individuals. Failure of the 'corporation' is, for all
> practical purposes, the failure of the individual entrepreneur. Accordingly,
> relief available in the bankruptcy court should be cut off only for the most
> pressing reasons."

18  *Id.* at 184.

19       10.     These cases demonstrate that prior to the introduction of rules such as this

20  District's Civil Local Rule 3-9(b), blocking corporations' access to justice was merely a legal

21  tradition in the federal courts—not always followed—and based loosely on precedent.

22       11.     Corporations have encountered no such difficulty with self-representation

23  before small claims courts and administrative bodies, such as the United States Patent and

24

---

CORPORATE PLAINTIFFS' RESPONSE TO THE   3                  5:14-cv-02396-BLF
COURT'S ORDER TO SHOW CAUSE

Trademark Office Trademark Trial and Appeal Board.  Nor have these bodies been particularly harmed or even challenged in any way by *pro se* corporations, especially since virtually all large corporations hire counsel, even when not required to do so.

12.     The most common reason proffered for the supposed necessity of corporate representation by counsel is effectively a side effect of the ambiguous word "personally" in 28 U.S.C. § 1654 (though courts also sometimes focus on the word "parties").  Rather than interpret "personally or by counsel" in the statute as meaning that Congress intended for litigants to always have a choice between either representing their own interests, or hiring counsel to represent them, courts have instead chosen a needlessly more literal path, giving rise to questions surrounding the widely-accepted and long-standing legal fiction of corporate personhood; the idea being that because corporate persons cannot think, write or speak, they must act through others.  "This rule that a corporation may be represented only by licensed counsel is based not just on a tradition that goes back to the common law, *Brandstein v. White Lamps, Inc.*, 20 F.Supp. 369 (S.D.N.Y.1937), but also on the practical consideration that '[s]ince a corporation can appear only through its agents, they must be acceptable to the court; attorneys at law, who have been admitted to practice, are officers of the court and subject to its control.'"  *In re Las Colinas, supra*, at 11.

13.     This theory of mandatory "agency" is fundamentally flawed in that the intentions, plans and expressions of many corporations of limited size can actually be pinpointed physically: in the brains of their respective founders, as Judge Weinstein suggested—not in some unknowable ether.  In this limited context of the single-owner corporation, the owner's person literally is the corporation's person.  Even corporations

involving more than one person are capable of designating, through Boards of Directors or other means, an owner or officer to represent the company "personally."

14.     As discussed in the FAC, sub-chapter S corporations do not exist for tax purposes as independent legal entities. Based upon Form 1040 Schedule E filings, the IRS collects their taxes directly from the corporate shareholders—who, by virtue of Restrictive Local Rules such as Civil Local Rule 3-9(b), are denied the ability to assert or defend their corporations' rights in the same Courts they themselves fund.

15.     The ultimate precedent establishing the mandatory agency principle (in a notably tautological fashion) is *Osborn v. Bank of United States*, 22 U.S. 738 (1824), which states, "A corporation, it is true, can appear only by attorney, while a natural person may appear for himself." *Id.* at 830. A more comprehensive explanation, while lacking in the text of the *Osborn* decision, can be found in *Strong Del. Min. Ass'n v. Board of App. of Cook Cty.*, 543 F. 2d 32 (7th Cir. 1976), summarizing two cases from four decades prior:

> "The underlying rationale for the rule was inquired into in *Heiskell v. Mozie*, 65 U.S. App. D.C. 255, 82 F.2d 861, 863 (1936) wherein it was explained:
>
>> The rule in these respects is neither arbitrary nor unreasonable. It arises out of the necessity, in the proper administration of justice, of having legal proceedings carried on according to the rules of law and the practice of courts and by those charged with the responsibility of legal knowledge and professional duty. . . . The rules for admission to practice law in the courts of the District of Columbia require the applicant to submit to an examination to test not only his knowledge and ability, but also his honesty and integrity, and the purpose behind the requirements is the protection of the public and the courts from the consequences of ignorance or venality.
>
> Perhaps cutting more to the quick, it was suggested in *Mortgage Commission of New York v. Great Neck Improvement Co.*, 162 Misc. 416, 295 N.Y.S. 107, 114 (1937):
>
>> Were it possible for corporations to prosecute or defend actions in person, through their own officers, men unfit by character

1
2
3
4

> and training, men, whose credo is that the end justifies the means, disbarred lawyers or lawyers of other jurisdictions would soon create opportunities for themselves as officers of certain classes of corporations and then freely appear in our courts as a matter of pure business not subject to the ethics of our profession or the supervision of our bar associations and the discipline of our courts.

5
6

> The uniform interpretation of 28 U.S.C. § 1654 and the reference to 'the parties' therein is consonant only with the parties in interest — the real beneficial owners of the claims asserted in the suit."

7  *Strong Del. Min. Ass'n*, *supra*, at 33-34. This explanation is key to understanding the *Osborn*

8  rationale, a nearly two-century-old protectionist anachronism that has plagued the judicial

9  branch of our nation ever since by perpetually skewing justice in favor of only those who can

10  afford attorneys.

11       16.    The *Osborn* rationale, at least as formulated by the various courts cited above,

12  invokes only two key principles:

13       a) competence, or *Heiskell*'s "proper administration of justice," bolstered by

14       *Mortgage Commission of New York*'s perceived need for "the protection

15       of the public and the courts from the consequences of ignorance;"

16       b) moral character, or *Heiskell*'s "honesty and integrity," bolstered by the

17       perceived need for "the protection of the public and the courts from the

18       consequences of…venality" and the fear of an apocalyptic scenario a la

19       *Mortgage Commission of New York* in which corporate *pro se* litigants

20       appear *en masse* as a "matter of pure business not subject to the ethics of

21       our profession or the supervision of our bar associations and the discipline

22       of our courts."

23

24

17.     A third principle was grafted onto the original two at least as early as the 1980s:

> c)  efficiency, as explained by *Jones v. Niagara Frontier Transportation Authority*, 722 F.2d 20, 22 (2d Cir. 1983). "The reasons for requiring that a party, unless exercising his constitutional right to represent himself, be represented by an attorney are principally that the conduct of litigation by a non-attorney creates unusual burdens for his adversaries and the court, as well as for the party he would represent. The lay litigant frequently brings pleadings that are awkwardly drafted, motions that are inarticulately presented, [and] proceedings that are needlessly multiplicative. *See Model Code of Professional Responsibility* DR 7-102(A) (1 & 2) (1976)." *Id.*

18.     The "Model Code of Professional Responsibility DR 7-102(A) (1 & 2) (1976)" cited by *Jones* is a document compiled by Defendant ABA. The sections of the document specifically cited read:

> "DR 7-102 Representing a Client Within the Bounds of the Law.
>
> (A) In his representation of a client, a lawyer shall not:
>
>> (1) File a suit, assert a position, conduct a defense, delay a trial, or take other action on behalf of his client when he knows or when it is obvious that such action would serve merely to harass or maliciously injure another.[footnote omitted]
>>
>> (2) Knowingly advance a claim or defense that is unwarranted under existing law, except that he may advance such claim or defense if it can be supported by good faith argument for an extension, modification, or reversal of existing law."

19.     The citation of Defendant ABA's Model Code of Professional Responsibility is not a mere coincidence. Defendant ABA's Model Codes and Rules have been part of a

1  concerted lobbying effort to project the appearance of attorneys as having superior

2  competence, moral character and efficiency relative to laymen in order to drive increased

3  industry demand, while Defendant ABA's monopoly on law school credentialing has served

4  to restrict industry supply. The effects of such policies could be correctly guessed at by

5  reading any elementary economics textbook: an artificially low quantity of services rendered

6  at artificially high prices.

7       20.    The cases cited by this Court's Order to Show Cause, namely *Rowland v.*

8  *Calif. Men's Colony*, 506 U.S. 194 (1993) and *United States v. High Country Broad. Co.*, 3

9  F.3d 1244, 1245 (9th Cir. 1993), cite and repeat the very same cases and justifications

10 enumerated above, starting with *Osborn*, which collectively amount to a plea by many judges

11 for assurances of competency, moral character, and efficiency.[1]  While perhaps

12 understandable—no one wants to deal with a case involving an incompetent, dishonest and

13 inefficient party—restricting access to justice merely as a means of *hoping* to improve the

14 quality of legal discourse (for the plea always invokes the general *existence* of rules, and

15 never data demonstrating that they are actually *followed*) is constitutionally impermissible by

16 virtue of the First and Fourteenth Amendments to the United States Constitution.

17      21.     Defendant ABA's monopoly on the legal profession was cemented in 1952

18 when the United States Department of Education designated it "as the national agency for the

19 accreditation of programs leading to the J.D. degree in the United States," according to

20 Defendant ABA's web site. Therefore, the character of the legal profession, and its

21

22

---

23 [1] Notably, in *United States v. High Country Broad. Co.*, the Ninth Circuit drastically and uniquely misconstrues
   28 U.S.C. § 1654 as containing an explicit prohibition on corporate *pro se* representation, which § 1654 clearly

24 does not. Regardless, the Ninth Circuit cites to *Rowland*, which in turn falls back on *Osborn*.

CORPORATE PLAINTIFFS' RESPONSE TO THE     8      5:14-cv-02396-BLF
COURT'S ORDER TO SHOW CAUSE

participants, may have been quite different when *Osborn* was decided (well prior to 1952), compared to its nature today.

22.     Today, each of the three concerns alleged by courts against business owners to support the prohibition on *pro se* corporate representation—incompetence, poor moral character, and inefficiency—apply just as much, if not quite a bit more, to licensed attorneys.

23.     Even experienced attorneys have a difficult time performing their duties with accuracy and total adherence to the vast rules that govern them, and they frequently misinterpret or overlook key facts. The system of often-conflicting rules and various Orders in place has become so unwieldy and needlessly complex, driven in large part by Defendant ABA, that even this Court agreed with Corporate Plaintiffs that Defendant ABA's own licensed counsel in this case "ha[d] not complied with the Notice of Appearance requirements of the Civil Local Rules" from the outset (Docket No. 18). This kind of occurrence and worse is hardly unique; attorneys practicing before every federal court routinely face sanctions from both judges and bar associations for unethical conduct, and more alarmingly, frequently escape the consequences of such conduct until it is so egregious that it is completely undeniable.

24.     The notion that attorneys are of superior moral character relative to laymen, either inherently or by virtue of professional training, is an enormous fallacy—one perpetuated in a variety of manners by Defendant ABA and its members. Corporate Plaintiff Think's direct experiences with attorneys, briefly described in part below, are useful as a lens to examine an industry that has actually come to resemble the amoral nightmare scenario of nineteenth-century judges—except that the men (and women) "unfit by character and training" almost without exception are ironically the licensed attorneys, not their clients.

a) In 1998, Think was incorporated by a family friend of the undersigned who happened to be a Harvard Law School-educated attorney in Ohio. Think timely paid the hourly attorney's fees for incorporation work and a trademark search; later, the same attorney refused to pay Think at all for work on a web site for an office supply reseller. Later, the undersigned (then in high school) realized the true purpose of the attorney's office supply web site: to project to the federal government the illusion of minority business ownership. The same [Caucasian] attorney had enlisted an African-American acquaintance to serve as a token minority "owner" for a new corporation that the attorney had created and directed, so that he might profit from a lucrative and fraudulent side-business.

b) From 2001-2004 Think was forced to defend its federal trademark rights in a proceeding before the United States Patent and Trademark Office Trademark Trial and Appeal Board. Various attorneys for Think located in Minnesota sent several invoices for many thousands of dollars with no line item breakdown by hour or cost, so as to make it impossible to challenge the firm's hourly billing practices, or even to know what work had contributed most to the bill.

c) In 2005, an experienced attorney in Massachusetts attempted to bill Think $748.65 for discussing the *possibility* of providing legal representation—which he ultimately did not—for *not* responding to various e-mails, and for providing non-legal non-advice consisting of the words, "I don't know," after taking the undersigned to lunch at an Italian restaurant. His firm nullified the bill.

d) In early 2008, Think retained a different, major law firm in Pennsylvania to assist with a re-emergence of the prior trademark dispute. For three months, Think's

attorney was essentially non-responsive and provided no guidance or advice of any kind, until suddenly, without Think's knowledge or consent, he sent opposing counsel a unilaterally modified version of a three-month-old e-mail, copied and pasted onto firm letterhead, misstating Think's settlement threshold by a factor of one-third (a very large sum of money). His firm reacted by offering a full refund of Think's retainer and legal fees, provided that Think agree to keep the firm's name confidential.

e) In 2009, during confidential negotiations, California attorneys for Think completely failed to advocate on Think's behalf and conducted themselves in a manner described in the ABA/BNA Lawyers' Manual on Professional Conduct as "unethical."

f) In 2010, a major California law firm provided Think with legal advice and documents concerning its employee stock option incentive plan. Think's attorney at the firm failed to mention that an independent valuation would be necessary, leading Think to distribute invalid contracts to its employees and various associates that, had the error not been caught, would have led to considerable legal and tax liability for both Think and the contract recipients.

g) In early 2011, without ever informing Think, one of Think's California patent attorneys hired a technical artist to re-draw all of the diagrams in an application, at Think's expense, because even though the patent examiner had not raised issues with any of them, the attorney was concerned that *one* of the several diagrams *could* have contained an unallowably small font size. The attorney presented Think with a cryptic bill for the artist's services months later, which

Think questioned and refused to pay. The attorney then asserted that Think would

not be able to proceed with its patent application due to copyright infringement—

until he was reminded that *he* had instructed the artist to, without permission,

copy Think's original diagrams, making the attorney (and the artist) the only

parties in violation of copyright law. The bill was waived.

h) In late 2011, a young Massachusetts attorney offered to assist Think "pro bono"
with the company's constitutional case involving money transmission statutes.
After charging a retainer, the attorney insisted on printing a wide variety of court
documents and sent Think a bill for the ink, including time spent acquiring it.
While he offered no input into Think's case and consequently agreed to refund
Think's retainer in full, he separately became enamored of the practice of
copyright trolling, in which he would send settlement demands to supposed
"infringers" of his other clients' copyrights on pornographic films, calculated
such that settlement of the "violations," in the low thousands of dollars, would be
far less costly and embarrassing than the inevitable litigation he could and did
manufacture. He has since been sanctioned by at least one court and has moved
to a different state.

i) A second California patent attorney for Think provided helpful advice, but failed
to realize that the Track Changes feature in his word processor recorded the exact
date and time when changes were made. His invoices provably inflated the
amount of time he actually spent on the work performed.

j) In 2012, another of Think's $450-per-hour attorneys—a seasoned former partner
at a respected, major firm—violated multiple Civil Local Rules by filing legal

briefs late and in the wrong format with pervasive serious errors and "(CITE)" in place of citations. One citation-free quote attributed to the "United States Supreme Court" actually originated from the Supreme Court of West Virginia. When questioned, the attorney verbally abused the undersigned for 45 minutes, claimed not to have "proper PDF generating equipment," and even proceeded to unlawfully ask the undersigned for both legal advice on a specific statute *for another one of his paying clients* and technical advice on legal brief formatting. For these reasons and more, Think reported the attorney to the State Bar of California, which advised *unlawfully charging the attorney for the legal advice* as a "consultant." Otherwise, the Bar did nothing, even when Think noted that the attorney had been sued for malpractice four times, and once even appropriated rights to a client's house after she could not pay his inflated legal bills (which fit the same pattern as inflated bills sent to Think).

These representative examples, and countless others like them, serve to illustrate that morally contemptible and highly inappropriate behaviors, for which there are virtually no consequences save an occasional slap on the wrist, utterly pervade the legal profession. More than mere "bad luck" or "a few bad apples," they occur independent of firm size, geography, billing rates, years of experience, college background and/or law school prestige.

25.   The notion that only attorneys can be "subject to [the Court's] control" is an utter fallacy. *Brandstein v. White Lamps*, 20 F. Supp. 369 (S.D.N.Y. 1937). Whether via Federal Rules of Civil Procedure 11, 37, 38, through its own power, or pursuant to statutes such as 28 U.S.C. § 1912, the Court may sanction parties regardless of any Bar membership. Furthermore, *pro se* litigants can be (and sometimes are) declared "vexatious" by the Court

1   and prevented from filing repeated meritless lawsuits in extreme circumstances. Court orders

2   routinely compel *pro se* litigants to comply with rules, requirements and directives of all

3   kinds.

4         26.    Plaintiff Think is not the only entity that has ever been shocked by the moral

5   depravity of some lawyers. Licensed attorneys have been key players in some of the largest

6   and most notable ethical breaches in modern history, including but not limited to:

7              a)  the Watergate scandal during the Nixon administration, which an article

8                  on Defendant ABA's website[2] calls "a huge breakdown of integrity;"

9              b)  the tobacco industry's attempt to hide the addictive and carcinogenic

10                 effects of smoking. In the words of Judge Gladys Kessler,

11                     "Finally, a word must be said about the role of lawyers in this
                       fifty-year history of deceiving smokers, potential smokers, and
12                     the American public about the hazards of smoking and second
                       hand smoke, and the addictiveness of nicotine. At every stage,
13                     lawyers played an absolutely central role in the creation and
                       perpetuation of the Enterprise and the implementation of its
14                     fraudulent schemes. They devised and coordinated both
                       national and international strategy; they directed scientists as to
15                     what research they should and should not undertake; they
                       vetted scientific research papers and reports as well as public
16                     relations materials to ensure that the interests of the Enterprise
                       would be protected; they identified 'friendly' scientific
17                     witnesses, subsidized them with grants from the Center for
                       Tobacco Research and the Center for Indoor Air Research, paid
18                     them enormous fees, and often hid the relationship between
                       those witnesses and the industry; and they devised and carried
19                     out document destruction policies and took shelter behind
                       baseless assertions of the attorney client privilege. What a sad
20                     and disquieting chapter in the history of an honorable and often
                       courageous profession."

21

22

23   _____

     [2] *See* "40 years after Watergate, lawyers involved reflect on political scandal," October, 2013 ABA News
24   Archives, http://www.americanbar.org/news/abanews/aba-news-archives/2013/10/40_years_after_water.html.

---

CORPORATE PLAINTIFFS' RESPONSE TO THE    14          5:14-cv-02396-BLF
COURT'S ORDER TO SHOW CAUSE

*USA v. Philip Morris USA, et al*, 449 F.Supp.2d 1, 28, (Dist. Columbia 2006).

    c) the Bush Administration's decision, premised on a secret Executive Order with the non-binding and improper signature of White House Counsel (and eventual United States Attorney General) Alberto Gonzales, to enable the National Security Agency to spy on Americans via the wholesale secret collection of vast quantities of telecommunications data;

    d) the increasingly popular practice—completely dependent upon the willing cooperation of attorneys—of establishing opaquely-named shell corporations in locales such as Marshall, Texas for the express purpose of suing other corporations[3] for patent infringement. Typically the patents in question are incredibly vague, improperly-granted software patents, and the attorneys asserting them deliberately mask real parties in interest;

    e) the Bush Administration's decision, codified in Deputy Assistant U.S. Attorney General John Yoo's "Torture Memos," to allow for "enhanced interrogation techniques" that would commonly be referred to as "torture;"

    f) most recently, the General Motors ignition switch defect, linked to at least 13 deaths. According to the May 17, 2014 *New York Times* article "Inquiry by General Motors Is Said to Focus on Its Lawyers" by Bill Vlasic, "Transportation Secretary Anthony R. Foxx said on Friday that

---

[3] Frequently, corporations sued by patent trolls' attorneys are startup companies that lack any legal budget or expertise. Even in those cases where their founders are capable of learning the legal system on an *ad hoc* basis, it matters little, for corporations are prohibited from appearing *pro se*. Many companies have been forced out of business as a result. In other words, attorneys have over time managed to create a nearly perfect machine whose function is to legally extort vast amounts of wealth from inventors, for their own benefit. Hence, the sadly optimistic "Driving Innovation, Not Litigation" headline on the home page of the USPTO.

---

1                     G.M.'s unwillingness to share information it had about defective switches

2                     with regulators most likely cost lives in accidents. 'Literally, silence can

3                     kill,' Mr. Foxx said in a news briefing."

4      27.    Licensed attorneys and rules backed by Defendant ABA have managed to

5  impede judicial efficiency to such an alarming degree that courts in several states, including

6  California, are woefully short of funding to the point where many state courts are closing,

7  deeply harming the public. The issues surrounding PACER raised in this very lawsuit speak

8  directly to the issue of efficiency in the justice system, which is altogether lacking not

9  because of self-represented corporate (or individual) filers, but because of Defendant ABA's

10  terror at the mere thought of having to accommodate them with improved technology and

11  more sensible rules, which might have a negative impact on its monopoly.

12      28.    The three pillars of *Osborn*—attorney competence, attorney moral character,

13  and attorney efficiency—have therefore all but crumbled in today's legal environment. The

14  monopoly enthusiastically encouraged by Defendant ABA is in large part responsible, but

15  regardless of blame, the consequences are disproportionately felt by small businesses with

16  the misfortune of touching the Third Rail of business: legal issues. Yet running a business

17  without ever encountering a single legal issue is virtually impossible. Thus, the mandate that

18  corporations hire attorneys, who too often conduct themselves as described above, turns

19  small businesses into unwilling hostages in a legal system that refuses to grant them any

20  voice of their own—forced to pay extortionate hourly rates and to tolerate abysmal

21  "professional" service, lest their representation, and compliance with Civil Local Rule 3-9(b),

22  lapse.

23

24

29.     Corporate Plaintiff Think has been in this hostage position all too often (and remains so) given its other pending cases before this Court—where it *must* pay attorneys whose services it does not need, does not want, and cannot afford—simply to have its voice heard on key political issues such as the regulatory framework for money transmission, which in turn has an enormous impact on modern-day banking.

30.     "The Government may regulate corporate political speech through disclaimer and disclosure requirements, but it may not suppress that speech altogether." So states the United States Supreme Court at the outset of *Citizens United v. Federal Election Com'n*, 130 S. Ct. 876 (2010), widely regarded as a landmark case that, through its many thousands of citations, has overturned key precedent in the field of political campaign contributions. Yet the Supreme Court did not limit "corporate political speech" in *Citizens United* to campaigns alone.

31.     While in *Rowland*, *supra*, the Supreme Court read a variety of tea leaves to justify its decision that "Four contextual features indicate that 'person' in § 1915(a) refers only to individuals,"[4] *Citizens United* more recently affirmed that whether "person" means an individual or any kind of person is irrelevant, due to "*Bellotti*'s central principle: that the First Amendment does not allow political speech restrictions based on a speaker's corporate identity." *Id.* at 903.

32.     The First Circuit briefly considered the First Amendment implications of corporate self-representation in *In re Las Colinas*, *supra*. "It was the protection of free discussion of governmental affairs, not concern for the welfare of the bank, that implicated the first amendment in *First National Bank v. Bellotti*." *Id.* at 12. Yet given the Supreme

---

[4] 28 U.S.C. § 1915 concerns appearances *in forma pauperis*.

1  Court's aforementioned discussion of *Bellotti* in *Citizens United*, it would appear that the

2  Court has now finally expressed its "concern for the welfare of the bank," some thirty-six

3  years after the First Circuit penned its skeptical decision.

4        33.    In the present case, Corporate Plaintiffs have opted to express their undeniably

5  political views—regarding access to justice, associated tolls imposed by the Government,

6  and Defendant ABA's monopoly on the legal profession—by speaking directly through their

7  shared founder, Plaintiff Aaron Greenspan, rather than through a government-sanctioned

8  proxy. "[T]he Government lacks the power to ban corporations from speaking." *Id.*

9        34.    The cause for Corporate Plaintiffs' ability to represent themselves through

10  their founder is that to force licensed counsel onto each of them pursuant to Civil Local Rule

11  3-9(b) *by virtue of their corporate identity alone* would directly contradict their First

12  Amendment rights under the United States Constitution—especially in this specific context,

13  wherein each corporation wishes to speak to the political issue of judicial access.

14        35.    The fact that pursuant to Civil Local Rule 3-9(b), a hypothetically

15  incompetent, immoral and habitually inefficient corporate owner would be prohibited from

16  representing his or her own corporation *unless that incompetent, immoral and habitually*

17  *inefficient individual were also a member of the Bar*, isolates the single factor that is really

18  behind the Rule: economic protectionism for the benefit of attorneys. Aside from being

19  conspicuously absent from the *Osborn* factors, economic protectionism has no place

20  informing Court policies and cannot pass constitutional muster. In the words of British legal

21  scholar Richard Susskind OBE, "The law is no more there to create business for lawyers than

22  ill health is there to create business for doctors."

23

24

36.     Though Government may still "regulate" corporate political speech through "disclaimer and disclosure" requirements, the forced insertion of a Government-sanctioned intermediary or translator figure between the speaker and the intended audience reeks of unconstitutional censorship. This explains why for almost 200 years the issue of corporate self-representation before the Courts has barely been addressed: because virtually every attempt to do so has been effectively censored by members of the Bar, whether in their positions as attorneys or judges. Those rare cases authored by brave judges who ignored protectionist pressure and flawed reasoning have been shunned as aberrant ever since.

37.     A hypothetical arrangement, such as where *Citizens United* requires free political speech by corporations, but *Osborn* and its dated progeny still demand that corporations be banned from direct access to the courts, is so internally inconsistent as to be unthinkable. The courts are, after all, a hugely important venue for the registration and discussion of political grievances.

38.     Corporate Plaintiffs must be party to this case for standing purposes. By their own flawed logic, Defendants are likely to argue that despite his business ownership, individual Plaintiff Aaron Greenspan does not have standing to sue over the constitutionality of Restrictive Local Rules as a corporation whose access to the courts has been blocked.

39.     Corporate Plaintiffs must also be permitted to remain in the case as it is not likely that any other corporation would even attempt to press the issue of corporate self-representation due to the implicit censorship that has been at work since at least 1824.

40.     Without the ability to represent Corporate Plaintiffs *pro se*, the undersigned does not believe that Corporate Plaintiffs will be able to find, let alone afford, a lawyer

willing or able to competently represent them given the issues involved, in large part because
Corporate Plaintiffs' resources have already been so depleted by attorney fees.

41.     WHEREFORE, Plaintiffs respectfully request that the Court permit Corporate
Plaintiffs, and all corporations, to, if and when desired, express their views directly to the
Court, in this and all future cases, without forced legal counsel.


Respectfully submitted,


Dated:  June 16, 2014                           By: _____
                                                Aaron Greenspan
                                                President
                                                THINK COMPUTER FOUNDATION


                                                By: _____
                                                Aaron Greenspan
                                                President & CEO
                                                THINK COMPUTER CORPORATION

## CERTIFICATE OF SERVICE

The undersigned certifies that, on June 16, 2014, a true copy of the foregoing

**CORPORATE PLAINTIFFS' RESPONSE TO THE COURT'S ORDER TO SHOW**

**CAUSE** is being served via electronic mail, pursuant to written agreements between the parties,

at the following e-mail addresses:

**Administrative Office of the United States Courts**
**United States District Court for the Northern District of California**
James A. Scharf
Assistant United States Attorney
james.scharf@usdoj.gov

**American Bar Association**
Bety Javidzad
Venable, LLP
bjavidzad@venable.com

Dated: June 16, 2014                    By: _____
                                             Aaron Greenspan
                                             President
                                             THINK COMPUTER FOUNDATION

                                        By: _____
                                             Aaron Greenspan
                                             President & CEO
                                             THINK COMPUTER CORPORATION