1
2
3
4
5
6
7
8
9

AARON J. GREENSPAN
THINK COMPUTER FOUNDATION
1132 Boranda Avenue
Mountain View, CA  94040-3145
Telephone: (415) 670-9350
Fax: (415) 373-3959
E-Mail: legal@thinkcomputer.org

*PRO SE*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

FILED
AUG 2 0 2014
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AARON GREENSPAN; THINK COMPUTER FOUNDATION, an Ohio 501(c)(3) non-profit corporation; and THINK COMPUTER CORPORATION, a Delaware corporation,<br><br>Plaintiffs,<br><br>v.<br><br>ADMINISTRATIVE OFFICE OF THE UNITED STATES COURTS; MICHEL ISHAKIAN, in her official capacity on behalf of the Administrative Office of the United States Courts; WENDELL SKIDGEL, in his official capacity on behalf of the Administrative Office of the United States Courts; UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA; RICHARD WIEKING, in his official capacity on behalf of the United States District Court for the Northern District of California; CLAUDIA WILKEN, in her official capacity on behalf of the United States District Court for the Northern District of California; and AMERICAN BAR ASSOCIATION,<br><br>Defendants. | Case No. 5:14-cv-02396-JTM<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS FIRST AMENDED COMPLAINT**<br><br>Judge Jeffrey T. Miller<br><br>Date:       Monday, October 6, 2014<br>Time:      10:00 A.M.<br>Location:  San Jose, CA |

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ............................................................................................................ 1

STATEMENT OF FACTS ............................................................................................... 2

STANDARD OF REVIEW .............................................................................................. 4

ARGUMENT ................................................................................................................... 5

I.   Challenges to the Restrictive Local Rules in the Northern District of California ............. 5

    A.   Sovereign and Judicial Immunity are Limited By the Fifth Amendment and the Nature of Government Defendants' Actions ...................................................... 5

    B.   Plaintiffs Have Standing to Challenge the Restrictive Local Rules ...................... 7

    C.   The Restrictive Local Rules Discriminate Against Corporations Both Narrowly and Broadly.......................................................................................... 8

    D.   The Government's Arguments Concerning the Local Rules Advisory Committee Are Mistakenly Inverted ....................................................................... 9

    E.   *Citizens United* Fundamentally Altered the Legal Landscape for Corporate Personhood, Decisively Granting Corporations the Right to Free Political Speech, Including the Right To Speak in Court Unaided ...................................... 10

    F.   Given the Gravity of the Issues Involved, Plaintiffs Should Be Given Leave to Amend or, Though Virtually Impossible, Hire Counsel ....................................... 12

II.   Challenges to the PACER System's Operation and Design ............................................. 12

    A.   Plaintiffs Have Standing to Challenge PACER's Operation and Design ............. 12

    B.   The Washington Defendants Can and Should Redress Plaintiffs' Grievances Related to PACER ................................................................................................ 13

    C.   Defendant AO Does Not Own PACER's Contents ............................................. 16

    D.   Defendant AO's Violation of the E-Government Act of 2002 Should Be Construed as a Fourth Amendment *Bivens* Violation............................................ 18

    E.   The United States of America Can Easily Be Substituted as a Defendant .......... 20

    F.   Plaintiffs' Federal Tort Claims Act Has Merit Because Defendant AO Has "Overcharged" By a 100% Margin ...................................................................... 20

III.   The American Bar Association Must Be Held Accountable for Its Deliberate Efforts to Strip Non-Attorneys of Their Constitutional First Amendment and Statutory Rights . 21

CONCLUSION.............................................................................................................. 25

1

# TABLE OF AUTHORITIES

2

**Cases**

3

*American Tobacco Co. v. United States,*
    328 U.S. 781 (1946) ................................................................................................ 24

4

*Arlington Heights v. Metropolitan Housing Development Corp.,*
    429 U.S. 252 (1977) ................................................................................................ 15

5

*Ashcroft v. Iqbal,*
6
    129 S. Ct. 1937, 1950 (2009) ................................................................................... 4

7

*Barrows v. Jackson,*
    346 U.S. 249 (1953) ................................................................................................ 13

8

*Bivens v. Six Unknown Fed. Narcotics Agents,*
    403 U.S. 388 (1971) ................................................................... 5, 18, 19, 20

9

*Bradley v. Fisher,*
    80 U.S. 335, 351 (1872) ........................................................................................... 6

10

*Burwell v. Hobby Lobby Stores, Inc.,*
    Case No. 13-354 (2014) ........................................................................................... 8

11

*California Motor Transport Co. v. Trucking Unlimited,*
12
    404 U.S. 508, 512 (1972) ....................................................................................... 23

13

*Carlson v. Green,*
    446 U.S. 14, 20-21 (1980) ...................................................................................... 19

14

*Cassirer v. Kingdom of Spain,*
    580 F.3d 1048, 1052 n.2 (9th Cir. 2009) ................................................................. 4

15

*Citizens United v. Federal Election Com'n,*
    130 S. Ct. 876 (2010) ...................................................................................... passim

16

*City of Lakewood v. Plain Dealer Publishing Co.,*
17
    486 U.S. 750, 772A (1988) ..................................................................................... 16

18

*Cordero v. Astrue,*
    Case No. 1:11-cv-05020-PAE-HBP (S.D.N.Y. July 29, 2013) ........................... 16

19

*Davis v. Passman,*
    442 U.S. 228, 248-49 (1979) .................................................................................. 19

20

*Doe v. Bolton,*
    410 U.S. 179, 188 (1973) ....................................................................................... 13

21

*Eastern R. Conf. v. Noerr Motors,*
22
    365 U.S. 127, 135 (1961) ....................................................................................... 23

*Equity Lifestyle Props., Inc. v. Cnty. of San Luis Obispo,*
23
    548 F.3d 1184, 1189 n. 10 (9th Cir. 2008) .............................................................. 5

24

---

*ex parte Hull*,
   312 U.S. 546, 549 (1941) ........................................................................... 14

*FDIC v. Schuchmann*,
   235 F. 3d 1217 (10th Cir. 2000) ............................................................... 15

*First Lutheran Church v. Los Angeles County*,
   482 U.S. 304, 316 n 9 (1987) ...................................................................... 5

*Forrester v. White*,
   484 U.S. 219, 225 (1988) ............................................................................ 6

*Giannini v. District Court for Dist. of Northern Cal.*,
   Case No. 3:12-cv-04289-DWM, 11 (N.D. Cal. Feb. 28, 2013) ................. 6

*Goldlawr, Inc. v. Heiman*,
   369 U.S. 463, 466 (1962) .......................................................................... 15

*Griswold v. Connecticut*,
   381 U.S. 479, 481 (1965) .......................................................................... 13

*Ileto v. Glock Inc.*,
   349 F.3d 1191, 1200 (9th Cir. 2003) .......................................................... 4

*In re: Application for Exemption*,
   Case No. 12-16373 (9th Cir. 2013) ........................................................... 17

*Johnson v. Avery*,
   393 U.S. 483 (1969) ................................................................................... 14

*Liberty Lake Invs., Inc. v. Magnuson*,
   12 F.3d 155, 158-60 (9th Cir. 1993) ......................................................... 23

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555, 561 (1992) ............................................................................ 4

*Lujan v. Natl. Wildlife Fedn.*,
   497 U.S. 871, 889 (1990) ............................................................................ 4

*Maya v. Centex Corp.*,
   658 F.3d 1060, 1068 (9th Cir. 2011) .......................................................... 5

*PMG Int'l Div. v. Rumsfeld*,
   303 F.3d 1163, 1173 (9th Cir. 2002) ........................................................ 10

*Raifman v. Wachovia Securities, LLC et al*,
   Case No. 4:11-cv-02885-SBA (N.D. Cal. May 7, 2012) ......................... 15

*Rodriguez v. Cook*,
   169 F. 3d 1176, 1179 (9th Cir. 1999) ......................................................... 9

*Ross v. Moffitt*,
   417 U.S. 600, 611 (1974) .......................................................................... 16

*San Diego Gas & Electric Co. v. San Diego*,
   450 U.S. 621, 655, n. 21 (1981) (BRENNAN, J., dissenting) ................... 5

*Schmidt v. Contra Costa County*,
   693 F.3d 1122, 1131 n.10 (9th Cir. 2012) ........................................................... 6

*Supreme Court of Virginia v. Consumers Union of the United States*,
   446 U.S. 719, 734 (1980) .................................................................................... 6

*United Mine Workers of America v. Pennington*,
   381 U.S. 657, 670 (1965) .................................................................................. 23

*United States v. High Country Broadcasting Co.*,
   3 F.3d 1244, 1245 (9th Cir. 1993) ...................................................................... 7

*Ward v. Caldera*,
   138 F. Supp. 2d 1, 7-9 (D.D.C. 2001) .............................................................. 10

*Warth v. Seldin*,
   422 U.S. 490, 501 (1975) ............................................................................ 4, 13

*Western Radio Services Co. v. U.S. Forest Service*,
   578 F. 3d 1116, 1123 (9th Cir. 2009) .............................................................. 20

*White et al v. West Publishing Corporation et al*,
   Case No. 1:12-cv-01340-JSR (S.D.N.Y. July 3, 2014) ...................................... 17

*Wilkie v. Robbins*,
   551 U.S. at 550, 554, 127 S.Ct. 2588 ............................................................... 19

*Winnemem Wintu Tribe v. United States Department of the Interior*,
   Case No. 2:09-cv-01072-FCD-EFB (E.D. Cal. July 16, 2010) .......................... 19

*Zavaletta v. American Bar Association*,
   721 F. Supp. 96, 98 (E.D. Va. 1989) ................................................................ 24

**Statutes**

28 U.S.C. § 1654 ................................................................................................. 21

28 U.S.C. § 2071(a) .............................................................................................. 6

28 U.S.C. § 2679(d)(1) ........................................................................................ 20

Cartwright Act .................................................................................................... 22

E-Government Act of 2002 ............................................................................ 7, 18

Federal Tort Claims Act ..................................................................................... 20

Sherman Act .................................................................................................. 22, 23

**Other Authorities**

Campos, Paul, "The Law-School Scam," *The Atlantic*,
   http://www.theatlantic.com/features/archive/2014/08/the-law-school-scam/375069/
   (August 13, 2014) ............................................................................................ 24

https://www.youtube.com/watch?v=2VxW4iH-Krw .......................................... 14

MacKie-Mason, Jeffrey K. and Varian, Hal R., *Some Economics of the Internet*, Proceedings of the Tenth Michigan Public Utility Conference, March 25-27, 1993 ........................... 20

Winston, Clifford et al, "First Thing We Do, Let's Deregulate All the Lawyers," Brookings Institution Press (2011) ............................................................................... 24

## **Rules**

Civil Local Rule 3-9(b) ........................................................... 8, 9, 11, 12

Civil Local Rule 5-1(b) ........................................................... 14

Federal Rule of Civil Procedure 12(b)(1) ........................................ 4

Federal Rule of Civil Procedure 12(b)(6) ........................................ 4

Federal Rule of Civil Procedure 8(a) ............................................ 4

## **Constitutional Provisions**

First Amendment ................................................................. 19, 21, 23

Fourth Amendment ............................................................... 19

Fifth Amendment ................................................................. 5, 19

Fourteenth Amendment ........................................................... 5

## **INTRODUCTION**

Plaintiffs Aaron Greenspan, Think Computer Corporation (the "Corporation"), and Think Computer Foundation (the "Foundation") filed the instant lawsuit to challenge judicial traditions and practices that, despite having no basis in law, have come to be thought of as natural and unassailable. They have persisted not because of some irrefutable logic or benefit to society at large, but because the judicial branch has effectively insulated itself from change, efficiency, and accountability, while the American Bar Association ("ABA") has deliberately pursued policies designed to ossify the judiciary's recalcitrance. Yet it must be possible, through some channel, to hold the judiciary and the ABA to account for their actions, just as the executive branch, legislative branch, and regulatory bodies so often are. Admittedly, since accountability typically flows through adjudicative processes by way of the courts, the problem of holding these entities in particular accountable poses a special, but not insurmountable, challenge.

In its motion to dismiss, representing Defendants Administrative Office of the United States Courts ("AO"), Michel Ishakian, Wendell Skidgel (collectively, "Washington Defendants"), the United States District Court for the Northern District of California, Clerk Richard Wieking, and Chief Judge Claudia Wilken (collectively, "California Defendants," and all combined, the "Government Defendants"), the United States Department of Justice does an ample job of articulating just what those challenges are. Yet many of the arguments employed by the Government and the ABA are far weaker than they appear on the surface, for immunity in this context is not—and cannot be—absolute, and despite what Defendants appear to wish, key precedent from recent years all but eviscerates a number of their contentions. In the end, it all comes down to this: the legal system appears to be afraid of what might happen if the floodgates are opened to the populace at large. Similar fears have

1   preceded other important civil rights decisions in our nation's history. Fortunately, these

2   fears are overblown, and modern technology is up to the task of facilitating a fair and

3   efficient court system. Rather than fearing the future, the courts must embrace it.

4   ### STATEMENT OF FACTS

5       Aaron Greenspan, an individual residing in Mountain View, California, is the

6   President and Chief Executive Officer of Think Computer Corporation, and the President of

7   Think Computer Foundation. Each has incurred expenses paid to Defendant AO through a

8   PACER account initially registered in Greenspan's name, directly related to either litigation

9   in the federal courts or research thereon. Collectively, those expenses have exceeded

10  $1,000.00 and are approaching $1,500.00, thanks in part to research costs for this very case.

11  Plaintiffs have requested refunds of PACER fees on numerous occasions, not only because

12  they are being collected in violation of the E-Government Act of 2002, Pub. Law No. 107-

13  347, 116 Stat. 2899, but also because PACER is a colossal mess from a technological

14  perspective that routinely overcharges users for errors, failed search results, and documents

15  that the system has recorded as already having been purchased. Just as importantly,

16  CM/ECF, the e-filing component of PACER, offers parties to a case one free copy of each

17  document in that case—except when the party does not have access, which is often.[1]

18      *Pro se* litigants in the Northern District of California are required by Local Rule 5-

19  1(b) to obtain permission from the presiding judge before using CM/ECF. Consequently, to

20  stay current with their own case, every *pro se* litigant must for at least some time pay

21  otherwise needless PACER fees to view documents on-line, unless they prefer to wait for the

22

---

23  [1] As this brief was being drafted, Defendant AO announced—after more than two years of absolute silence on
    the matter—that CM/ECF 2.0 (also called "NextGen") is ready for use. In truth, it is not; although users can

24  "upgrade" their accounts, a total of zero courts presently support CM/ECF NextGen. Regardless, even if any
    courts did presently support the upgrade, none of the issued raised here appear to be addressed in any way.

---

1    Clerk of Court to deposit documents in the mail.[2]  Without access to e-filing, *pro se* litigants

2    must also file their own papers by mail or in person, which is generally slower and far more

3    expensive than using CM/ECF on account of travel and/or mailing costs.

4        None of the Plaintiffs in this case are represented by counsel, including the two

5    corporations ("Corporate Plaintiffs").  On June 11, 2014, Judge Beth Labson Freeman issued

6    an Order to Show Cause as to Why the Complaint Should Not Be Dismissed.  Docket No 19.

7    On June 16, 2014, Corporate Plaintiffs filed a First Amended Complaint adding Aaron

8    Greenspan in his individual capacity as a Plaintiff, along with a Response to the Order to

9    Show Cause.  Docket Nos. 23, 24.  On July 17, 2014, the Court issued an Order discharging

10   the Order to Show Cause and putting off the issue of corporate self-representation "for

11   another day," leaving Corporate Plaintiffs free to represent their own interests.  Docket No.

12   33.  On July 28, 2014, Judge Freeman recused herself from the case without denoting a

13   specific reason as to why.  The case was subsequently assigned to the Executive Committee

14   and stayed on August 5, 2014.  Docket No. 39.  On the same day, Ninth Circuit Chief Judge

15   Alex Kozinski designated Senior District Judge Jeffrey T. Miller of the Southern District of

16   California to manage the case, and the Clerk filed its notification as to such three days later

17   on August 8, 2014.  Docket No. 40.

18       Still pending are Plaintiffs' Motion for Permission to Use Electronic Case Filing

19   (Docket No. 3) and Plaintiffs' unopposed Motion for Leave to File a Second Amended

20   Complaint via CM/ECF (Docket No. 34).

21

22   [2] The Clerk of Court has an abysmal track record when it comes to mailing documents in a timely or honest
fashion.  Many of the documents received by mail in this case indicated in their respective Certificates of
23   Service stated they had been "SERVED...by placing said copy(ies) in a postage paid envelope addressed to the
person(s) hereinafter listed, by depositing said envelope in the U.S. Mail."  This would seem to be impossible
given that the Court's envelopes almost always were stamped with a Pitney Bowes barcoded postage stamp
24   *bearing a later date than the Certificate of Service*.  Some documents arrived one week or more after filing.

PLAINTIFFS' OPPOSITION TO MOTIONS TO            3                          5:14-cv-02396-JTM
DISMISS FIRST AMENDED COMPLAINT

**STANDARD OF REVIEW**

1        For various claims, the Government invokes Federal Rule of Civil Procedure 12(b)(1)

2   and/or Rule 12(b)(6). In reviewing a Rule 12(b)(6) motion to dismiss, the court "accept[s] all

3   well-pleaded factual allegations in the complaint as true, and determines whether the factual

4   content allows the court to draw the reasonable inference that the defendant is liable for the

5   misconduct alleged." *Cassirer v. Kingdom of Spain*, 580 F.3d 1048, 1052 n.2 (9th Cir. 2009)

6   (internal citations omitted). A motion to dismiss must be denied if the complaint contains

7   factual allegations that, when accepted as true, "plausibly give rise to an entitlement to

8   relief." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009). Moreover, the Federal Rules of

9   Civil Procedure require a plain and short statement of a plaintiff's claim, Fed. R. Civ. P. 8(a),

10   a standard that "contains a powerful presumption against rejecting pleadings for failure to

11   state a claim." *Ileto v. Glock Inc.*, 349 F.3d 1191, 1200 (9th Cir. 2003). As shown below,

12   the FAC puts Defendants on notice of the claims they must defend, and amply alleges facts

13   that, taken as true, plausibly allow the Court "to draw the reasonable inference that [the

14   Defendants are] liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949.

15        "For purposes of ruling on a motion to dismiss for want of standing, both the trial and

16   reviewing courts must accept as true all material allegations of the complaint and must

17   construe the complaint in favor of the complaining party." *Warth v. Seldin*, 422 U.S. 490,

18   501 (1975). "At the pleading stage, general factual allegations of injury resulting from the

19   defendant's conduct may suffice, for on a motion to dismiss we 'presum[e] that general

20   allegations embrace those specific facts that are necessary to support the claim.'" *Lujan v.*

21   *Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (alteration in original) (quoting *Lujan v.*

22   *Natl. Wildlife Fedn.*, 497 U.S. 871, 889 (1990)).

1    Still, *"Twombly* and *Iqbal* are ill-suited to application in the constitutional standing

2    context because in determining whether plaintiff states a claim under 12(b)(6), the court

3    necessarily assesses the merits of plaintiff's case. The threshold question of whether plaintiff

4    has standing (and the court has jurisdiction) is distinct from the merits of his claim. Rather,

5    '[t]he jurisdictional question of standing precedes, and does not require, analysis of the

6    merits.'" *Maya v. Centex Corp.*, 658 F.3d 1060, 1068 (9th Cir. 2011) (quoting *Equity

7    Lifestyle Props., Inc. v. Cnty. of San Luis Obispo*, 548 F.3d 1184, 1189 n. 10 (9th Cir. 2008)).

8                                              **ARGUMENT**

9    **I.     Challenges to the Restrictive Local Rules in the Northern District of California**

10          **A.     Sovereign and Judicial Immunity are Limited By the Fifth Amendment
                     and the Nature of Government Defendants' Actions**

11          Government Defendants begin by discussing jurisdictional matters. They argue that,

12   "no waiver of sovereign immunity permits suit against the United States District Court for

13   the Northern District of California." Motion to Dismiss at 5. While this normally might be

14   true, Government Defendants also allow that, "Citations to the Fourteenth Amendment have

15   been treated as citations to the Fifth Amendment..." *Id.* In certain contexts, claims under the

16   Fifth Amendment have been found to trump sovereign immunity. "[I]t is the Constitution

17   that dictates the remedy for interference with property rights amounting to a taking. See *San

18   Diego Gas & Electric Co. v. San Diego*, 450 U.S. 621, 655, n. 21 (1981) (BRENNAN, J.,

19   dissenting), quoting *United States v. Dickinson*, 331 U.S. 745, 748 (1947)." *First Lutheran

20   Church v. Los Angeles County*, 482 U.S. 304, 316 n 9 (1987). Fifth Amendment due process

21   is a constitutionally protected interest, and "federal courts do have the power to award

22   damages for violation of 'constitutionally protected interests.'" *Bivens v. Six Unknown Fed.

23   Narcotics Agents*, 403 U.S. 388 (1971). Therefore, in the present context, sovereign

24   immunity is moot and inapplicable.

---

PLAINTIFFS' OPPOSITION TO MOTIONS TO                    5                    5:14-cv-02396-JTM
DISMISS FIRST AMENDED COMPLAINT

1    As to the judicial immunity of Defendant Wilken, Government Defendants

2  themselves admit that, "The Ninth Circuit has suggested in dicta in a footnote that legislative

3  immunity is not available for official capacity claims," citing *Schmidt v. Contra Costa*

4  *County*, 693 F.3d 1122, 1131 n.10 (9th Cir. 2012). That other circuits or lower courts may

5  have reached different conclusions is irrelevant, given that this case is proceeding within the

6  Ninth Circuit. Government Defendants' reference to *Supreme Court of Virginia v.*

7  *Consumers Union of the United States*, 446 U.S. 719, 734 (1980) is inapposite, as that case

8  posited a hypothetical scenario where the legislature could have been sued for its formulation

9  of the State Bar Code. Here, the legislature in question, Congress, delegated away its power

10  to draft a federal court's Local Rules, so the analogy does not apply. 28 U.S.C. § 2071(a).

11  *Supreme Court of Virginia* also precedes the Ninth Circuit's ruling in *Schmidt* by 32 years.

12    The quasi-judicial immunity afforded to the Clerk of Court does not apply in these

13  circumstances according to Government Defendants' own authorities. "The doctrine protects

14  'judicial independence by insulating judges from vexatious actions prosecuted by disgruntled

15  litigants.' *Forrester v. White*, 484 U.S. 219, 225 (1988)." *Giannini v. District Court for*

16  *Dist. of Northern Cal.*, Case No. 3:12-cv-04289-DWM, 11 (N.D. Cal. Feb. 28, 2013). Yet

17  Plaintiffs are not "disgruntled litigants." The Foundation has never sued before in this or any

18  court, and no claim in this suit is directly based upon a previously rendered judgment or

19  order. Furthermore, Government Defendants, including the Clerk of Court, are sued over

20  acts committed "in the clear absence of all jurisdiction." *Bradley v. Fisher*, 80 U.S. 335, 351

21  (1872). "Where there is clearly no jurisdiction over the subject-matter any authority

22  exercised is a usurped authority, and for the exercise of such authority, when the want of

23  jurisdiction is known to the judge, no excuse is permissible." *Id.* at 352. Staff for the Clerk

24  of Court relied on a supposed "Local Rule" that does not actually exist to justify their

1    "closing" of the clerk's office—with the door still open—a half hour early.  FAC ¶¶ 4, 82.

2    There could be no clearer example of an action taken with no legal authority.  Plaintiffs'

3    claims stemming from violations of the E-Government Act of 2002 and the curiously all-

4    attorney composition of the Local Rules Advisory Committee also implicate Government

5    Defendants in actions that were taken with absolutely no legal authority.

6       **B.    Plaintiffs Have Standing to Challenge the Restrictive Local Rules**

7           Government Defendants further allege that "Mr. Greenspan also lacks standing to

8    challenge this rule on behalf of the Corporate Plaintiffs because third-party representation

9    would constitute an impermissible 'end run' around the corporate-representation."  To

10   support this assertion, they invoke *United States v. High Country Broadcasting Co.*, 3 F.3d

11   1244, 1245 (9th Cir. 1993)—a curious choice given that the First Amended Complaint was

12   filed well into 2014, four years after *Citizens United v. Federal Election Com'n*, 130 S. Ct.

13   876 (2010) fundamentally transformed jurisprudence and politics related to corporate

14   personhood.  By requiring corporations to have the same rights to free political speech as any

15   person, *Citizens United* unilaterally reversed the "two centuries" of tangled and inconsistent

16   precedent wrongly prohibiting small businesses from self-representation.  *See* Docket No. 24

17   at 17-20 (detailed discussion of *Citizens United*'s impact on corporate self-representation).

18          First, the Government's description of Plaintiff Greenspan's involvement as a third-

19   party representative is technically erroneous.  The corporate Plaintiffs are representing

20   *themselves* with Mr. Greenspan as their designated officer in each respective instance.

21          Second, what may have been "an impermissible 'end run'" some time ago is very

22   clearly now permissible.  A great deal of jurisprudence related to corporations has changed

23   since 1993—after all, corporations are even permitted to have their own religions.  "In

24   holding that the HHS mandate is unlawful, we reject HHS's argument that the owners of the

---

PLAINTIFFS' OPPOSITION TO MOTIONS TO          7          5:14-cv-02396-JTM
DISMISS FIRST AMENDED COMPLAINT

1   companies forfeited all RFRA protection when they decided to organize their businesses as

2   corporations rather than sole proprietorships or general partnerships. The plain terms of

3   RFRA make it perfectly clear that Congress did not discriminate in this way against men and

4   women who wish to run their businesses as for-profit corporations in the manner required by

5   their religious beliefs." *Burwell v. Hobby Lobby Stores, Inc.*, Case No. 13-354 (2014). This

6   ruling also negates the Government's contention that, "The owners of a corporation waive

7   the privilege of self-representation in exchange for the benefits of incorporating." Motion to

8   Dismiss at 10. This is nonsense; they do not, just as they do not magically "forfeit[] all

9   RFRA protection." There is certainly no form or other type of disclaimer informing

10  entrepreneurs that by incorporating, they are suddenly waiving certain rights and a entering a

11  domain where only lawyers may speak for their corporate interests.[3]  For corporations to

12  have virtually every First Amendment right *but* for the right to speak in certain courts (and

13  especially federal courts) unassisted is itself entirely inconsistent and unconstitutional.

14      **C.      The Restrictive Local Rules Discriminate Against Corporations Both
                 Narrowly and Broadly**

15          Government Defendants lose the forest for the trees. Whether Civil Local Rule 3-

16  9(b) explicitly discriminates against small businesses or merely has a disparate impact upon

17  them is irrelevant, because the Rule explicitly discriminates against businesses to start with.

18  "A corporation, unincorporated association, partnership or other such entity may appear only

19  through a member of the bar of this Court." Civil Local Rule 3-9(b). The Rule's disparate

20  impact on small businesses is just the icing on a bitter cake, much as unconstitutional laws

21  that discriminate against racial minorities often have a disparate impact on the poorest

22

23  _____

[3] There is hardly a shortage of attorneys in the United States. It is reasonable to expect that by the year 2014,
24  any waiver of rights tied to incorporation would be adequately and explicitly disclaimed by each Secretary of
    State as part of the incorporation process. The Government points to no such evidence of a waiver.

---

PLAINTIFFS' OPPOSITION TO MOTIONS TO          8          5:14-cv-02396-JTM
DISMISS FIRST AMENDED COMPLAINT

1   minority individuals.[4]  The Government's argument that the Rule is "facially neutral" is

2   simply wrong.  "[T]he Government may not suppress political speech *on the basis of the*

3   *speaker's corporate identity*.  No sufficient governmental interest justifies limits on the

4   political speech of nonprofit or for-profit corporations" (emphasis added).  *Citizens United*,

5   *supra*, at 913.[5]

6        Access to justice has been unlawfully restricted by nominally well-meaning

7   government officials in the past.  Enlightening context can be found by examining court

8   filing fees levied upon prisoners.  "These cases reason that requiring prisoners to make the

9   same financial decisions as non-prisoners before filing a cause of action does not violate

10   equal protection." *Rodriguez v. Cook*, 169 F. 3d 1176, 1179 (9th Cir. 1999).  By such logic,

11   requiring prisoners to make *different* financial decisions than non-prisoners before filing a

12   cause of action *does* violate equal protection.  This is exactly what *pro se* parties must do:

13   they make different financial decisions than represented parties—not just because of a

14   difference in the cost of hiring an attorney—but also because they are subject to different

15   rules affecting the cost of filing documents in court, both before and after filing a cause of

16   action.

17        **D.   The Government's Arguments Concerning the Local Rules Advisory
          Committee Are Mistakenly Inverted**

18        The Government's authorities relative to Plaintiffs' claims concerning the Local

19   Rules Advisory Committee again undercut its own argument.  *Ward v. Caldera*, 138 F. Supp.

---

21   [4] The Government also argues that there are no allegations of "gross statistical disparities" that would serve to
    evidence "intentional discrimination" against small businesses. That is because PACER fails to record data on
22   corporation size for litigants, making the role of small businesses in the federal courts nearly impossible to
    measure; and because even if PACER did account for business size, there would still be no way to measure the
    chilling effect on filings caused by Civil Local Rule 3-9(b).

23   [5] Though *Citizens United* focuses on the First Amendment, the Government alleges that "[A] First Amendment
    claim premised on the denial of 'meaningful access to the courts' [i]s 'inseparable' from a due process claim.
24   473 U.S. 305, 335 (1985)." Motion to Dismiss at 14. Therefore, *Citizens United* is relevant in both contexts.

1   2d 1, 7-9 (D.D.C. 2001) is inapposite as it concerns effectively the opposite scenario: a white

2   male soldier alleging in effect that a promotion board was already *too* diverse because it

3   already included women and minorities. A surplus of diversity of input in the judicial branch

4   is hardly the issue raised by this suit, besides which, it is obviously "likely" and not merely

5   "speculative" that including non-attorneys in the Court's decision-making processes for the

6   first time would have a positive impact on policies affecting non-attorneys.

7          While the Government paraphrases *PMG Int'l Div. v. Rumsfeld*, 303 F.3d 1163, 1173

8   (9th Cir. 2002) with, "the Ninth Circuit has rejected the notion that an inference of

9   discrimination can be drawn from the composition of a board," a closer reading of the same

10   cited page reveals that as an alternative to discriminatory intent, the Ninth Circuit looks to

11   patterns to infer discrimination. Motion to Dismiss at 9. "A 'stark pattern' of racially

12   disparate enforcement would require a finding that all or nearly all 'minority' publications

13   had been deemed sexually explicit, and that all or nearly all 'non-minority' publications were

14   deemed not sexually explicit." *PMG, supra*, at 1173. Here, the "stark pattern" could not be

15   any more stark: the Committee, 100% comprised of attorneys, has supposedly by chance

16   deemed that all *attorneys* running businesses *are* able to speak before the Court, and all *non-*

17   *attorneys* running business *are not* able to speak before the Court. There is no way to

18   interpret this data other than to conclude that the Committee's attorneys are discriminating

19   against non-attorney litigants with no legitimate rational basis.

20          E.      *Citizens United* **Fundamentally Altered the Legal Landscape for**
                    **Corporate Personhood, Decisively Granting Corporations the Right to**
21                  **Free Political Speech, Including the Right To Speak in Court Unaided**

22          Arguing that "the precedent is one-sided" concerning corporate self-representation, as

23   the Government does, is not just objectively false given the examples raised in Plaintiff's

24   various filings—it also wastes Plaintiffs' and the Court's time. Clearly the United States

1   Department of Justice is aware of *Citizens United*. It was, after all, discussed explicitly in the

2   First Amended Complaint. FAC ¶ 72. Yet rather than address the case's holdings head-on,

3   or at least explain the Government's view on why such holdings are inapposite, Government

4   Defendants instead sidestepped the issue altogether, choosing to rely on a plethora of

5   outdated precedent which does nothing to advance the Court's understanding of the issues we

6   face today. The Government's defective argument is made that much more frivolous by its

7   head-scratching insistence on invoking circular logic: "the inherent power of the Court

8   cannot help Plaintiffs here because, in this instance, the corporate-representation principle is

9   enshrined in a local rule." Motion to Dismiss at 11. Obviously, Plaintiffs are aware of Civil

10  Local Rule 3-9(b); the instant lawsuit challenges its constitutionality. If the Government is

11  attempting to argue that Local Rules of courts are invulnerable to legal challenges of any

12  sort, it provides no authority whatsoever to back such a highly questionable contention.

13      The Government's hypothetical, "[A forcibly represented party] has not, thereby,

14  been deprived of her opportunity to be heard; she has simply agreed that she will be heard in

15  a certain way – through trained counsel" gets to the heart of Plaintiffs' concern: that "trained

16  counsel" are often trained in such a way as to limit access to the courts themselves. Motion

17  to Dismiss at 12. The training, for one, must be sanctioned by at least one federal or state

18  authority, if not more than one, raising censorship concerns. Self-regulation of the legal

19  profession compounds the conflict of interest because the training tends to discourage any

20  legal challenge to the profession's economic dominance, which has already had a

21  disproportionately negative impact on the public sphere. Additionally, the hypothetical

22  business owner has *not* "agreed" to anything, any more than a wrongfully-imprisoned

23  innocent bystander has "agreed" to sacrifice her liberty by being dragged to jail. The

24

1    Government's choice to construe such unlawful schemes with flattering euphemisms does

2    not *ipso facto* make them lawful.

3          F.      **Given the Gravity of the Issues Involved, Plaintiffs Should Be Given**
                   **Leave to Amend or, Though Virtually Impossible, Hire Counsel**
4
               Even if Civil Local Rules 3-9(b) and 5-1(b) are constitutional—which they are not—
5
     the Government's entire argument indisputably has a gaping hole: not one mention of
6
     *Citizens United*, let alone subsequent related cases.  Therefore, Corporate Plaintiffs' claims
7
     should not be dismissed, or if the Restrictive Local Rules are found to be constitutional,
8
     Corporate Plaintiffs should at least be given the opportunity to attempt to retain counsel—a
9
     nearly impossible task given this case's crux, proving the very points discussed above.
10
     **II.      Challenges to the PACER System's Operation and Design**
11
          A.      **Plaintiffs Have Standing to Challenge PACER's Operation and Design**
12
               Government Defendants put forth a number of meritless arguments challenging
13
     Plaintiffs' standing regarding Defendant AO's flawed and unlawful PACER fee structure.
14
     First, as discussed in the FAC, all of Plaintiffs are paying users of PACER.  Ignoring that
15
     fact, the Government argues that Plaintiffs are not sufficiently low-income to have prudential
16
     standing given the AO's policies that adversely impact low-income individuals.  "None of
17
     the Plaintiffs alleges that it is a 'low-income person[ ].'  *See* FAC."  DOJ Motion to Dismiss
18
     at 15.  Yet the FAC is quite clear that Plaintiff Think Computer Corporation, were it a
19
     person, would qualify as "low-income."  "The corporation posted a 2012 net loss of
20
     $41,226.95, having spent $52,552.95 on attorney fees throughout the fiscal year.  In 2013,
21
     attorney fees of $36,778.75 constituted the vast majority (82.65%) of the corporation's
22
     $44,501.86 net loss."  FAC ¶ 62.  As a 501(c)(3) non-profit organization, Plaintiff Think
23
     Computer Foundation's tax returns are publicly available, and reveal that the Foundation has
24

---

PLAINTIFFS' OPPOSITION TO MOTIONS TO        12                      5:14-cv-02396-JTM
DISMISS FIRST AMENDED COMPLAINT

1    filed IRS Form 990-N (e-Postcard)[6] every year since fiscal year 2010.  Plaintiff Greenspan's

2    personal federal and state tax returns from 2010 onward, which may be provided under an

3    appropriate protective order due to sensitive information therein, also qualify him as a low-

4    income individual.[7]

5         Furthermore, through their jointly-run PlainSite web site, both the Corporation and

6    the Foundation have a close relationship with both paying and non-paying low-income

7    clients who have a direct interest in access to PACER records.  "In several cases, this Court

8    has allowed standing to litigate the rights of third parties when enforcement of the challenged

9    restriction against the litigant would result indirectly in the violation of third parties' rights.

10   See, e.g., *Doe v. Bolton*, 410 U.S. 179, 188 (1973); *Griswold v. Connecticut*, 381 U.S. 479,

11   481 (1965); *Barrows v. Jackson*, 346 U.S. 249 (1953)."  *Warth v. Seldin*, 422 U.S. 490

12   (1975).  *See also* FAC ¶ 18.

13        **B.    The Washington Defendants Can and Should Redress Plaintiffs'
              Grievances Related to PACER**

14

15        The Government asserts further that Article III standing is lacking because even if

16   there exists a case or controversy, "the AOUSC Defendants cannot provide redress."  DOJ

17   Motion to Dismiss at 15.  This is plainly false.  Access to CM/ECF may be "controlled by the

18   Local Rules" to a limited extent, but the PACER software is hardly designed or operated by

19   "the judges of this District" directly.  *Id.*  The employees of Defendant AO are obviously

20

21

22   [6] IRS Form 990-N (e-Postcard) is a short-form tax return for "small tax-exempt organizations whose annual
     gross receipts are normally $50,000 or less."  *See* http://www.irs.gov/Charities-&-Non-Profits/Annual-
     Electronic-Filing-Requirement-for-Small-Exempt-Organizations-Form-990-N-(e-Postcard).

23   [7] Plaintiff Greenspan's willingness to provide his recent tax returns to the Court under seal should not be
     construed as condoning the notion that users of PACER should be forced to disclose any information at all on

24   their financial status in order to qualify for free access or fee exemption.

1    instrumental in the day-to-day design and operation of PACER,[8] including frequent updates

2    designed to address specific problems that have been identified internally or externally. *See*

3    https://www.youtube.com/watch?v=2VxW4iH-Krw (2010 video recording in which

4    Defendants Ishakian, Skidgell, and other AO representatives discuss their role and Defendant

5    AO's role in managing PACER).

6            Civil Local Rule 5-1(b), denying access to CM/ECF without prior Court approval,

7    violates equal protection principles as it very closely resembles another policy that might

8    have had the same presumptuous (and absurd) "rational" basis conjured up by the

9    Government: that "*pro se* litigants…are more likely to use the system incorrectly." DOJ

10   Motion to Dismiss at 17. That policy was "a state regulation which required that habeas

11   corpus petitions first be submitted to prison authorities and then approved by the 'legal

12   investigator' to the parole board as 'properly drawn' before being transmitted to the court."

13   *Johnson v. Avery*, 393 U.S. 483 (1969). Local Rule 5-1(b) is simply the modern-day

14   equivalent, formulated in an era where the internet is effectively ubiquitous and the courts

15   use it to conduct routine business. "[T]he state and its officers may not abridge or impair

16   petitioner's right to apply to a federal court for a writ of habeas corpus. Whether a petition

17   for writ of habeas corpus addressed to a federal court is properly drawn and what allegations

18   it must contain are questions for that court alone to determine." *ex parte Hull*, 312 U.S. 546,

19   549 (1941). Yet the Rule does absolutely nothing to help ensure that documents are

20   "properly drawn;" rather, an erroneous filing that could have been sent electronically and

21   error-checked in an instant by a computer must instead be delivered in paper form, further

22

23   _____

[8] The Government admits, "The PACER system is operated by the Administrative Office of the United States
Courts." Motion to Dismiss at 2. The Government also appears to have mis-typed and hyphenated the URL of
24   the web site cited on the following page of its motion.

1  clogging the courts.[9]  It is the polar opposite of the type of policy the Supreme Court

2  encouraged when it wrote, regarding a statute enabling cases to be transferred between

3  courts, "The section is thus in accord with the general purpose which has prompted many of

4  the procedural changes of the past few years—that of removing whatever obstacles may

5  impede an expeditious and orderly adjudication of cases and controversies on their merits."

6  *Goldlawr, Inc. v. Heiman*, 369 U.S. 463, 466 (1962).

7          It is not the only problematic policy in light of precedent.  The AO's highly unusual

8  $15.00-per-quarter fee exemption[10] is precisely the kind of "[d]eparture[] from the normal

9  procedural sequence [that] also might afford evidence that improper purposes are playing a

10  role."  *Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977).

11          "Plaintiffs do not allege that the amount of PACER fees has denied – or will

12  imminently deny – them of a meaningful opportunity to be heard."  DOJ Motion to Dismiss

13  at 18.  This is flatly contradicted by ¶ 8 of the First Amended Complaint: "...in a precedent-

14  based system, access to court documents is necessary for the successful prosecution of a

15  case."  Without citation to precedent, it is effectively impossible to have a "meaningful

16  opportunity to be heard" in a federal court.  *See Raifman v. Wachovia Securities, LLC et al*,

17  Case No. 4:11-cv-02885-SBA (N.D. Cal. May 7, 2012) ("Defendants' opposition lacks

18  citation to authority"); *FDIC v. Schuchmann*, 235 F. 3d 1217 (10th Cir. 2000) (criticizing

19  federal agency that "fails to cite a single legal authority supporting its contention"); *Cordero*

20

21  [9] Government Defendants suggest that unchecked use of CM/ECF by any *pro se* litigant would rationally "inhibit the Court's ability to do its job."  DOJ Motion to Dismiss at 17.  This is utter nonsense, and further evidence of the judicial branch's tendency to discriminate against *pro se* litigants.

22  [10] The fee exemption is made even more peculiar by the AO's cryptic "Notice for Fee Exempt PACER Users," presently accessible at https://www.pacer.gov/announcements/general/exemptnotice.html.  This "Notice," without citing any statutory or other authority, reminds fee exempt PACER users that, "A fee exemption applies only for limited purposes," but does not even attempt to explain what those "limited purposes" are.  Generally, the Notice appears to state that fee exempt users waive their First Amendment rights to share information in the public domain—at best a preposterous, unlawful and technologically unenforceable suggestion.

23

24

---

PLAINTIFFS' OPPOSITION TO MOTIONS TO      15            5:14-cv-02396-JTM
DISMISS FIRST AMENDED COMPLAINT

1   *v. Astrue*, Case No. 1:11-cv-05020-PAE-HBP (S.D.N.Y. July 29, 2013) (castigating litigant

2   for submitting a document that "lacks citation to a single legal authority"). PACER is the

3   only official, authoritative and comprehensive source for federal court precedent.

4       Due process may not directly require the creation of appeal rights, but on the flip side,

5   lone bureaucrats, such as Defendant Ishakian, cannot be given unfettered decision-making

6   power. "We hold those portions of the Lakewood ordinance giving the mayor unfettered

7   discretion to deny a permit application and unbounded authority to condition the permit on

8   any additional terms he deems 'necessary and reasonable,' to be unconstitutional." *City of*

9   *Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750, 772A (1988). The Government's

10   citation to *Ross v. Moffitt*, 417 U.S. 600, 611 (1974) is inapposite as it relates only to criminal

11   convictions; contesting court fees in most cases would not even amount to a civil proceeding.

12       **C.**    **Defendant AO Does Not Own PACER's Contents**

13       The Government's argument that "[t]he courthouses of the Northern District of

14   California have public access terminals in the Clerk's offices at which documents on PACER

15   can be viewed for free" is disingenuous at best. It is true that PACER documents can be

16   *viewed* for free at a limited number of public access terminals in the Clerk's offices during

17   limited hours that also overlap with typical work hours. It is not true, however, that PACER

18   documents can be *saved* or otherwise *transmitted* from these terminals for later viewing on

19   another device, as is possible with a typical web browser or mobile device for every other

20   kind of document in the public domain.[11] The public access terminals are as restrictive as a

21   library reference desk that prohibits the removal of bound volumes owned by the library.

22   

---

23   [11] There is no technical justification whatsoever for such a restriction. The only possible justification is an
    economic argument that Defendant AO should be entitled to earn additional revenue for each subsequent

24   download of a given document. Unfortunately for the courts, there is no legal backing for this argument at all.
    Defendant AO does not own the content it curates.

1   Nor is it true, as the Government acknowledges, that PACER documents can even be printed

2   for free. DOJ Motion to Dismiss at 19 n 9.[12]

3        These facts speak to Defendant AO's general, if carefully unstated, position that it

4   *owns* the information passing through the Courts. It does not. Legal briefs are not even

5   subject to copyright by their initial authors, let alone Defendant AO. *White et al v. West*

6   *Publishing Corporation et al*, Case No. 1:12-cv-01340-JSR (S.D.N.Y. July 3, 2014).

7   Defendant AO is at best a guardian of public domain information that belongs to the public,

8   and therefore it has no right to withhold that information from its public owners for any

9   reason short of a court's order to seal. It certainly has no right to profit from it.

10       One could be forgiven for believing that Defendant AO has gone to great lengths to

11  ensure public access to the data with which it has been entrusted, and the Government

12  outlines three circumstances in which PACER fees are waived in order to foster exactly such

13  a mistaken belief. Each of these is a red herring, for (1) fee waivers are exceptionally rare

14  and extremely limited in scope when granted, which is true even for legitimate journalists

15  and non-profit organizations, as exemplified by *In re: Application for Exemption*, Case No.

16  12-16373 (9th Cir. 2013); (2) it is all but impossible to adequately research a single motion,

17  let alone an entire case, for less than $15.00 per quarter given the current fee schedule; and

18  (3) judicial opinions are only occasionally flagged appropriately by their authors so as to

19  avoid fee charges. FAC ¶¶ 30, 32, 136. Notably, Government Defendants, having had more

20  than two months to analyze these aspects of the FAC, still have no response to them.

21       Instead, the Government's callous quip that, "there is no reason to believe that the

22  First Amendment grants researchers a greater right of access to court documents than it

23

24  [12] Given that Plaintiffs do actually dispute the Government's misleading description of the PACER public access program, the Court may not take judicial notice as the Government requests in its motion.

furnishes to litigants – and mandates a government subsidy in the process" frames the issue

in a deliberately stilted light.  DOJ Motion to Dismiss at 20.  The question is not which group

has a "greater right of access."  The question is whether or not Washington Defendants are

unlawfully inhibiting *anyone's* right of access.  They clearly are.  Researchers cannot write

about court cases without paying for the privilege, and they certainly cannot afford to analyze

large sets of cases in bulk.  Litigants cannot research cases in an affordable manner, even if

PACER may charge less than some of the most expensive legal research services ever built.[13]

In the meantime, litigants and researchers alike, including Plaintiffs, who have clearly

demonstrated their actions in both the research and litigation contexts, are being injured.

### D.  Defendant AO's Violation of the E-Government Act of 2002 Should Be Construed as a Fourth Amendment *Bivens* Violation

"[F]ederal courts do have the power to award damages for violation of

'constitutionally protected interests.'"  *Bivens*, *supra*, at 399.  With respect to Plaintiffs'

claim for declaratory judgment that Washington Defendants have violated the E-Government

Act of 2002—which the Government does not deny in its motion—the Government argues

that Washington Defendants are immune to suit, and that even were they not, there is no

private right of action in the E-Government Act of 2002.  This is irrelevant.

In *Bivens*, a man was assaulted in front of his family, arrested, and then strip-searched

by Federal Bureau of Narcotics agents "acting under claim of federal authority."  The instant

circumstances are fortunately far less dramatic, but similar in principle.  Rather than

knocking on (or knocking down) most individuals' doors[14] to obtain $0.10 for each "page"

---

[13] In contrast to Westlaw and Lexis-Nexis, Google Scholar and PlainSite both charge nothing to download court materials.  While Google Scholar only features opinions, PlainSite also contains dockets, motions, etc.

[14] Not all have been so lucky.  The role of Defendant AO's involvement in the criminal prosecution of Aaron Swartz, who downloaded many PACER documents, remains unknown, and the Government's response in its motion is silence.  FAC ¶¶ 44-48, 53, Exhibit D.  To call this disturbing would be a severe understatement.

---

PLAINTIFFS' OPPOSITION TO MOTIONS TO        18                    5:14-cv-02396-JTM
DISMISS FIRST AMENDED COMPLAINT

1    viewed on PACER, "acting under claim of federal authority," Washington Defendants and

2    their various agents at the PACER Service Center make use of the telephone network, the

3    internet and the banking system to unlawfully reach into private citizens' wallets. Typically,

4    this would be considered theft or wire fraud, but since Washington Defendants work for or

5    are branches of the federal government, and act "under claim of federal authority," few

6    question the taking. In reality, such actions violate the Fourth Amendment as an unlawful

7    seizure of monetary property, in addition to the First and Fifth Amendments, as discussed.

8         Even if Defendant AO has sovereign immunity, which here it does not,

9         "The *Bivens* Court held that a plaintiff was entitled to bring a federal court
          action against individual federal agents for damages resulting from the
10        violation of his Fourth Amendment rights. 403 U.S. at 397. The Supreme
          Court has extended *Bivens* liability to other contexts. In *Davis v. Passman*,
11        the Court recognized an implied cause of action for damages for a violation of
          the Due Process Clause of the Fifth Amendment, 442 U.S. 228, 248-49
12        (1979), and in *Carlson v. Green*, the Court held that a *Bivens* remedy was
          available for a violation of the Eighth Amendment's prohibition against cruel
13        and unusual punishment. 446 U.S. 14, 20-21 (1980)."

14   *Winnemem Wintu Tribe v. United States Department of the Interior*, Case No. 2:09-cv-

15   01072-FCD-EFB (E.D. Cal. July 16, 2010).

16        The Government argues—and at great length—that because Defendant AO is most

17   frequently construed as a judicial, rather than executive agency, "the Administrative

18   Procedure Act...does not aid Plaintiffs." DOJ Motion to Dismiss at 20. In cases where the

19   APA *does* factor, "the design of the APA raises the inference that Congress 'expected the

20   Judiciary to stay its *Bivens* hand' and provides 'a convincing reason for the Judicial Branch

21   to refrain from providing a new and freestanding remedy in damages,' *Wilkie*, 551 U.S. at

22   550, 554, 127 S.Ct. 2588, notwithstanding the unavailability of money damages against

23   individual officers or the right to a jury trial." *Western Radio Services Co. v. U.S. Forest*

24

---

Case5:14-cv-02396-JTM   Document41   Filed08/20/14   Page26 of 32

1    *Service*, 578 F. 3d 1116, 1123 (9th Cir. 2009).   Here, the Government tells us that the APA

2    does *not* apply, so the *Bivens* doctrine does.

3    ### E.    The United States of America Can Easily Be Substituted as a Defendant

4    Government Defendants argue that the United States of America was not properly

5    named as a defendant for the purposes of the Federal Tort Claims Act ("FTCA").   Yet

6    "[u]pon certification by the Attorney General that the defendant employee was acting within

7    the scope of his office or employment at the time of the incident out of which the claim arose

8    . . . the United States shall be substituted as the party defendant."  28 U.S.C. § 2679(d)(1).

9    That the United States Department of Justice is already representing the individual

10   Washington Defendants after successful service upon the Attorney General of the United

11   States necessarily means that 28 U.S.C. § 2679(d)(1) can and should be invoked.

12   ### F.    Plaintiffs' Federal Tort Claims Act Has Merit Because Defendant AO Has "Overcharged" By a 100% Margin

13

14   As for the Government's assertion that "Plaintiffs accuse the AOUSC of committing

15   the tort of conversion by overcharging for access to PACER," this is a deliberately incorrect

16   paraphrasing of the FAC.  DOJ Motion to Dismiss at 23.  FAC ¶ 159, specifically cited by

17   Government Defendants, alleges that conversion took place as to $1,077.56—*the full amount

18   paid* to Defendant AO by Plaintiffs within the FTCA's statute of limitations.  The marginal

19   cost of transmission over the internet of each PACER document is effectively so

20   infinitesimally small that it amounts to zero.  "The physical marginal cost of sending a

21   packet, for a given line and router capacity, is essentially zero."  MacKie-Mason, Jeffrey K.

22   and Varian, Hal R., *Some Economics of the Internet*, Proceedings of the Tenth Michigan

23   Public Utility Conference, March 25-27, 1993.  Therefore, Plaintiffs do not accuse

24   Washington Defendants merely of "overcharging;" Plaintiffs accuse Washington Defendants

---

PLAINTIFFS' OPPOSITION TO MOTIONS TO
DISMISS FIRST AMENDED COMPLAINT                    20                         5:14-cv-02396-JTM

1    of outright theft on a grand scale, skewing the entire justice system—an immense wrong in

2    the form of conversion that must be remedied.

3    **III.    The American Bar Association Must Be Held Accountable for Its Deliberate**
     **Efforts to Strip Non-Attorneys of Their Constitutional First Amendment and**
4    **Statutory Rights**

5        The separate motion to dismiss filed by Defendant American Bar Association is only

6    barely worthy of a response.  For years, the ABA has undertaken a deliberate campaign

7    designed to strip ordinary Americans—individuals and corporations alike—of their

8    constitutional First Amendment rights to free speech and their right to self-representation

9    pursuant to 28 U.S.C. § 1654.  Rather than allowing its brazen effort to silence non-attorneys

10   to remain the focus of discussion, the ABA instead spews a plethora of nonsense at the Court,

11   much of it repetitive and irrelevant, for nearly twenty pages.

12       The first nominally substantive point the ABA makes, that "Plaintiff Greenspan

13   cannot represent the Corporate Plaintiffs,"[15] directly echoes the Government's tired and dated

14   contentions about corporate self-representation, discussed above.  ABA Motion to Dismiss at

15   7.  Like the Government, the ABA fails to mention the Supreme Court's holdings in *Citizens*

16   *United* even once, let alone subsequent cases affirming corporate free speech, portraying the

17   ABA as either stupendously ignorant of the legal sphere it monopolizes, or deliberately coy.[16]

18       Defendant ABA alleges that Plaintiff Greenspan does not have standing to challenge

19   its anticompetitive behavior, which it does not deny engaging in.  In reality, Greenspan—

20   who has been a consumer of legal services provided by attorneys on a multitude of occasions,

21

22   _____

23   [15] Again, Plaintiff Greenspan does not seek to "represent the Corporate Plaintiffs."  The Corporate Plaintiffs
     seek to represent themselves, as is their right, through their officer and director, Greenspan.

24   [16] It is nearly impossible to have a meaningful debate with counsel that refuses to acknowledge the one of the
     most important precedential decisions of the past decade.

_____

PLAINTIFFS' OPPOSITION TO MOTIONS TO          21          5:14-cv-02396-JTM
DISMISS FIRST AMENDED COMPLAINT

and is thus "a consumer... in the market in which trade was restrained"[17]—has suffered a

clear loss: a complete loss of personal income, on account of a skewed market that charges

supracompetitive rates for attorney's fees. FAC ¶¶ 62, 64. The unusually broken market for

legal services can be directly traced to the ABA's policies—a large number of which involve

no government enforcement role whatsoever aside from the Restrictive Local Rules—that

result in supply and demand distortions. FAC ¶¶ 93-96, 170, Exhibit J. Defendant ABA

spills considerable ink trying to explain why Plaintiff Greenspan's lack of a salary for years

is "too indirect and remote to qualify as antitrust injury," without considering that as an S

Corporation, all of Think Computer Corporation's expenses pass through to Greenspan's

personal income. FAC ¶¶ 69-70. Unless the Court issues a judgment declaring the ABA's

unlawful monopoly void, Plaintiffs Greenspan and Think Computer Corporation, which have

litigation ongoing aside from this lawsuit, will be injured on an ongoing basis through the

imposition of supracompetitive attorney's fees. Should the Foundation engage in further

litigation, it too would be injured by the same market conditions.

Regarding Plaintiffs Think Computer Corporation and Think Computer Foundation,

Defendant ABA relies on the State Action and *Noerr-Pennington* doctrines in an attempt to

escape liability under the Sherman and Cartwright Acts. This attempt fails. The State Action

doctrine applies to actions taken by "the state acting in its sovereign capacity," but the ABA,

a private Illinois corporation, is not the state. FAC ¶ 26. Moreover, the ABA has *already*

been found to have violated the Sherman Act, *and* to have violated the consent decree it

signed regarding that violation, rendering every assertion about the ABA's supposed

immunity from any alleged antitrust liability, moot. FAC ¶ 91.

---

[17] Defendant ABA misquotes the Supreme Court, alluding to "the market in which trade was retrained [sic]." Training has no bearing on the antitrust analysis. ABA Motion to Dismiss at 10.

1    As for *Noerr-Pennington*, the doctrine essentially states that, "no violation of the

2    [Sherman] Act can be predicated upon mere attempts to influence the passage or enforcement

3    of laws." *Eastern R. Conf. v. Noerr Motors*, 365 U.S. 127, 135 (1961). The counterpart to

4    *Noerr* clarifies that, "Joint efforts to influence public officials do not violate the antitrust laws

5    even though intended to eliminate competition." *United Mine Workers of America v.*

6    *Pennington*, 381 U.S. 657, 670 (1965). The aims of these principles are essentially to

7    preserve First Amendment liberties to lobby government bodies without fear of retribution.

8    Yet despite the existence of these reasonable principles, the *Noerr-Pennington*

9    doctrine—which already has two exceptions for shams and fraud—is inapposite. *See*

10   *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 512 (1972); *see also*

11   *Liberty Lake Invs., Inc. v. Magnuson*, 12 F.3d 155, 158-60 (9th Cir. 1993). What the ABA

12   has done actually goes far beyond typical commercial attempts to stymie competition through

13   the lobbying for favorable treatment in legislation. The ABA has effectively lobbied, bit by

14   bit, for a uniform gag order affecting the entire country—a collection of laws, rules and

15   procedures, enforced jointly by the ABA and various parts of government, that ultimately

16   results in the private First Amendment rights of the ABA trumping the private First

17   Amendment rights of all citizens and corporations that need access to the justice system—

18   including Plaintiffs.

19   The ABA's invocation of *Noerr-Pennington* therefore fails. Given that the ABA's

20   actions also affect commerce by restricting competition, it cannot be successfully argued that

21   to preserve the ABA's right to lobby government(s) to restrict First Amendment rights of

22   non-attorneys, the First Amendment rights of the whole citizenry must be sacrificed. The

23   Sherman Act exists to remedy exactly this kind of predatory, unlawful, unconstitutional and

24

---

1   morally bankrupt behavior, which has unfortunately infected the legal system from its lowest

2   levels to its highest.

3        Finally, the ABA's citation to *Zavaletta v. American Bar Association*, 721 F. Supp.

4   96, 98 (E.D. Va. 1989) concerning its "towering reputation" is not just inapposite—it is

5   laughable. ABA Motion to Dismiss at 14. First, it dates to 1989, prior to the ABA signing

6   the 1996 consent decree with the United States Department of Justice for Sherman Act

7   violations. Second, a cursory glance at any book, magazine or web site covering the legal

8   profession does indeed make reference to the ABA's reputation—for "towering"

9   inconsistency, corruption, graft, and conflicts of interest. *See* Campos, Paul, "The Law-

10  School Scam," *The Atlantic*, http://www.theatlantic.com/features/archive/2014/08/the-law-

11  school-scam/375069/ (August 13, 2014) ("This world is one in which schools accredited by

12  the American Bar Association admit large numbers of severely underqualified students; these

13  students in turn take out hundreds of millions of dollars in loans annually, much of which

14  they will never be able to repay."); *see also* Winston, Clifford et al, "First Thing We Do,

15  Let's Deregulate All the Lawyers," Brookings Institution Press (2011) ("…tuition increases

16  would be curbed if not for the ABA's accreditation process, which shields law schools from

17  low-cost competition such as online law programs, certain two-year accelerated curricula,

18  and apprenticeships.").

19       That California allows a four-year study program before sitting for a bar examination

20  is also of little help to Defendant ABA's argument for exemption from liability. First,

21  monopoly power need not be absolute power, e.g. 100% market share. *See American*

22  *Tobacco Co. v. United States*, 328 U.S. 781 (1946) (90% market share sufficient to find

23  monopoly power). On a state-by-state basis, the ABA's policies are mandatory to sit for bar

24  exams in 98% of states. In California, in 2011, only about 0.1% of those sitting for bar exam

1   were law readers who have not attended a California- or ABA-accredited institution.[18] Yet

2   even those law readers were required to be supervised by an attorney who had a 99.9%

3   chance of attending a California- or ABA-accredited institution, which is to say that the ABA

4   still plays a major, if not dominant, role in the California market for legal services.

5                                      **CONCLUSION**

6           The American justice system must allow *pro se* litigants, including corporations, the

7   same rights as the wealthiest, represented parties.  It must also deliver to the public the

8   transparency that the citizenry is owed, and which is clearly mandated by Congress to be free

9   of arbitrary barriers and expenses.  In each instance there are admittedly powerful forces that

10  argue to the contrary, but their justifications have no basis in fact or in law.  Should

11  additional clarification of any facts be required, the Court should grant Plaintiffs leave to

12  amend their complaint.

13

14  Respectfully submitted,

15

16  Dated:  August 20, 2014                         By: _____
                                                        Aaron Greenspan

17                                                  President
                                                    THINK COMPUTER FOUNDATION
18
                                                    President & CEO
19                                                  THINK COMPUTER CORPORATION

20

21

22

23

24  _____
    [18] *See* http://www.callawyer.com/Clstory.cfm?eid=916106.

    PLAINTIFFS' OPPOSITION TO MOTIONS TO          25          5:14-cv-02396-JTM
    DISMISS FIRST AMENDED COMPLAINT

## CERTIFICATE OF SERVICE

The undersigned certifies that, on August 20, 2014, a true copy of the foregoing

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS FIRST**

**AMENDED COMPLAINT** is being served via e-mail to all parties subject to a prior written

agreement.


Dated: August 20, 2014                    By:  _____

                                               Aaron Greenspan

                                               President
                                               THINK COMPUTER FOUNDATION

                                               President & CEO
                                               THINK COMPUTER CORPORATION