1  AARON J. GREENSPAN
2  THINK COMPUTER FOUNDATION
   1132 Boranda Avenue
3  Mountain View, CA  94040-3145
   Telephone: (415) 670-9350
4  Fax: (415) 373-3959
   E-Mail: legal@thinkcomputer.org
5
   *PRO SE*
6
                    UNITED STATES DISTRICT COURT
7
                 NORTHERN DISTRICT OF CALIFORNIA
8
                        SAN JOSE DIVISION
9

10  AARON GREENSPAN; THINK              Case No. 5:14-cv-02396-JTM
    COMPUTER FOUNDATION, an Ohio
11  501(c)(3) non-profit corporation; and THINK   **PLAINTIFFS' REQUEST FOR JUDICIAL**
    COMPUTER CORPORATION, a Delaware   **NOTICE**
12  corporation,
                                       Judge Jeffrey T. Miller
13                  Plaintiffs,

14        v.

15  ADMINISTRATIVE OFFICE OF THE
    UNITED STATES COURTS; MICHEL
16  ISHAKIAN, in her official capacity on behalf
    of the Administrative Office of the United
17  States Courts; WENDELL SKIDGEL, in his
    official capacity on behalf of the
18  Administrative Office of the United States
    Courts; UNITED STATES DISTRICT
19  COURT FOR THE NORTHERN DISTRICT
    OF CALIFORNIA; RICHARD WIEKING, in
20  his official capacity on behalf of the United
    States District Court for the Northern District
21  of California; CLAUDIA WILKEN in her
    official capacity on behalf of the United States
22  District Court for the Northern District of
    California; and AMERICAN BAR
23  ASSOCIATION,

24                  Defendants.

PLAINTIFFS' REQUEST FOR JUDICIAL NOTICE                        5:14-cv-02396-JTM

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that Plaintiff respectfully requests that the Court take judicial notice of the documents listed herein, true and correct copies of which are attached hereto.

## LEGAL STANDARD

Federal Rule of Evidence 201 "governs judicial notice of an adjudicative fact." Fed. R. Evid. 201(a). A court may take judicial notice of a fact "that is not subject to reasonable dispute because it … can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." *Id.* at 201(b). Under Federal Rule of Evidence 201, a court "may take judicial notice of 'matters of public record'" under certain circumstances. *Lee v. City of Los Angeles*, 250 F.3d 668 (9th Cir. 2000) (quoting *Mack v. S. Bay Beer Distrib.*, 798 F.2d 1279, 1282 (9th Cir. 1986)) (*overruled on other grounds by Galbraith v. County of Santa Clara*, 307 F.3d 1119, 1125–26 (9th Cir. 2002)). A court may "consider evidence on which the complaint necessarily relies if: (1) the complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no party questions the authenticity" of the document. *See Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010) (internal quotation marks omitted); *accord Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006); *see also Kosta v. Del Monte Corp.*, No. 12-cv-01722-YGR, at *7 (N.D. Cal. May 15, 2013) (a court may consider documents referenced in the complaint, "central" to the claims, and the authenticity of which is unchallenged).

## REQUEST FOR JUDICIAL NOTICE

Plaintiff Think Computer Corporation hereby requests that the Court take judicial notice of the following documents, true and correct copies of which are attached hereto as the following exhibits. These documents are central to Plaintiff's assertions that Government Defendants are charging fees for access to PACER documents far in excess of the extent

necessary, e.g. the actual cost to store and transmit information.

**Exhibit A:** December, 2012 Electronic Public Access Program Summary, accessible at https://www.pacer.gov/documents/epasum2012.pdf. This document states, "In fiscal year 2012 alone, PACER processed over 500 million requests for information." This document is officially published on the PACER web site. Therefore, it is ascertainable and verifiable and its accuracy cannot be reasonably questioned. *See Kos Pharm., Inc. v. Andrx Corp.*, 369 F. 3d 700, 705 n. 5 (3d Cir. 2004).

**Exhibit B:** March 26, 2009 Letter from Judicial Conference of the United States to former United States Senator Joseph I. Lieberman, in response to his inquiry as to whether PACER information "is freely available to the greatest extent possible." Exhibit B is self-authenticating as a domestic public document that is signed by a member of Judicial Conference, a political subdivision of the United States. Fed. R. of Evid. 902(2).

**Exhibit C:** Working Paper by Stephen Schultze, "Electronic Public Access Fees and the United States Federal Courts' Budget: An Overview," accessible at http://cyber.law.harvard.edu/~sjschultze/Schultze_PACER_Budget_Working_Paper.pdf. This academic paper identifies at most $52.4 million in annual expenditures as of 2009 for PACER and CM/ECF operation development based upon government documents. This document is published on the Harvard University web site. Therefore, it is ascertainable and verifiable and its accuracy cannot be reasonably questioned. *See Kos Pharm., Inc., supra.*

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that this Court grant Plaintiff's request for judicial notice and take judicial notice of Exhibits A through C attached hereto.

1

Respectfully submitted,

2

Dated:  August 20, 2014

3

By: _____

Aaron Greenspan

4

President

THINK COMPUTER FOUNDATION

5

6

President & CEO

THINK COMPUTER CORPORATION

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

## CERTIFICATE OF SERVICE

The undersigned certifies that, on August 20, 2014, a true copy of the foregoing
**PLAINTIFFS' REQUEST FOR JUDICIAL NOTICE** is being served via e-mail to all parties
subject to a prior written agreement.


Dated: August 20, 2014          By:   _____
                                      Aaron Greenspan

                                      President
                                      THINK COMPUTER FOUNDATION

                                      President & CEO
                                      THINK COMPUTER CORPORATION

# EXHIBIT A

December, 2012 Electronic Public Access
Program Summary

## Electronic Public Access Program Summary
December 2012

**Program Overview**

The Electronic Public Access program provides public access to court information through electronic means in accordance with federal statutes, Judiciary policies, and user needs. The Internet-based PACER (Public Access to Court Electronic Records) service provides courts, litigants, and the public with access to dockets, case reports, and over 500 million documents filed in federal courts through the Case Management and Electronic Case Files (CM/ECF) system. In other words, PACER is a portal to CM/ECF, which in turn, is integral to public access.

A PACER account is obtained by registering with the PACER Service Center, the Judiciary's centralized registration, user support and billing center. Registration information can be submitted via fax or the Internet, and there is no registration fee. At present, there are more than 1.4 million user accounts, with approximately 13,000 new accounts added each month. In fiscal year 2012 alone, PACER processed over 500 million requests for information.

As mandated by Congress, the public access program is funded entirely through user fees set by the Judicial Conference of the United States. The fees are published in the Electronic Public Access Fee Schedule, available on www.uscourts.gov and www.pacer.gov. Funds generated by PACER are used to pay the entire cost of the Judiciary's public access program, including telecommunications, replication, and archiving expenses, the Case Management/Electronic Case Files system, electronic bankruptcy noticing, Violent Crime Control Act Victim Notification, on-line juror services, and courtroom technology.

**Court Websites**

Each federal court uses its website, funded by fee revenue, to provide the public with access to information well beyond that which is required by the E-Government Act of 2002, such as court locations, contact information, local rules, standing or general orders, docket information, written opinions, and documents filed electronically. The courts are also using their websites to disclose information about judges' attendance at privately-funded seminars, orders issued on judicial conduct and disability complaints, and digital audio recordings of oral arguments heard by the court. Additionally, court websites provide general information concerning court operations, filing instructions, courthouse accessibility, interpreter services, job opportunities, jury information, and public announcements. Court websites are used to interact directly with the public through PACER, CM/ECF, on-line jury questionnaires, *pro se* filing tools, forms, and court calendars.

**CM/ECF and the Next Generation**
Implementation of the federal Judiciary's Case Management/Electronic Case Files system (CM/ECF) began in 2001 in the bankruptcy courts after several years of pilot programs in bankruptcy and district courts. CM/ECF not only replaced the courts' old electronic docketing and case management systems, but it also enabled courts to maintain case file documents in electronic format and to accept filings from court practitioners via the Internet. The CM/ECF system is now in use in all of the federal appellate, district, and bankruptcy courts, the Court of International Trade, and the Court of Federal Claims. Nearly 43 million cases are on CM/ECF, and more than 600,000 attorneys and others have filed documents over the Internet.

Attorneys are able to file documents directly with any federal court over the Internet. There are no added fees for filing documents using CM/ECF. The CM/ECF system uses standard office computer hardware, an Internet connection and a browser, and accepts documents in portable document format (PDF). The system is easy to use -- filers prepare a document using conventional word processing software, then save it as a PDF file. After logging onto the court's web site with a court-issued CM/ECF password, and acknowledging that the filing complies with the redaction rules, the filer enters basic information relating to the case and document being filed, attaches the document, and submits it to the court. A notice verifying court receipt of the filing is generated automatically and immediately. All electronically filing parties[1] in the case automatically receive immediate e-mail notification of the filing.

Work on the Next Generation of CM/ECF (Next Gen) is well underway. The project is currently transitioning from its first phase – requirements definition – to its second phase – design and development. As part of the requirements definition phase, the Judiciary gathered extensive information from stakeholders both inside and outside the court system. The NextGen project included an Additional Stakeholders Functional Requirements Group (ASFRG) that focused on how the federal courts interact with others in the legal system. The group's 24 members included representatives from the Judiciary, the Department of Justice, the American Bar Association, the Internal Revenue Service, the Association of American Law Schools, and the National Association of Bankruptcy Trustees.

The group reached out to more than 60 constituent groups in a variety of ways, such as focus group meetings, interviews, conferences, surveys, and elicitation sessions at the courts and the Administrative Office. In all, more than 7,000 individual stakeholders provided input, most of which focused on the same core requirements sought in NextGen.

---

[1] Those parties who are not electronic filers receive notification via U.S. mail.

These core requirements include single sign-on, enhanced search capabilities, batch-filing features, and customizable reports. Nearly 500 of the ASFRG's requirements have been adopted and incorporated into the functional requirements documents being used to design NextGen. The final report of the ASFRG is available to the public on www.uscourts.gov.

The first releases of the Next Generation of CM/ECF are expected in 2014 and 2015, and the requirements prioritized for those releases are associated with time-saving and/or cost-saving functionality. The Next Generation of CM/ECF will also enable additional improvements to the PACER service, including an updated user interface.

**Access to Court Records**
Registered PACER account holders can use a court's website or the PACER Case Locator to access court documents. The PACER Case Locator is a tool for locating court records that reside in U.S. district, bankruptcy, and appellate court CM/ECF databases across the country. Usage of the Case Locator continues to grow, with over 200,000 searches daily. Links to all courts and the PACER case locator are located at www.pacer.gov. Each court maintains its own CM/ECF database with case information. As a result, querying information from each court is comparable; however, the format and content from each court may differ slightly.

The Judiciary continues to seek to improve electronic public access to its records, and a number of initiatives have been put into place to broaden public access, including:

> *Public Access Terminals* -- Every courthouse has public access terminals in the clerk's office to provide access to PACER[2] and other services, such as credit counseling.

> *Digital Audio* – At its March 2010 meeting, the Judicial Conference endorsed a proposal from the Committee on Court Administration and Case Management to allow judges, who use digital audio recording as the official means of taking the record, to provide, at their discretion, access to digital audio recordings of court proceedings via PACER. The digital audio initiative, also known as CourtSpeak, continues to be successful, both in terms of public and court interest. Presently, nineteen bankruptcy courts and two district courts have implemented digital audio, and an additional 23 bankruptcy courts, five district courts, and the Court of

---

[2] Viewing court records at a public access terminal is free. Printing copies of documents from a public access terminal is $0.10 per page.

Federal Claims have begun implementation. The fee for an audio file is $2.40, regardless of the length of the recording.

*Training and Education Program* – In September 2010, the Judicial Conference approved a recommendation from the Committee on Court Administration and Case Management to establish a program involving the Government Printing Office (GPO), the American Association of Law Libraries (AALL), and the Administrative Office, that would provide training and education to the public about the PACER service, and would exempt from billing the first $50 of quarterly usage by a library participating in the program. The GPO and the AALL worked with the Administrative Office to develop three levels of training classes: training for trainers, training for library staff, and training for the public. There are currently 12 libraries participating in the program. In some instances, libraries are providing on-the-spot individual training. All training classes include instructions on *How to Create a PACER Account* and *How to Monitor PACER Usage*. Although some patrons expressed disappointment that they were not being allowed to use the library's PACER account, but instead had to use their own accounts, they did report being satisfied with the instructions provided. The AALL and the GPO continue to publicize the program to their communities.

*PACER Training Application* – The training site dcecf.psc.uscourts.gov enables the public to learn how to use PACER without registering or incurring any fees. In March 2012, the Administrative Office also launched video tutorials to assist the public in learning how to use PACER.

*RSS* – In addition to PACER access, which allows users to "pull" information from the courts, approximately 50 district courts and 80 bankruptcy courts are using a common, free internet tool, RSS, to "push" notification of docket activity to users who subscribe to their RSS feeds, much like a Congressional committee might notify its RSS subscribers of press releases, hearings, or markups.

*Pro Se Bankruptcy Pathfinder* – In August 2010, the CM/ECF Subcommittee of the Committee on Court Administration and Case Management approved a proposal to undertake a bankruptcy *pro se* pathfinder initiative, which is designed to assist *pro se* litigants in preparing the filings required at case opening, to reduce the time required to process *pro se* bankruptcy filings, to increase the quality of the data collected, and to employ new development tools today, which are selected for future federal Judiciary use. Three bankruptcy courts currently serve as beta courts: Central District of California, District of New Jersey, and District of New Mexico. It is anticipated that this software will be available for use by filers later this year.

-4-

*Opinion Initiative with the Government Printing Office* – In September 2012, the Judicial Conference of the United States approved national implementation of the program to provide access to court opinions via the Government Printing Office's Federal Digital System (FDSys) and agreed to encourage all courts, at the discretion of the chief judge, to participate in the program. Twenty-nine pilot courts are live, with over 600,000 individual court opinions available on FDSys. This has proved to be extremely popular with the public. Federal court opinions are one of the most utilized collections on FDsys, which includes the Federal Register and Congressional bills and reports. Access to FDSys is available free of charge via the Internet at www.gpo.gov. Registration is not required.

## PACER Users

PACER has a diverse user population, including: lawyers; *pro se* filers; government agencies; trustees; bulk collectors; researchers; educational institutions; commercial enterprises; financial institutions; the media; and the general public. The chart below is a breakdown of the PACER user population. The majority of "other" users are background investigators.



The largest user is the Department of Justice. Virtually all of the other high volume users are major commercial enterprises or financial institutions that collect massive amounts of data, typically for aggregation and resale.

**Electronic Public Access Service Assessment**
A comprehensive assessment of PACER services was completed in May 2010. The assessment provided insight into who uses PACER, areas that provide the highest level of satisfaction for those users, and areas that could be improved. The initial assessment was also used to inform the work of the Additional Stakeholders Functional Requirements Group (ASFRG) as it began identifying requirements for the Next Generation of CM/ECF. An on-line satisfaction survey was made available to all 325,000 active PACER users in late 2009. User types giving the highest overall satisfaction scores to PACER included creditors and service providers to the legal sector, followed by commercial businesses. Users in the legal sector and litigants—the two largest groups of PACER users—are also among the most satisfied. Users at educational and research institutions gave the lowest overall satisfaction rating. These are small groups of less-frequent users. The survey indicated that satisfaction rates climb steadily as frequency of use increases.

In addition to assessing satisfaction with the on-line component of PACER, users were asked to rate help-desk services provided by the PACER Service Center. Satisfaction was very high; over 95 percent of respondents who contacted the center during the study period indicated they are "satisfied" or "very satisfied" overall. However, about one-third of PACER users were not aware that the PACER Service Center is available to provide help with PACER. The assessment also revealed that 75 percent of users were satisfied with the value for the money they paid for PACER access, 15 percent were neutral, and 10 percent were dissatisfied.

As a result of the assessment, a number of short- and mid-term activities were implemented to improve user satisfaction with electronic public access services. These included:

- creating a new PACER Case Locator with expanded search capabilities to replace the U.S. Party/Case Index;
- redesigning the pacer.gov web page to include video tutorials;
- embarking on a program to provide public access to judicial opinions via the Government Printing Office's Internet-based FDSys Application;
- partnering with law libraries to provide training on the efficient and effective use of PACER;
- creating a free PACER training application, which is populated with actual court cases and case reports from the New York Western District Court;
- promoting the use of RSS feeds to "push" information to users;
- creating a mobile PACER application;
- redesigning the PACER bill and providing a tool to better manage billing for large organizations; and

- providing access to some audio recordings of judicial proceedings through PACER.

In April 2012, an initiative was undertaken to refresh the results from the initial assessment. This initiative is on track to meet its scheduled completion date of March 2013.

**Basis and History of Fees**

In 1988, the Judiciary sought funding through the appropriations process to provide electronic public access services. Rather than appropriate funds for this purpose, Congress specifically directed the Judiciary to fund electronic public access services through the collection of user fees. As a result, the electronic public access program relies exclusively on fee revenue. The statutory language specifically requires that the fees be used "to reimburse expenses incurred in providing these services."[3]

A study of policies and practices regarding use, release, and sale of data, recommended that the level of fees for a service should sustain the cost of the service. In 1991, a fee of $1.00 per minute for access to electronic information, via a dial-up bulletin board service, was set for the district and bankruptcy courts. Four years later, the fee was reduced to $0.75 per minute, and one year after that it was reduced to $0.60 per minute. The revenue generated from these fees was used exclusively to fund the full range of Electronic Public Access services, including PACER, the Appellate Bulletin Board system, the Voice Case Information System. The Voice Case Information System provided case information free of charge. Fee revenue also provided each court with hardware and software necessary to support public access services. This included more than 700 regular telephone lines, more than 200 toll-free telephone lines, and a personal computer for free public access at the front counter of all clerks' offices with 10 or more staff.

In 1997, the Judiciary addressed three issues pertaining to providing electronic public access to court information via the Internet. These issues were: (1) the establishment of an appropriate fee for Internet access to court electronic records; (2) the types of information for which a fee should be assessed; and (3) the technical approach by which PACER information should be provided over the Internet. An application of Internet technologies to the Judiciary's public access program was viewed as a way to make court and case information more widely available and to offer the opportunity to add additional information (local rules, court forms, court calendars and hours of operation) and services.

---

[3] Judiciary Appropriations Act, 1991, Pub. L. No. 101-515,Title IV, § 404, 104 Stat. 2102 and Judiciary Appropriations Act, 1992, Pub. L. No. 102-140, Title III, § 303, 105 Stat. 782.

The Judiciary's analysis focused on finding the fairest, most easily understood, and most consistent method for charging. In 1998, the Judicial Conference adopted a per-page fee, as it was determined to be the simplest and most effective method for charging for public access via the Internet. The $0.07 per page electronic access fee[4] was calculated to produce comparable fees for large users in both the Internet and dial-up applications and thus maintain the then current public access revenue level while introducing new technologies to expand public accessibility to the PACER information. For infrequent PACER users, costs were reduced considerably by using the Internet.

In 2003, in the Congressional conference report that accompanied the Judiciary's FY 2004 appropriations act, Congress expanded the permitted uses of EPA funds to include Case Management/Electronic Case Files (CM/ECF) system costs. In order to provide sufficient revenue to fully fund currently identified CM/ECF system costs, in September 2004, the Judicial Conference approved an increase in the electronic public access fee from $0.07 to $0.08 per page, effective January 1, 2005.

Based on a recommendation from the Committee on Court Administration and Case Management, in September 2011, the Judicial Conference approved an increase in the fee from $0.08 to $0.10 per page, effective April 1, 2012, in order to give users adequate notice. The Committee noted that the fee had not been increased since 2005 and that, for the previous three fiscal years, the public access program's obligations had exceeded its revenue. The fee increase is being used to fund the Next Generation of CM/ECF and PACER. The Committee also recommended that the waiver of fees of $10 or less in a quarterly billing cycle be changed to $15 or less per quarter, so that approximately 75 percent of users would still receive fee waivers. Finally, in recognition of the current fiscal austerity for government agencies, the Committee recommended that the fee increase be suspended for local, state, and federal government entities for a period of three years. The Conference adopted all of the Committee's recommendations.

The Judiciary takes its responsibility to set the EPA fee very seriously. Since well before the E-Government Act, it has been the Judicial Conference's policy to set the electronic

---

[4] The per-page charge applies to the number of pages that result from any search, including a search that yields no matches (one page for no matches). In the current PACER systems, billable pages are calculated in one of two ways: a formula is used to determine the number of pages for an HTML formatted report. Any information extracted from the CM/ECF database, such as the data used to create a docket sheet, is billed using a formula based on the number of bytes extracted (4320 Bytes). For a PDF document, the actual number of pages is counted to determine the number of billable pages.

public access fee to be commensurate with the costs of providing and enhancing services related to public access. Before the one-cent-per-page increase in 2004, the Conference had a history of lowering the fee, and Congressional appropriations to the Judiciary have never provided funding for the public access program. In 2001, the Judicial Conference established a fee of $0.10 per page to print copies of documents from public access terminals in the clerks' office. That fee has never been raised. A fee is not charged to view PACER documents from the public access terminals in federal courthouses. Finally, the per page fee has been capped at the charge for 30 pages (or $3.00) for documents, docket sheets, and case-specific reports.[5]

**Free Information and Exemptions**

There is a high cost to providing electronic public access, and as described above, Congress decided in 1991 that the funds needed to improve electronic access to court information were to be provided by the users of this information through reasonable fees rather than by all tax payers through appropriated funds. It is also important to note, however, that the public access program does provide a great deal of federal court information to the American public for no charge. For example:

- The Judiciary does not charge for access to judicial opinions;

- Parties to a court case receive a copy of filings in the case at no charge;

- The $0.10 per page fee is not charged for viewing case information or documents on PACER at the public access terminals in the courthouses;

- If an individual account does not reach $15 quarterly, no fee is charged at all; and in a given fiscal year, approximately 65-to-75 percent of active users have fee waivers for at least one quarter. Most of these users are litigants and their attorneys who are involved in a specific case;

- Consistent with Judicial Conference policy, courts may grant exemptions for payment of electronic public access fees. Approximately 20 percent of all PACER usage is performed by users who are exempt from any charge – including indigents, case trustees, academic researchers, CJA attorneys, and *pro bono* attorneys.

---

[5]The 30 page fee cap does not apply to non case-specific reports such as docket activity reports that include multiple cases and reports from the PACER Case Locator.

The vast majority (95 percent) of PACER accounts incur less than $500 in fees – or no fee at all – over the course of the year. This is a long-established pattern. Additionally, the public access program also provides free access to court case information through VCIS (Voice Case Information System), an automated voice response system that provides a limited amount of bankruptcy case information directly from the court's database in response to telephone inquiries.

**Benefits of a Fee**

In order to maintain the level of service presently provided through the public access program, the Judiciary would need appropriated funds to replace the fee revenue, and in this fiscal climate increased appropriations are not available. Fee revenue allows the Judiciary to pursue new technologies for providing public access, develop prototype programs to test the feasibility of new public access technologies, and develop enhancements to existing systems. By authorizing the fee, Congress has provided the Judiciary with revenue that is dedicated solely to promoting and enhancing public access. These fees are only used for public access, and are not subject to being redirected for other purposes. The fee, even a nominal fee, also provides a user with a tangible, financial incentive to use the system judiciously and efficiently, and in the absence of a fee the system can be abused.

**Privacy**

The Judiciary is committed to protecting private information in court filings from public access. It has been over a decade since the Judicial Conference began consideration of – and subsequently formulated – a privacy policy for electronic case files, and over four years since the enactment of Federal Rules of Appellate, Bankruptcy, Civil, and Criminal Procedure requiring that certain personal data identifiers not be included in court filings. These policies and rules have been integral to the success of the Judiciary's electronic public access program. Adherence to these policies and rules by litigants and attorneys is essential to ensure that personal identifier information is appropriately redacted from court filings. The Judicial Conference examined how the privacy rules were working in practice and found that overall the Judiciary's implementation of the privacy rules has been a tremendous success.

In 2001, the Judicial Conference adopted a policy on privacy and public access to electronic case files that allowed Internet-based access to civil and bankruptcy case filings; the policy required filers, however, to redact certain personal information (i.e., Social Security numbers, financial account numbers, names of minor children, and dates of birth). Following a pilot program and a Federal Judicial Center study on criminal case files, the Conference approved electronic access to criminal case files, with similar redaction requirements. The redaction requirements of the Conference's privacy policy were largely incorporated into the Federal Rules, effective December 1, 2007.

-10-

As noted above, a key tenet of these rules (as well as the precursor Conference policy) is that the redaction of personal identifiers lies with the filing party. The Advisory Committee Note accompanying Federal Rule of Civil Procedure 5.2 states: "The clerk is not required to review documents filed with the court for compliance with this rule. The responsibility to redact filings rests with counsel and the party or non-party making the filing." Nonetheless, the Judicial Conference and the Administrative Office are obviously interested in ensuring that these privacy rules are adequate and appropriately followed. To this end, two Judicial Conference Committees – the Court Administration and Case Management Committee, and the Committee on Rules of Practice & Procedure – have worked jointly with the Federal Judicial Center to monitor and study the operation of the privacy rules and related policies and to address new issues that have arisen since their implementation. In addition, the Administrative Office took a number of steps to ensure that the privacy protections established in the federal rules can be more easily followed, including the establishment of a task force that developed a notice for the current CM/ECF system reminding litigants of their obligation under the law to redact personal identifier information and to require filers to affirm that they must comply with the redaction rules.

The Administrative Office continues to encourage courts to stress the rules' redaction requirements with those who file in the court. Options for informing the filers include various, readily available communications vehicles, such as the court's public website, newsletters, listserves, and Continuing Legal Education programs. Further, Judicial Conference Committees and the Administrative Office have asked individual courts to share information on actions they have taken to ensure compliance with the privacy rules, including promulgation of local rules or standing orders, modifications to local CM/ECF applications, and outreach efforts to the public and bar informing them of the redaction requirements. This type of information will assist the Administrative Office, as well as the Conference Committees, to be better informed of the scope of any non-compliance. Thus far, the Administrative Office has received an impressive response from the courts, which are addressing the privacy rules in a variety of ways, ranging from conducting education and awareness campaigns to issuing judicial orders to redact noncompliant filings.

**E-Government Act Compliance**

It is important to emphasize the effort and seriousness with which the Judiciary has implemented the E-Government Act's requirements. Section 205(d) of the Act directed the Judicial Conference to "explore the feasibility of technology to post online dockets with links allowing all filings, decisions and rulings in each case to be obtained from the docket sheet of the case." The Judiciary has gone much further than "exploring" such a system. It designed and has now implemented that system in all courts, providing more than 1.4 million PACER users with access to over 500 million case file documents at a

reasonable fee – and, frequently, free of any charge at all. The EPA program was developed as an alternative to going to the courthouse during business hours and making copies at the cost of $0.50 per page. This service saves litigants/lawyers and the public time and money by allowing them to file from any computer and also to download and review case information electronically, with all the attendant benefits.

Very few state courts have electronic access systems, and none provides as much information as PACER. Many state courts charge several dollars for a single records search. No other court system in the world provides as much information to as many people in as efficient a manner. State court officials and court administrators from other countries contact the federal Judiciary frequently about our electronic public access model.

# EXHIBIT B

March 26, 2009 Letter from Judicial
Conference of the United States to Former
United States Senator Joseph I. Lieberman



RECEIVED
CH  DATE 3/31

# JUDICIAL CONFERENCE OF THE UNITED STATES
## WASHINGTON, D.C. 20544

THE CHIEF JUSTICE
OF THE UNITED STATES
*Presiding*

JAMES C. DUFF
*Secretary*

March 26, 2009

Honorable Joseph I. Lieberman
Chairman
Committee on Homeland Security
  and Governmental Affairs
United States Senate
Washington, D.C.  20510

Dear Mr. Chairman:

We are responding on behalf of the Judicial Conference and its Rules Committees to your letter to Judge Lee H. Rosenthal dated February 27, 2009.  Your letter raises two questions about the Judiciary's compliance with the E-Government Act of 2002:  the first involves the fees charged for Internet-based access to court records, to which Director Duff responds; and the second relates to the protection of private information within these court records, to which Judge Rosenthal responds.  The Judiciary welcomes the opportunity to address these issues.

<u>User Fees Necessary to Support PACER</u>

You inquired whether the Judiciary's Public Access to Court Electronic Records (PACER) system complies with a provision of the E-Government Act that contemplates a fee structure in which electronic court information "is freely available to the greatest extent possible."  We assure you that the Judiciary is charging PACER fees only to the extent necessary.  As described below, many services and documents are provided to the public for free, and charges that are imposed are the minimum possible only to recover costs.  As such, we believe we are meeting the E-Government Act's requirements to promote public access to federal court documents while recognizing that such access cannot be entirely free of charge.

There are high costs to providing the PACER service.  This fact raises an important question of who should pay for the costs — taxpayers or users.  Congress initially answered the question in our 1991 appropriations act when it required that improved electronic access to court information be funded through reasonable fees paid by the users of the information, and not through taxes paid by the general public.  That requirement is the basis for the current Electronic Public Access (EPA) program, and for the fees charged for access to federal court documents through the PACER system.

Honorable Joseph I. Lieberman
Page 2

The PACER user population includes lawyers, *pro se* filers, government agencies, trustees, bulk collectors, researchers, educational institutions, commercial enterprises, financial institutions, the media, and the general public. The fees are the same for all users of the system. The program does not, however, provide free access to every individual, law firm, or corporation (most notably data resellers and credit reporting firms) that is interested in obtaining vast amounts of court data at no cost.

As noted above, Congress mandated 18 years ago that the Judiciary charge user fees for electronic access to court files as a way to pay for this service. Since that time, various legislative directives have amended the mandate, mostly to expand the permissible use of the fee revenue to pay for other services related to the electronic dissemination of court information, such as the Case Management/Electronic Case Files (CM/ECF) system[1] and an Electronic Bankruptcy Noticing (EBN) system.[2] Your letter correctly notes that the E-Government Act shifted emphasis by providing that fees "may," rather than "shall," be collected, and "only to the extent necessary." It did not, however, alter Congress's policy that the EPA program recoup the cost of services provided through a reasonable fee. Indeed, the Conference Report on the Judiciary Appropriations Act of 2004, adopted two years after the E-Government Act, included the following statement: "[t]he Committee expects the fee for the Electronic Public Access program to provide for Case Management/Electronic Case Files system enhancements and operational costs."[3] Consistent with that directive, the Judicial Conference increased the EPA fee by one cent per page accessed.

The Judiciary takes its responsibility to establish the EPA fee very seriously. Since well before the E-Government Act, it has been the Judicial Conference's policy to set the electronic public access fee to be commensurate with the costs of providing and enhancing services related to public access. In fact, prior to the one-cent per-page increase in 2004, the Conference had a history of lowering the fee. As a result, PACER is a very economical service:

- The charge for accessing filings is just eight cents per page (as opposed to the fees for using commercial services such as Westlaw or Lexis, which are much more);

---

[1]   CM/ECF, the primary source of electronic information on PACER, was developed and is maintained with EPA fees. This system provides for electronic filing of all documents in all 94 district courts and all 90 bankruptcy courts, and currently is being implemented in the courts of appeals.

[2]   The EBN system is funded in its entirety by EPA fee revenue. It provides access to bankruptcy case information to parties listed in the case by eliminating the production and mailing of traditional paper notices and associated postage costs, while speeding public service. Available options include Internet e-mail and fax services, and Electronic Data Interchange for large volume notice recipients. Over 20 million bankruptcy notices were transmitted through the EBN program in fiscal year 2008.

[3]   *See* H.R. Rpt. No. 108-401, 108th Cong., 1st Sess., at 614 (adopting the language of H.R. Rpt. No. 108-221, 108th Cong., 1st Sess., at 116).

Honorable Joseph I. Lieberman
Page 3

- There is a $2.40 maximum charge for any single document, no matter its length; and

- At federal courthouses, public access terminals provide free PACER access to view filings in that court, as well as economical printouts (priced at $.10 per page).

In addition, contrary to the notion that little has been done to make court records freely available, the Electronic Public Access (EPA) program *does* provide a significant amount of federal court information to the public for free. For example, through PACER:

- Free access to all judicial opinions is provided;

- Parties to a court case receive a free copy of filings in the case;

- If an individual account does not reach $10 annually (which translates into access to at least 125 pages), no fee is charged at all – in 2008, there were over 145,000 accounts in this status; and

- Approximately 20 percent of all PACER usage is performed by users who are exempt from any charge, including indigents, academic researchers, CJA attorneys, and *pro bono* attorneys.[4]

Nonetheless, the fact remains that the EPA program does require funding, and Congress has never provided appropriations for its support. If the users, the largest of which are finance and information management corporations, are not charged for the services they receive, the Judiciary cannot maintain PACER or other public access facilities unless Congress annually provides taxpayer-funded appropriations to support the program.

Additionally, a misconception about PACER revenues needs clarification. There is *no* $150 million PACER surplus; the figure referenced in your correspondence was a FY 2006 balance of $146.6 million in the much larger Judiciary Information Technology Fund (JITF). The JITF finances the IT requirements of the entire Judiciary and is comprised primarily of "no-year" appropriated funds which are expected to be carried forward each year. While fee

---

[4]   In addition to these examples, the EPA program provides free access to court case information through VCIS (Voice Case Information System), an automated voice response system that provides a limited amount of bankruptcy case information directly from the court's database in response to touch-tone telephone inquiries. The Judicial Conference also recently attempted to expand free PACER access through a pilot project that provided PACER terminals in Federal Depository Libraries. The purpose of the pilot was to provide access to individuals who would be unlikely to go to the courthouse, have ready access to the Internet, or establish a PACER account. Unfortunately, after only 11 months, the pilot had to be suspended pending an evaluation and an investigation of potentially inappropriate use.

Honorable Joseph I. Lieberman
Page 4

collections from the EPA program are also deposited into the JITF, they are used only to fund
electronic public access initiatives and account for only a small portion of its balance.[5]

Finally, the Judiciary is making a serious effort to implement the requirements of the
E-Government Act. Section 205(d) directed the Judicial Conference to "explore the feasibility of
technology to post online dockets with links allowing all filings, decisions and rulings in each
case to be obtained from the docket sheet of that case." In reality, the Judiciary has done much
more than "explore" such technology — *we have designed and now implemented in all courts a
system that provides nearly one million PACER users with access to over 250 million case file
documents at a reasonable fee, and frequently free of any charge at all.* The EPA program was
developed as an alternative to going to the courthouse during business hours and making copies
at the cost of 50 cents a page.

In contrast, very few state courts have electronic access systems, and none provides as
much information as PACER. Many state courts charge several dollars for a single records
search. We receive frequent inquiries from state court officials and court administrators from
other countries about PACER, which is viewed as an electronic public access model. Taxpayers,
who incur none of the expenses associated with PACER, and users of the system, who enjoy
rapid access to a vast amount of docket information, are well served by PACER. The PACER
system is an on-going success story and the Judiciary remains committed to providing a high
level of electronic public access to court information.

Private Information in Electronic Court Records

The Judicial Conference and its Rules Committees share your commitment to protecting
private information in court filings from public access. Over a decade ago, before electronic
filing was adopted in the federal district and bankruptcy courts and well before enactment of
the E-Government Act of 2002, the Conference began developing a policy to protect private
information in electronic case files while ensuring Internet-based public access to those files.
That policy became effective in September 2001. Changes to the Federal Appellate, Bankruptcy,
Civil, and Criminal Rules, largely incorporating the privacy policy and addressing other rules'
aspects of protecting personal identifiers and other public information from remote electronic
public access, became effective in December 2007, under the E-Government Act and pursuant
to the Rules Enabling Act process.[6]

The Judicial Conference has continued to examine how the privacy policy and rules
are working in practice. Two Conference committees are reviewing the rules, the policy, and
their implementation. The Administrative Office of the United States Courts has also continued

---

[5]   The carryover JITF balances (including the portion attributable to EPA fee collections) have been
    substantially reduced since FY 2006 in order to meet the Judiciary's IT requirements.

[6]   Fed. R. App. P. 25(a)(5); Fed. R. Bankr. P. 9037; Fed. R. Civ. P. 5.2; and Fed. R. Crim. P. 49.1.

Honorable Joseph I. Lieberman
Page 5

to reinforce effective implementation. The Federal Judiciary has been in the forefront of protecting privacy interests while ensuring public access to electronically filed information.

In late 1999, a few federal courts served as pilot projects to test electronic filing. In 2009, the Judiciary's CM/ECF system has become fully operational in 94 district courts and 93 bankruptcy courts, and it will soon become operational in all 13 courts of appeals. As courts and litigants have acquired experience with nationwide electronic filing, new issues have emerged on how to balance privacy interests with ensuring public access to court filings.

The Judiciary-wide privacy policy was adopted in September 2001 after years of study, committee meetings, and public hearings. The policy requires that court filings must be available electronically to the same extent that they are available at the courthouse, provided that certain personal identifiers are redacted from those filings by the attorney or the party making the filing. The personal identifiers that must be redacted include the first five digits of a social-security number, financial account numbers, the name of a minor, the date of a person's birth, and the home address in a criminal case. These redaction requirements were incorporated into the Federal Rules amendments promulgated in December 2007 after the public notice and comment period prescribed under the Rules Enabling Act. These rules, which also address other privacy protection issues, meet the requirements of the E-Government Act.

The 2001 Conference policy and the 2007 privacy rules put the responsibility for redacting personal identifiers in court filings on the litigants and lawyers who generate and file the documents. The litigants and lawyers are in the best position to know if such information is in the filings and, if so, where. Making litigants and lawyers responsible to redact such information has the added benefit of restraining them from including such information in the first place. Moreover, requiring court staff unilaterally to modify pleadings, briefs, transcripts, or other documents that are filed in court was seen to be impractical and potentially compromising the neutral role the court must play. For these reasons, the rules clearly impose the redaction responsibility on the filing party. The Committee Notes accompanying the rules state: "The clerk is not required to review documents filed with the court for compliance with this rule. The responsibility to redact filings rests with counsel and the party or non-party making the filing."[7] The courts have made great efforts to ensure that filers are fully aware of their responsibility to redact personal identifiers. Those efforts continue.

The reported instances of personal identifier information contained in court filings is disturbing and must be addressed. The Rules Committees' Privacy Subcommittee, which developed and proposed the 2007 privacy rules, is charged with the task of examining how the rules have worked in practice, what issues have emerged since they took effect on December 1, 2007, and why personal identifier information continues to appear in some court filings. The

---

[7]    Fed. R. Civ. P. 5.2 (Committee Note).

Honorable Joseph I. Lieberman
Page 6

Privacy Subcommittee, which includes representatives from the Advisory Rules Committees
as well as the Court Administration and Case Management Committee, will consider whether
the federal privacy rules or the Judicial Conference privacy policy should be amended and how to
make implementation more effective. The subcommittee will review empirical data;
the experiences of lawyers, court staff, and judges with electronic court filings; the software
programs developed by some district and bankruptcy courts to assist in redacting personal
identifier information; and other steps taken by different courts to increase compliance with
the privacy rules.

    While this work is going on, the Judiciary is taking immediate steps to address the
redaction problem. Court personnel have been trained in administering the privacy policy
and rules; additional training is taking place. On February 23, 2009, the Administrative Office
issued a written reminder to all Clerks of Court about the importance of having personal
identifiers redacted from documents before they are filed and of the need to remind filers of
their redaction obligations. Court clerks were directed to use a variety of court communications,
such as newsletters, listservs, continuing legal education programs, and notifications on websites
administered directly by the courts, to reach as many filers as possible, as effectively as possible.
Plans are underway to modify the national CM/ECF system to include an additional notice
reminding filers of their redaction obligation. In addition, all the courts have been asked to
provide information on their experience with the privacy policy and rules. Early responses
have included some promising approaches that the Privacy Subcommittee will consider for
possible national adoption.

    The Privacy Subcommittee does not underestimate the difficulty or complexity of the
problems. Court filings can be voluminous. Some cases involve hundreds or even thousands
of pages of administrative or state-court paper records that cannot be electronically searched.
Redacting personal identifier information in certain criminal proceedings may interfere with
legitimate law enforcement prosecutions. Erroneously redacting information can affect the
integrity of a court record. The propriety of court staff changing papers filed in private civil
litigation is an ongoing concern. Internet access to court filings present other privacy and
security issues besides the redaction of the personal identifiers specified in the 2007 rules,
and these issues need to be studied as well.

    The resolution of these privacy issues will involve important policy decisions that
require careful and comprehensive consideration and input from the bench, bar, and public.
The Judicial Conference and its Rules Committees look forward to continuing this dialogue
with you.

*    *    *

Honorable Joseph I. Lieberman
Page 7

If we may be of assistance to you in either of these areas, or on any other matter, please do not hesitate to contact the Office of Legislative Affairs in the Administrative Office at 202-502-1700.

Sincerely,

Lee H. Rosenthal
Chair, Standing Committee on
Rules of Practice and Procedure

James C. Duff
Secretary, Judicial Conference
of the United States

# EXHIBIT C

Working Paper by Stephen Schultze,
"Electronic Public Access Fees and the
United States Federal Courts' Budget: An
Overview."

# Electronic Public Access Fees and the United States Federal Courts' Budget:
## *An Overview*

Stephen Schultze, *Fellow, Berkman Center for Internet & Society at Harvard*[1]

**Abstract:** This draft working paper examines the role of user fees for public access to records in the budgeting process of the federal courts. It sketches the policy principles that have traditionally motivated open access, describes the administrative process of court budgeting, and traces the path of user fees to their present-day instantiation. There has been considerable confusion about motivation and justification for the courts charge for access to PACER, the web-based system for "Public Access to Court Electronic Records." Representatives from the Administrative Office of the Courts describe the policy as mandated by Congress and limited to reimbursing the expenses of operating the system. This paper identifies the sources of these claims and places them in the context of the increasing push to make government data freely accessible.

*Disclaimer: This is an early sketch of a more extensive paper I hope to write on the subject. I am releasing this now in the hope that it can help clarify some of the details on PACER fees, and so that I can solicit feedback and corrections early on. As such, it is just a brief tour through some of the relevant sources rather than a rigorous treatment.*

## Traditional Principles of Public Access to the Courts

Public access to court records is fundamental to the effective functioning of the Judiciary. James Grimmelmann describes why this has become an important doctrine.[2] Democracy relies on open publication of the law. When the law is secret or obfuscated, we risk arbitrary application. Open access is fundamental to transparency and accountability. Similarly, closed or limited access is simply unfair. If "ignorance of the law is no defense," the law must be knowable to all. Likewise, judicial consistency—the revered principle of *stare decisis*—relies on an accessible record. Equal access is also essential to equal representation in our adversarial system. If access is costs money, or too much money, the rich can obtain an unjust advantage.[3]

---

[1] Affiliation is for identification purposes only. The views expressed here are mine, and do not necessarily reflect the conclusions or opinions of the Berkman Center.

[2] http://james.grimmelmann.net/essays/CopyrightTechnologyAccess

[3] In addition to these factors is the theory that when the government provides open access to raw data, third parties will make it far more useful and accessible than the government entity itself would be capable of doing. See, generally, Robinson, David G., Yu, Harlan, Zeller, William P. and Felten, Edward W., Government Data and the Invisible Hand (2009).

Peter Winn has described the historical development of standards of judicial information management.[4] There is little attention paid to these issues during periods of information technology stability, such as orally reported proceedings or physically transcribed decisions. But when the record-keeping medium undergoes radical change, significant debates arise. Secret proceedings have never fared well, and historical examples like the English Star Chamber have become epithets used to describe judicial opacity. However, some elements of proceedings must necessarily be kept secret to the broader public. Redaction and sealing are critical tools for protecting personal or commercially sensitive information. Winn believes that privacy and transparency need not be in tension. On the contrary, effective judicial information management serves both. The "practical obscurity" of paper no longer protects against privacy violating mistakes of counsel or the court, so the system needs increased attention to digital information management.[5]

## Management and Budgeting of the Courts

There is a highly structured process by which the U.S. Courts request appropriations from Congress, allocate these outlays, and determine the flow of other available funds. This process changes little from year to year, with the biggest exceptions occurring in fiscal years in which Congress fails to complete the budget process on schedule and must instead issue a continuing resolution. In either case, once procedures and practices become established, they are difficult to change.

Each year, the Judiciary produces its "Congressional Budget Justification" that lays out its requests to Congress. These so-called "yellow books" are submitted to the House Subcommittee on Financial Services and General Government of the Committee on Appropriations. This typically happens in February, and the Judiciary has considerable

---

Yale Journal of Law & Technology, Vol. 11, p. 160, 2009.
http://ssrn.com/abstract=1138083
[4] Peter A. Winn, Judicial Information Management in an Electronic Age: Old Standards, New Challenges, 2009 Fed. Cts. L. Rev. 2 (July, 2009)
<http://www.fclr.org/fclr/articles/html/2009/jmffedctslrev4.pdf>
[5] See, e.g.: In re Killian, 2009 Bankr. LEXIS 2030 [C/A No. 05-14629-HB, Adv. Pro. No. 08-80250-HB, Chapter 13] (July 23, 2009)

back-and-forth with the subcommittee before passage of the appropriations bill, which is then usually followed by a Senate version and reconciliation of the two. The Judiciary also submits its budget to the President for inclusion in his budget, which must be included in the final draft "without change." Historically, the President has had more latitude to change the request, but this was limited in part to insulate the Judiciary from political manipulation of their budget.[6]

Once the President signs the bill into law, the funds can be disbursed and the Judiciary undergoes a round of internal planning for spending them—culminating in the National Financial Plan. This plan often includes more detail than the budget justifications, and more closely describes the likely use of the funds. The Judiciary sends a copy of the plan to the appropriations subcommittee, although their approval is not required. The plan is not publicly published anywhere.

The Judiciary also prepares various reports on actual spending over the course of the year. One relevant report is the Judiciary Information Technology Fund Report, which describes the income and spending for IT-related expenses. It is mandated by 28 U.S.C. §612. This is typically published a few months into the following year, although 2008 report is still forthcoming. This report is also not publicly published anywhere.

**The History of Paid Electronic Public Access**

Electronic public access to court records was remarkably ahead of its time. As early as the 1980s, the courts had a simple dial-up system that provided basic case information and charged by the minute. As this system proved its usefulness, Congress gave the Courts more latitude to collect and spend for this service. In 1992, Congress established the Judiciary Information Technology Fund ("JITF", "Judiciary Automation Fund" at the time).[7] The fund served as a sort-of bank account for the Judiciary in which it could deposit and withdraw IT-related funds without fiscal year limitation. It instructed the courts to charge in order to fund electronic access and to deposit the funds into the JITF.[8]

---

[6] 31 U.S.C. §1105(b).

[7] 1992 Judiciary Appropriations Act, §303(a).

[8] The language was subsequently modified in the 2002 E-Government Act, as noted below.

The courts chose to charge 7¢ fees per page, with a maximum charge of $2.10 for any query. What constituted a "page" made some sense with respect to PDF files, but the Judiciary decided to also charge by the "page" for search results and docket reports even though there was no paging involved. The more results or the longer the docket, the more expensive it was—and there was no way to know before loading the page.[9] In 2005, the fees were raised to 8¢ per page. Some users such as pro-bono attorneys and researchers were occasionally granted no-fee access to the system, but on a court-by-court basis.[10] In 2006, the Courts introduced policy language that prohibited redistribution of these documents.[11] By 2007, the Judiciary Information Technology Fund had accumulated "significant unobligated balances," meaning that more had been collected than had been spent. There was an extra $146.6 million in the fund, $32.2 million of which was from PACER fees.[12] The Judicial Conference considered whether to reduce fees, but "The IT Committee did not support any reduction to the fee at this time." Instead, it chose to begin spending the money on other IT-related expenses.[13]

---

[9] This structure may have had an influence on PACER's system design as well. Peter Martin notes:

> "PACER's financial dependence on the market value of court records has had on system design. Features with reasonable prospect of furthering the foundational goals of transparency, judicial accountability, public education, and informed debate on important matters of policy have been ignored or rejected. Otherwise beneficial arrangements that might have threatened the willingness of the commercial sector to pay PACER fees have not been treated as realistic options."

Martin, Peter W.,Online Access to Court Records - from Documents to Data, Particulars to Patterns(March 14, 2008). Cornell Legal Studies Research Paper No. 08-003. Available at SSRN: http://ssrn.com/abstract=1107412

[10] Lynn Lopucki has explored the effects of this on academic researchers in depth, explaining:

> "Granting fee exemptions to academic researchers would not solve the cost problem. The courts already grant such exemptions. One problem is that the courts may grant, deny, or condition them in ways that encourage researchers to portray the courts in a positive light.[Footnote: For example, after I released research that was critical of the New York bankruptcy court, that court denied my request for an exemption.] Another is that each bankruptcy or district court grants exemptions for only its own records. A researcher can conduct exempt nationwide research only by obtaining an exemption from each of the ninety-eight federal districts. Even if the application process were consolidated, the system would still have to distinguish and restrict exempt researchers. The minimum necessary restriction would be that the exempt researcher could not transfer data to nonexempt persons. The adverse consequences have already been discussed."

LoPucki, Lynn M., Court System Transparency. Iowa Law Review, Vol. 94, 2008; UCLA School of Law Research Paper No. 07-28; Washington U. School of Law Working Paper No. 07-10-01. http://ssrn.com/abstract=1013380

[11] http://pacer.psc.uscourts.gov/announcements/general/fee_sched_upd.html

[12] JITF Annual Report for Fiscal Year 2006, http://www.scribd.com/doc/2436289/

[13] Summary of the Report of the Judicial Conference Committee

**Expanded Use of Public Access Fees**

The decision to expand the use of PACER fees did not happen overnight. Instead, what started as a clearly circumscribed cost-recovery system evolved over a decade to become what appears to be a profit center that cross-subsidizes other IT functions of the Judiciary.

In 1997, the House included PACER-related language in the report that accompanied the Judiciary's appropriations bill. It explained,

> "The Committee supports the ongoing efforts of the Judiciary to improve and expand information made available in electronic form to the public. Accordingly, the Committee expects the Judiciary to utilize available balances derived from electronic public access fees in the Judiciary Automation Fund to make information and services more accessible to the public through improvements to enhance the availability of electronic information. The overall quality of service to the public will be improved with the availability of enhancements such as electronic case documents, electronic filings, enhanced use of the Internet, and electronic bankruptcy noticing."[14]

As the Administrative Office began to anticipate the next generation of electronic filing, it planned to use PACER fees to construct it. To do so, it apparently suggested to the appropriations subcommittee that it this should be permitted. In 2004, the appropriators included language in their conference report that indicated that they expected the Courts to use some of these fees to fund the new case management and electronic filing systems ("CM/ECF").

> "The Committee expects the fee for the Electronic Public Access program to provide for Case Management/Electronic Case Files system enhancements and operational costs."[15]

> "The conferees adopt by reference the House report language concerning Electronic Public Access fees."[16]

The language reflects an apparent suggestion from the Judiciary that they begin to fund the no-fee *filing* side of their system using public fees on the *access* side of the system. The

---

On Information Technology, March 2007.
[14] House Report 104-676
[15] House Report 108-221
[16] House Report 108-401 (Conference report)

House appropriators seem to have approved of this suggestion (albeit in report language), regardless of any restrictions on use of public access fees in the JITF statutory language.

In 2007, the courts pursued a less-well-documented approach to further expand the types of expenditures of fees from electronic public access. After appropriations were approved, the Judiciary conducted its standard Financial Plan process. It then sent the plan to the appropriations subcommittee and used a somewhat unorthodox means for requesting expanded authority.

> "The fiscal year 2007 financial plan for courtroom technologies includes $7.0 million for court allotments to be funded EPA receipts to provide cyclical replacement of equipment and infrastructure maintenance. Via this financial plan submission, the Judiciary seeks authority to expand use of Electronic Public Access (EPA) receipts to support courtroom technology allotments for installation, cyclical replacement of equipment, and infrastructure maintenance. The Judiciary seeks this expanded authority as an appropriate use of EPA receipts to improve the ability to share case evidence with the public in the courtroom during proceedings and to share case evidence electronically through electronic public access services when it is presented electronically and becomes an electronic court record."[17]

The Judiciary presented this proposal as an extension of its public access service. The courtroom technology program certainly includes electronic evidence presentation systems such as flat-screen monitors and "ELMO" systems.[18] Broadly defined, perhaps this constitutes "electronic public access," but it is distant from the PACER system that is actually generating the fees. It is unclear how, if at all, the courtroom technology program supports the electronic record dissemination functions of PACER. The Chairman and Ranking Member of the Subcommittee on Financial Services and General Government nevertheless wrote letters to the Judiciary saying that they had "no objection" to the proposal.

By 2009, the list of programs supported by PACER fees was further expanded, and expenditures on the non-PACER items increased. "In fiscal year 2009, the Judiciary plans to

---

[17] The Judiciary Fiscal Year 2007 Financial Plans. March 14, 2007.
[18] http://www.elmousa.com/applications-legal.php

use $106.8 million in EPA collections and prior-year carryforward to fund public access initiatives including the following:

- Public Access Services and Applications $17.7 million;
- Telecommunications $8.7 million;
- EPA Equipment $1.3 million;
- CM/ECF Development, Operations and Maintenance $33.4 million;
- Courtroom Technology Allotments for Maintenance/Technology Refreshment $25.8 million;
- Electronic Bankruptcy Noticing $9.7 million;
- CM/ECF Allotments to Courts $7.5 million;
- CM/ECF state feasibility study $1.4 million;
- Violent Crime Control Act Notification $1.0 million; and
- Jury Management System Public Web Page $0.2 million."[19]

The only items that clearly relate directly to PACER are the $17.7 million and $1.3 million items, less than 18% of the total income from PACER fees. The Judiciary has described some of these items as:

"**Telecommunications Program.** This category includes voice and data transmissions services; telecommunications equipment for new buildings; and allotments to courts for local, long-distance, and cellular service and telephone system maintenance. [...]

**Courtroom Technology Program.** This category provides for the installation and maintenance of courtroom technologies to improve the quality and efficiency of courtroom proceedings. The judiciary continues its program to equip courtrooms with a variety of technologies to improve the quality and efficiency of certain aspects of courtroom proceedings. These technologies include video evidence presentation systems, audio systems, audio and video conferencing systems, and electronic methods of taking the record. The Judicial Conference has endorsed the use of such technologies in the courtroom as they can improve trial time, lower litigation costs, facilitate fact-finding, enhance the understanding of information, and improve access to court proceedings."[20]

"**Bankruptcy Noticing Center.** The AO's Bankruptcy Noticing Center (BNC) electronically retrieves data from bankruptcy courts' case management systems and prints, addresses, batches, and mails the resulting notices. The Bankruptcy Code and Federal Rules of Bankruptcy Procedure require bankruptcy courts to send these

---

[19] The Judiciary Fiscal Year 2009 Financial Plans. May 28, 2009.
[20] Judiciary Information Technology Fund Annual Report for Fiscal Year 2006.

> notices to all interested parties in a bankruptcy case. The BNC not
> only eliminates local preparation and mailing of notices by deputy
> clerks, it also generates notices in a fraction of the time and at a far
> lower cost than local noticing. The BNC, now in its eighth year, is
> estimated to have saved nearly $36 million for the judiciary since its
> inception."[21]

The courts do not appear to collect user fees for any of these services. In fact, the CM/ECF system has likely saved attorneys millions that they previously would have spent on creating physical versions of filings and having them delivered via courier.

### The E-Government Act, Lieberman's Inquiry, and the Judiciary's Response

The E-Government Act of 2002 required improved electronic services and information access from a variety of entities throughout the government. In the case of the Judiciary, it modified the language from the Judiciary Appropriations Act of 1992 that required user fees, and instead permitted the courts to charge for electronic access "only to the extent necessary."[22] This same portion of statute requires that the fees be used only to "reimburse expenses incurred in providing these services."[23] In the accompanying conference report, the lawmakers explained the intent of these changes.

> "The Committee intends to encourage the Judicial Conference to move
> from a fee structure in which electronic docketing systems are
> supported primarily by user fees to a fee structure in which this
> information is freely available to the greatest extent possible. For
> example, the Administrative Office of the United States Courts
> operates an electronic public access service, known as PACER, that
> allows users to obtain case and docket information from Federal
> Appellate, District and Bankruptcy courts, and from the U.S.
> Party/Case Index. Pursuant to existing law, users of PACER are
> charged fees that are higher than the marginal cost of disseminating
> the information."[24]

---

[21] S. Hrg. 109–330, Pt. 7, on H.R. 5576: Departments Of Transportation, Treasury, The Judiciary, Housing And Urban Development, And Related Agencies, Appropriations for Fiscal Year 2007 (p. 394), Thursday, May 4, 2006
[22] Public Law 107–347
[23] Revising 28 U.S.C. §1913
[24] Senate Report 107-174

Nevertheless, as outlined above, the Judiciary appears to have moved in the opposite direction—expanding the use of public access fees far beyond the marginal cost of dissemination and raising fees in 2005. Senator Lieberman, original sponsor of the E-Government Act, sent the Administrative Office of the Courts a letter on February 27, 2009 saying,

> "I am writing to inquire if the Court is complying with two key provisions of the E-Government Act of 2002 (P.L. 107-347) which were designed to increase public access to court records and protect the privacy of individuals' personal information contained in those records.
>
> As you know, court documents are electronically released through the Public Access to Court Electronic Records (PACER) system, which currently charges $.08 a page for access. While charging for access was previously required, Section 205(e) of the E-Government Act changed a provision of the Judicial Appropriation Act of 2002 (28 U.S.C. 1913 note) so that courts "may, to the extent necessary" instead of "shall" charge fees "for access to information available through automatic data processing equipment."
> [...]
> Seven years after the passage of the E-Government Act, it appears that little has been done to make these records freely available – with PACER charging a higher rate than 2002. Furthermore, the funds generated by these fees are still well higher than the cost of dissemination, as the Judiciary Information Technology Fund had a surplus of approximately $150 million in FY2006. Please explain whether the Judicial Conference is complying with Section 205(e) of the E-Government Act, how PACER fees are determined, and whether the Judicial Conference is only charging "to the extent necessary" for records using the PACER system.[25]

Senator Lieberman went on to discuss the concerns of proper redaction and sealing of electronic records.

James Duff, Director of the Administrative Office of the Courts, replied.[26] He explained that, absent Congressional appropriations, user fees are necessary to fund PACER. He also cited some of the correspondence between the appropriators and the courts that seemed to authorize more extended use of the fees. He also claimed that all opinions are available for

---

[25] http:// hsgac.senate.gov/public/_files/022709courttransparency.pdf
[26] http://public.resource.org/scribd/13838758.pdf (Duff replied in his capacity as Secretary for the Judicial Conference)

free, a policy that exists in theory but that the courts have since admitted is deficient in practice.[27]  Duff concluded by refuting the implication that all $146.6 million of the JITF "unobligated balances" were due to public access fees.  It is unfortunate that this number served as a distraction in the debate, because the same report made clear that $32.2 million of this balance came from public access fees.  In any event, the 2009 Financial Plan would have more clearly shown how public access fees were being collected and spent, providing a better platform for discussion.  Duff appeared to argue that regardless of the requirements of the E-Government's statutory changes and accompanying report, subsequent "authorizations" by the appropriators gave the courts full latitude to collect and spend PACER fees in the current fashion.

Subsequent comments by members of the Administrative Office appear to be in line with this reasoning, including the comments of Michel Ishakian, chief of the Public Access and Records Management Division on August 31, 2009.

> "We do not make a profit," says Ishakian, adding that "by law, we have to put all the money back into the program." PACER's revenues — $76.8 million for the 2008 fiscal year — pay for system operation, maintenance and upgrades, with any unspent revenues, $44.5 million in 2008, carried over to the next year.[28]

**Lessons from the Executive Branch**

This back-and-forth occurs in the context of a wide-ranging effort on the part of the new Administration to increase government transparency and to make the raw data of the government freely available.[29]  However, these are not fundamentally new principals. There is substantial precedent within the domain of Freedom of Information Act (FOIA) rights.  When the executive branch sought to define what should be permissible with respect to user fees for FOIA requests, it issued OMB Circular 130-A.

> "Statutes such as FOIA and the Government in the Sunshine Act establish a broad and general obligation on the part of Federal agencies to make government information available to the public and

---

[27] http://www.hyperlaw.com/topics/2009/2009-07-10-sugarman-to-ao-with-attachments.pdf and http://www.hyperlaw.com/topics/2009/2009-08-11-duff-ao-to-sugarman.pdf
[28] http://www.law.com/jsp/nj/PubArticleNJ.jsp?id=1202433484657&rss=nj
[29] See, generally, http://blog.ostp.gov/

to avoid erecting barriers that impede public access. User charges higher than the cost of dissemination may be a barrier to public access. The economic benefit to society is maximized when government information is publicly disseminated at the cost of dissemination. Absent statutory requirements to the contrary, the general standard for user charges for government information dissemination products should be to recover no more than the cost of dissemination. It should be noted in this connection that the government has already incurred the costs of creating and processing the information for governmental purposes in order to carry out its mission.

Underpinning this standard is the FOIA fee structure which establishes limits on what agencies can charge for access to Federal records. That Act permits agencies to charge only the direct reasonable cost of search, reproduction and, in certain cases, review of requested records. In the case of FOIA requests for information dissemination products, charges would be limited to reasonable direct reproduction costs alone. No search would be needed to find the product, thus no search fees would be charged. Neither would the record need to be reviewed to determine if it could be withheld under one of the Act's exemptions since the agency has already decided to release it. Thus, FOIA provides an information "safety net" for the public. While OMB does not intend to prescribe procedures for pricing government information dissemination products, the cost of dissemination may generally be thought of as the sum of all costs specifically associated with preparing a product for dissemination and actually disseminating it to the public. When an agency prepares an information product for its own internal use, costs associated with such production would not generally be recoverable as user charges on subsequent dissemination." [30]

## Conclusion

As noted at the outset of this overview, this is not intended to be a rigorous treatment of the issue. Nevertheless, it hopefully contributes to the quality of discussion on the proper structure of user fees for access to electronic court records. The time is ripe for consideration of how the Judiciary might more closely align its information management practices with modern technology, practices of the other branches, and public expectations.

---

[30] http://clinton1.nara.gov/White_House/EOP/OMB/html/omb-a130.html

ROBERT C. BYRD, WEST VIRGINIA, CHAIRMAN

DANIEL K. INOUYE, HAWAII
PATRICK J. LEAHY, VERMONT
TOM HARKIN, IOWA
BARBARA A. MIKULSKI, MARYLAND
HERB KOHL, WISCONSIN
PATTY MURRAY, WASHINGTON
BYRON L. DORGAN, NORTH DAKOTA
DIANNE FEINSTEIN, CALIFORNIA
RICHARD J. DURBIN, ILLINOIS
TIM JOHNSON, SOUTH DAKOTA
MARY L. LANDRIEU, LOUISIANA
JACK REED, RHODE ISLAND
FRANK R. LAUTENBERG, NEW JERSEY
BEN NELSON, NEBRASKA

THAD COCHRAN, MISSISSIPPI
TED STEVENS, ALASKA
ARLEN SPECTER, PENNSYLVANIA
PETE V. DOMENICI, NEW MEXICO
CHRISTOPHER S. BOND, MISSOURI
MITCH McCONNELL, KENTUCKY
RICHARD C. SHELBY, ALABAMA
JUDD GREGG, NEW HAMPSHIRE
ROBERT F. BENNETT, UTAH
LARRY CRAIG, IDAHO
KAY BAILEY HUTCHISON, TEXAS
SAM BROWNBACK, KANSAS
WAYNE ALLARD, COLORADO
LAMAR ALEXANDER, TENNESSEE

TERRENCE E. SAUVAIN, STAFF DIRECTOR
BRUCE EVANS, MINORITY STAFF DIRECTOR

# United States Senate

COMMITTEE ON APPROPRIATIONS
WASHINGTON, DC 20510–6025
http://appropriations.senate.gov

May 2, 2007

Mr. James Duff
Director
Administrative Office of the U.S. Courts
One Columbus Circle, N.E.
Washington, D.C. 20544

Dear Mr. Duff:

This letter is in response to the request for approval for the Judiciary's Fiscal Year 2007 Financial Plan, dated March 14, 2007 in accordance with section 113 of Public Law 110-5. For Fiscal Year 2007, Public Law 110-5 provided just under a five percent increase for the Judiciary over last year's level. With the increased funding provided in Fiscal Year 2007, $20.4 million is provided for critically understaffed workload associated with immigration and other law enforcement needs, especially at the Southwest Border.

We have reviewed the information included and have no objection to the financial plan including the following proposals:

- a cost of living increase for panel attorneys;
- the establishment of a branch office of the Southern District of Mississippi to allow for a federal Defender organization presence in the Northern District of Mississippi;
- a feasibility study for sharing the Judiciary's case management system with the State of Mississippi, and;
- the expanded use of Electronic Public Access Receipts.

Any alteration of the financial plan from that detailed in the March 14, 2007 document would be subject to prior approval of the Senate Committee on Appropriations.

Sincerely,

Richard J. Durbin
Chairman
Subcommittee on Financial Services
and General Government

Sam Brownback
Ranking Member
Subcommittee on Financial Services
and General Government

DAVID R. OBEY, WISCONSIN, CHAIRMAN
JOHN P. MURTHA, PENNSYLVANIA
NORMAN D. DICKS, WASHINGTON
ALAN B. MOLLOHAN, WEST VIRGINIA
MARCY KAPTUR, OHIO
PETER J. VISCLOSKY, INDIANA
NITA M. LOWEY, NEW YORK
JOSE E. SERRANO, NEW YORK
ROSA L. DeLAURO, CONNECTICUT
JAMES P. MORAN, VIRGINIA
JOHN W. OLVER, MASSACHUSETTS
ED PASTOR, ARIZONA
DAVID E. PRICE, NORTH CAROLINA
CHET EDWARDS, TEXAS
ROBERT E. "BUD" CRAMER, JR., ALABAMA
PATRICK J. KENNEDY, RHODE ISLAND
MAURICE D. HINCHEY, NEW YORK
LUCILLE ROYBAL-ALLARD, CALIFORNIA
SAM FARR, CALIFORNIA
JESSE L. JACKSON, JR., ILLINOIS
CAROLYN C. KILPATRICK, MICHIGAN
ALLEN BOYD, FLORIDA
CHAKA FATTAH, PENNSYLVANIA
STEVEN R. ROTHMAN, NEW JERSEY
SANFORD D. BISHOP, JR., GEORGIA
MARION BERRY, ARKANSAS
BARBARA LEE, CALIFORNIA
TOM UDALL, NEW MEXICO
ADAM SCHIFF, CALIFORNIA
MICHAEL HONDA, CALIFORNIA
BETTY McCOLLUM, MINNESOTA
STEVE ISRAEL, NEW YORK
TIM RYAN, OHIO
C.A. "DUTCH" RUPPERSBERGER, MARYLAND
BEN CHANDLER, KENTUCKY
DEBBIE WASSERMAN SCHULTZ, FLORIDA
CIRO RODRIGUEZ, TEXAS

JERRY LEWIS, CALIFORNIA
C. W. BILL YOUNG, FLORIDA
RALPH REGULA, OHIO
HAROLD ROGERS, KENTUCKY
FRANK R. WOLF, VIRGINIA
JAMES T. WALSH, NEW YORK
DAVID L. HOBSON, OHIO
JOE KNOLLENBERG, MICHIGAN
JACK KINGSTON, GEORGIA
RODNEY P. FRELINGHUYSEN, NEW JERSEY
ROGER F. WICKER, MISSISSIPPI
TODD TIAHRT, KANSAS
ZACH WAMP, TENNESSEE
TOM LATHAM, IOWA
ROBERT B. ADERHOLT, ALABAMA
JO ANN EMERSON, MISSOURI
KAY GRANGER, TEXAS
JOHN E. PETERSON, PENNSYLVANIA
VIRGIL H. GOODE, JR., VIRGINIA
JOHN T. DOOLITTLE, CALIFORNIA
RAY LaHOOD, ILLINOIS
DAVE WELDON, FLORIDA
MICHAEL K. SIMPSON, IDAHO
JOHN ABNEY CULBERSON, TEXAS
MARK STEVEN KIRK, ILLINOIS
ANDER CRENSHAW, FLORIDA
DENNIS R. REHBERG, MONTANA
JOHN R. CARTER, TEXAS
RODNEY ALEXANDER, LOUISIANA

CLERK AND STAFF DIRECTOR
ROB NABORS

TELEPHONE:
(202) 225-2771

# Congress of the United States
## House of Representatives
## Committee on Appropriations
## Washington, DC 20515-6015

May 2, 2007

Mr. James Duff
Director
Administrative Office of the U.S. Courts
One Columbus Circle NE
Washington, DC 20544

Dear Mr. Duff,

This letter is in response to the request for approval for the Judiciary's fiscal year 2007 Financial Plan, dated March 14th, 2007 in accordance with section 113 of Public Law 110-5.

We have reviewed the information included and have no objection to the financial plan including the following proposals:

- a cost of living increase for panel attorneys;
- the establishment of a branch office of the Southern District of Mississippi in the Northern District of Mississippi;
- a feasibility study for sharing the Judiciary's case management system with the state of Mississippi, and;
- the expanded use of Electronic Public Access Receipts.



# THE JUDICIARY

## Fiscal Year 2007  Financial Plans

### MARCH 14, 2007

## ELECTRONIC PUBLIC ACCESS (EPA)

### Financing ($000)

|  | FY 2006 Financial Plan | FY 2006 Actual | FY 2007 Financial Plan | Percent Change over FY 2006 Plan |
|---|---|---|---|---|
| Collections | $  49,152 | $  62,300 | $  62,120 | 26.4% |
| Prior-year Carryforward | $  14,376 | $  14,376 | $  32,200 | 124.0% |
| **Total** | $  63,528 | $  76,676 | $  94,320 | 48.5% |

### SPENDING

| ($000s) | FY 2006 Financial Plan | FY 2006 Actual | FY 2007 Financial Plan | Percent Change over FY 2006 Plan |
|---|---|---|---|---|
| EPA Program Operations | $  19,346 | $  11,560 | $  27,229 | 40.7% |
| Available to Offset Approved Public Access initiatives (e.g. CM/ECF) | $  36,807 | $  32,916 | $  41,372 | 12.4% |
| Planned Carryforward | $  7,325 | $  32,200 | $  25,719 | 251.1% |
| **Total** | $  63,528 | $  76,676 | $  94,320 | 48.5% |

The judiciary's Electronic Public Access (EPA) program provides for the development, implementation and enhancement of electronic public access systems in the federal judiciary.  The EPA program provides centralized billing, registration and technical support services for PACER (Public Access to Court Electronic Records), which facilitates Internet access to data from case files in all court types, in accordance with policies set by the Judicial Conference. The increase in fiscal year 2007 EPA program operations includes one-time costs associated with renegotiation of the Federal Telephone System (FTS) 2001 telecommunications contract.

Pursuant to congressional directives, the program is self-funded and collections are used to fund information technology initiatives in the judiciary related to public access.  Fee revenue from electronic access is deposited into the Judiciary Information Technology Fund.  Funds are used first to pay the expenses of the PACER program.  Funds collected above the level needed for the PACER program are then used to fund other initiatives related to public access.  The development, implementation, and maintenance costs for the CM/ECF project have been funded through EPA collections.  In fiscal year 2007, the judiciary plans to use $41.4 million in EPA collections to fund public access initiatives within the Salaries and Expenses financial plan including:

- CM/ECF Infrastructure and Allotments $20.6 million
- Electronic Bankruptcy Noticing $5.0 million
- Internet Gateways $8.8 million
- Courtroom Technology Allotments for Maintenance/Technology Refreshment $7.0 million (New authority requested for this item on page 46)

The fiscal year 2007 financial plan for courtroom technologies includes $7.0 million for court allotments to be funded EPA receipts to provide cyclical replacement of equipment and infrastructure maintenance.

**Via this financial plan submission, the Judiciary seeks authority to expand use of Electronic Public Access (EPA) receipts to support courtroom technology allotments for installation, cyclical replacement of equipment, and infrastructure maintenance. The Judiciary seeks this expanded authority as an appropriate use of EPA receipts to improve the ability to share case evidence with the public in the courtroom during proceedings and to share case evidence electronically through electronic public access services when it is presented electronically and becomes an electronic court record.**

## COURT OF INTERNATIONAL TRADE

The following table details the beginning balances, deposits, obligations, and carryforward balances in the JITF for the Court of International Trade for fiscal years 2006 and 2007.

| Judiciary Information Technology Fund | FY 2006 Financial Plan | FY 2006 Actual | FY 2007 Financial Plan | Percent Change over FY 2006 plan |
|---|---|---|---|---|
| Balance, Start of Year | $ 598 | $ 605 | $ 657 | 9.9% |
| Current-year Deposits | $ 0 | $ 200 | $ 0 | 0.0% |
| Obligations | $ (313) | $ (148) | $ (357) | 14.1% |
| Balance, End of Year | $ 285 | $ 657 | $ 300 | 5.3% |

The Court has been using the Judiciary Information Technology Fund to upgrade and enhance its information technology needs and infrastructure. Of the $0.7 million that carried forward into fiscal year 2007 in the Judiciary Information Technology Fund, $0.4 million is planned for obligation in the fiscal year 2007 financial plan, the remaining $0.3 million will carry forward into fiscal year 2008.

These funds will be used to continue the Court's information technology initiatives, in accordance with its long-range plan, and to support the Court's recent and future information technology growth. The Court is planning to use these funds to continue the support of its newly upgraded data network and voice connections; to pay for the recurring Virtual Private Network System (VPN) phone and cable line charges; replace the Court's CM/ECF file server; purchase computer desktop systems and laptops for the Court's new digital recording system; replace computer desktop systems, printers and laptops in accordance with the judiciary's cyclical replacement program; and upgrade and support existing software applications.

# THE JUDICIARY



## Fiscal Year 2009 Financial Plans

## MAY 28, 2009

## ELECTRONIC PUBLIC ACCESS (EPA)

**Financing ($000s)**

| Funding Sources | FY 2008 Financial Plan | FY 2008 Actuals | FY 2009 Financial Plan |
|---|---|---|---|
| Collections | $ 70,130 | $ 76,803 | $ 87,135 |
| Prior-year Carryforward | $ 44,503 | $ 44,503 | $ 40,344 |
| **Total** | $ 114,633 | $ 121,306 | $ 127,479 |

**SPENDING**

| Category ($000s) | FY 2008 Financial Plan | FY 2008 Actuals | FY 2009 Financial Plan |
|---|---|---|---|
| Obligations | $ 94,727 | $ 80,962 | $ 106,788 |
| Planned Carryforward | $ 19,906 | $ 40,344 | $ 20,691 |

The judiciary's Electronic Public Access Program (EPA) encompasses systems and services that provide the public with electronic access to federal case and court information and that provide centralized billing, registration, and technical support services through the Public Access to Court Electronic Records (PACER) Service Center. The program provides internet access to data from case files in all court types, in accordance with policies set by the Judicial Conference and congressional directives.

Pursuant to congressional directives, the EPA program is self-funded and revenues are used to fund IT projects related to public access, including costs for the Case Management /Electronic Case Files system (CM/ECF). CM/ECF is operational in 93 bankruptcy courts, 94 district courts, 10 appellate courts, the Court of International Trade and the Court of Federal Claims. CM/ECF should be fully implemented in all courts in calendar year 2009.

In fiscal year 2009, the judiciary plans to use $106.8 million in EPA collections and prior-year carryforward to fund public access initiatives including the following:

- Public Access Services and Applications $17.7 million;
- Telecommunications $8.7 million;
- EPA Equipment $1.3 million;
- CM/ECF Development, Operations and Maintenance $33.4 million;
- Courtroom Technology Allotments for Maintenance/Technology Refreshment $25.8 million;
- Electronic Bankruptcy Noticing $9.7 million;
- CM/ECF Allotments to Courts $7.5 million;
- CM/ECF state feasibility study $1.4 million;
- Violent Crime Control Act Notification $1.0 million; and
- Jury Management System Public Web Page $0.2 million.